# INTRODUCTION

At the time of his capital trial, Daniel Gwynn was a long-term cocaine addict suffering from severe mental illness and hallucinations. He had no criminal record and no prior history of violence. The jury that sentenced Mr. Gwynn to death heard no evidence about the profound effects of long-term cocaine addiction on Mr. Gwynn and no evidence about his mental impairments. The jury knew almost nothing about Mr. Gwynn's chaotic, abusive, and impoverished childhood.

The reason for the jury's ignorance is clear. The jury did not know because the lawyer who represented Mr. Gwynn did not know. The lawyer who represented Mr. Gwynn did not know because he did not look. Defense counsel's almost complete lack of preparation for either phase of his client's capital trial resulted in a defense that fell far short of the competent representation guaranteed by the Sixth Amendment.

Mr. Gwynn's case did not receive appropriate consideration in state court. His post-conviction petition was denied without an evidentiary hearing. The order denying his post-conviction petition ignored the merits of most of his serious claims. The judge rejected each of these claims in a single sentence, mistakenly believing they were procedurally barred.

Daniel Gwynn's conviction of first-degree murder and his sentence of death are the products of a pervasive breakdown of justice. Mr. Gwynn is entitled to an evidentiary hearing on his claims, and he is entitled to federal habeas corpus relief.

**JURISDICTION**

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

2.      On November 20, 1994, there was a fire at the premises of 4504-4506 Chestnut St., in Philadelphia, Pennsylvania.  The building was an abandoned apartment building, although a number of homeless people had taken residence there.  One of the residents, Marcia Smith, died in the fire after she refused to jump from a third floor window.  Five residents survived – John Antrom, Donald Minnick, Larry Hawkins, Terry McCullough and Rosalie Jones.

3.      Petitioner Daniel Gwynn was charged with the murder of Smith and the aggravated assault of Antrom, Minnick, Hawkins, McCullough and Jones.  After a jury trial, Petitioner was convicted of first degree murder, arson, and aggravated assault and sentenced to death and thirty to sixty years imprisonment in the Philadelphia County Court of Common Pleas. Petitioner was represented by trial counsel Lee Mandell.

4.      Petitioner, through appellate counsel Daniel Silverman, timely filed a direct appeal in the Pennsylvania Supreme Court.  The Pennsylvania Supreme Court affirmed on direct appeal, with one judge concurring in the judgment and two dissenting.  Commonwealth v. Gwynn, 723 A.2d 143 (Pa. 1998) ("Gwynn I").

5.      Petitioner filed a petition for writ of certiorari in the United States Supreme Court, which was denied on November 1, 1999.  Gwynn v. Pennsylvania, 528 U.S. 969 (1999).

6.      Petitioner filed a pro se Motion for Postconviction Collateral Relief in the Court of Common Pleas on November 12, 1999.  Petitioner filed a counseled Petition for Habeas Corpus Relief Pursuant to Article I, Section 14 of the Pennsylvania Constitution and Statutory

Post-Conviction Relief Under 42 Pa. C.S. § 9542 ("PCRA Petition") on May 30, 2001. The

PCRA Petition was denied without an evidentiary hearing. See Commonwealth v. Gwynn, 943

A.2d 940 (Pa. 2008) ("Gwynn II"). The Pennsylvania Supreme Court affirmed the denial of

PCRA relief on March 20, 2008. Id. Petitioner was represented during the PCRA proceedings

and on appeal by Scot Griffith.

7.     Petitioner moved in this Court for a stay of execution, *in forma pauperis* status

and appointment of counsel on October 22, 2008. This Court granted the motion and ordered

Petitioner to file a petition for writ of habeas corpus by April 22, 2009. See Gwynn v. Beard,

No. 08-cv-5061 (PBT), Order (E.D. Pa. Oct. 24, 2008).

8.     Petitioner has not previously filed a federal petition for habeas corpus relief in

this or any other court.

### STATEMENT ON EXHAUSTION

9.     Petitioner's claims were fairly presented in state court and are exhausted.

10.    Petitioner submits that any state court procedural bars are not adequate and

independent and, therefore, do not bar this Court from reviewing the merits of his claims.

Alternatively, Petitioner submits that he can satisfy the requirements of cause and prejudice, or

demonstrate a miscarriage of justice, as to any such claim.

11.    Because exhaustion and procedural default are affirmative defenses for the

Commonwealth, Petitioner reserves his right to respond to any such arguments the

Commonwealth may assert.

12.    Petitioner submits that, if this Court determines this Petition contains unexhausted

claims, the interests of justice require this Court to stay and abey federal proceedings rather than

dismissing the petition without prejudice.  See <u>Rhines v. Weber</u>, 544 U.S. 269 (2005).

<div align="center">**GROUNDS FOR RELIEF**</div>

13.     By his Petition for a Writ of Habeas Corpus, Petitioner asserts that his convictions and sentences violate the Fifth, Sixth, Eighth and Fourteenth Amendments, and should be vacated for each of the reasons set forth herein.

14.     To the extent the state court rendered decisions on the merits of the claims within the meaning of 28 U.S.C. § 2254(d), Petitioner submits that those decisions are contrary to, and/or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and/or were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.[1]

<div align="center">**CLAIMS FOR RELIEF**</div>

**I.      COUNSEL WAS INEFFECTIVE AT THE PENALTY PHASE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT MITIGATING EVIDENCE OF PETITIONER'S ABUSIVE CHILDHOOD, MENTAL HEALTH IMPAIRMENTS AND HISTORY OF SUBSTANCE ABUSE, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

15.     All other allegations, facts and claims contained in this Petition, its attachments and the other submissions made in this litigation are incorporated as if fully set forth herein.

16.     Trial counsel violated Mr. Gwynn's right to the effective assistance of counsel at his capital sentencing hearing as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution by failing to investigate and present during the penalty phase the readily available evidence of Mr. Gwynn's pervasive, long-standing crack-cocaine abuse, history of abandonment, child abuse, post-traumatic stress disorder, borderline personality disorder,

---

[1] As noted, there were no state court post-conviction evidentiary proceedings.

<div align="center">4</div>

depression, and domestic violence.

### Daniel Gwynn Is Not The "Worst of the Worst" and Does Not Deserve Death

17.     Daniel Gwynn does not deserve to die.  While convicted of a terrible crime, he is not deserving of death.  If trial counsel had done his job, the jury would have learned that even in the throes of his crack-cocaine abuse, Daniel Gwynn was never violent. He was never assaultive.  Nor did he have a history – juvenile or adult – of violent behavior.  In fact, had trial counsel thoroughly investigated Daniel Gwynn's life, he would have been able to tell the jury a compelling story of abuse, neglect, abandonment, and the psychological horrors that accompany such an upbringing.

18.     Instead, trial counsel completely failed to prepare for the penalty phase of Mr. Gwynn's trial.  He did not interview Mr. Gwynn's family and friends about his client's background.  He did not seek vital records for his client, such as school, hospital and prison records.  He failed to have Mr. Gwynn evaluated by mental health professionals, despite the obvious indications of his client's emotional distress and impairments.

19.     All trial counsel did was to put his completely unprepared client and his client's family and friends on the stand with instructions to beg for Mr. Gwynn's life.  He never explained what mitigating evidence was, or its significance, to his client or Mr. Gwynn's family and friends.  He never asked his client or the other penalty phase witnesses what kind of information they could provide.  In fact, he never asked any of them to testify until after the guilty verdict was returned.  As a result, trial counsel presented only a hollow, misleading shell of the abundant mitigation that was available.

20.     As a result, the jury never heard any of the readily available, compelling evidence

that would have shown Daniel for what he was: a damaged, psychologically scarred individual who used drugs (as so many abused and neglected children do as adults), to hide from and mask the pain that permeated his daily existence.  He is not a street thug.  He is not a terrible individual. Even the jury found that he did not have a significant criminal history. Indeed, had trial counsel done his job, the jury would have learned that there is more to a person than the worst thing they have ever done. They would have learned about Daniel Gwynn.  They did not.

**A.      Life History Mitigation Not Investigated or Presented by Trial Counsel**

21.      Trial counsel conducted no investigation of Mr. Gwynn's life history.  Had he interviewed the numerous friends and family members who were willing to provide information about Mr. Gwynn's upbringing and background, he would have discovered a wealth of mitigation to present to the jury.

**Evidence of Family Dysfunction, Abuse and Neglect**

22.      Daniel Gwynn was raised in what can only be described as an unstable and chaotic household.  His mother, Teresa Cook, became pregnant with Daniel at age fifteen.  At the time, she was a high school student who lived with her parents.  She gave birth to Daniel on January 12, 1970 in Philadelphia, PA.  He was the only child born to Teresa Cook and Richard Lee, who were never married.  Lee soon abandoned Daniel and his mother, but not before leaving behind a legacy of abuse and violence that permeated the rest of Daniel's live.

23.      Richard Lee was an absentee father and had virtually nothing to do with his son's upbringing.  In fact, shortly after Daniel's birth, he and Teresa ended their relationship.  At the time, he had also fathered a child with Teresa's best friend, Sharon Wright. Abandoning Daniel and his mother, he eventually moved in with Sharon.

24.     Teresa struggled as a young single parent.  She continued to live with her parents, and eventually dropped out of school in order to try to support her child.  She and Daniel lived in a cramped three bedroom house with her parents, her two sisters (Jeanette McDaniel and Joyce Gwynn) and the sisters' children (Michelle Dotson, Michael Dotson, Joyce Mills, and Raymond Mills). Two years after Daniel was born, Teresa's father passed away, and the family's financial condition deteriorated drastically.  It was difficult for the family to make ends meet, and life in the Gwynn home became even more chaotic and unpredictable. One of Daniel's cousins described the situation as follows:

> We all lived in three bedrooms with our mothers being in and out as well as the men in their lives from time to time.  Although our grandmother tried to maintain order, it was very chaotic there.

Affidavit of Michelle Dotson, ¶ 1 (attached hereto).

25.     Daniel's mother had a series of relationships, including two which resulted in the births of his siblings.  After having her third child, Regina Cook, Teresa moved in with Regina's father, Eugene Cook.

26.     Eugene Cook was a violent alcoholic and drug abuser who mercilessly beat both Teresa and her children, especially Daniel.  Daniel's sister, Regina states that:

> My father was . . . an alcoholic and heroin addict who died from an overdose when I was only eight years old.  I have no memory of him living with us but mother told me that he used to beat both her and Danny when she was pregnant with me.  His severe beatings of Danny were one of the reasons that mother left Danny, and eventually Darren also, with our grandmother.

Affidavit of Regina Cook, ¶ 2 (attached hereto).

27.     Other family members also noted the violence that plagued the Gwynn household. Indeed, Daniel's aunt, Jeanette McDaniel, recalls that:

7

> Teresa moved in with Regina's father, Eugene Cook, for a time.  He was
> an alcoholic who beat Teresa and the children.  Danny, although exposed
> to Cook only during brief visits, did not do well with him, resented and
> abused both verbally and physically by his stepfather.

Affidavit of Jeanette McDaniel, ¶ 3 (attached hereto).

28.     Daniel's cousin, Michelle Dotson, was witness to one incident of violence

involving Eugene Lee, Teresa and Danny.  She told of:

> a severe beating which he took at the hands of Eugene Cook, his
> stepfather.  We were visiting Teresa at her apartment at 55th and
> Landowne when Mr. Cook, Regina's father, while drunk, dragged Teresa
> down the steps during an argument.  Danny tried to stop him and Mr.
> Cook stopped hitting Teresa and hit Danny several times with his fists.
> Danny had a black eye and a split lip as a result.  I remember him being
> very frightened,  We were about nine and ten years old at the time.  That
> was the only time I saw Danny become physical with anyone.

Affidavit of Michelle Dotson, ¶ 3(attached hereto).

29.     When Daniel was age ten, his mother and Eugene Cook moved to South Carolina,

taking Regina and Darren with them.  Daniel was left behind at his grandmother's house.  His

ailing grandmother and his Aunt Jeanette assumed full responsibility for raising him.  Daniel was

devastated by his mother's desertion of him and never fully understood why she left him but

took his siblings with her.

30.     The disciplinarian at Daniel's grandmother's house was his aunt, Jeanette.

Daniel's cousin, Joyce Mills, recalls that Jeanette harshly disciplined him, doling out beatings

"with any household thing which was handy."   Affidavit of Joyce Mills, ¶ 3 (attached hereto).

Daniel was also subjected to the psychologically abusive rants of his Aunt Joyce, who:

> has been hospitalized over the years for what was called a nervous
> condition.  We later learned that she is an alcoholic who has psychotic
> episodes where she shakes violently . . . her bizarre outbursts were
> unprovoked and unpredictable.  They especially took a toll on Danny.

Quiet anyway, he seemed to withdraw more after her rants and ravings.

Id. at ¶ 4.

31.     Daniel's early abandonment by his father Richard Lee was exacerbated by the minimal contact he had with him growing up, even though Lee lived in the same neighborhood with his "other" family.  Lee would make promises to a young Daniel of time together and then, without warning, not show up or keep his promises. The near total absence of Daniel's father in his life, as well as the many broken promises that he made to his son on the few occasions that he paid attention to him deeply affected him from a very early age.  Jeanette remembers the devastation such broken promises, coupled with his father's abandonment, caused Daniel:

> [a]lthough Richard Lee remained in the neighborhood, he never was involved in Danny's life in any positive way.  On those occasions where he would see Danny, he frequently made promises to him which he would not keep.  Danny often said that he wished he had a real father.  His own father did not keep his promises even though Danny only wanted to spend time with him.  His father would not show up after promising to do so and Danny was very disappointed and hurt by it.

Affidavit of Jeanette McDaniel, ¶ 4 (attached hereto).

32.     Similarly, his cousin Joyce Mills stated that "[t]he absence of a father in Danny's life gnawed at him." Affidavit of Regina Cook, ¶ 2 (attached hereto).  Indeed, Daniel confided in his cousin Michelle, that he:

> longed for a father, as we all did to some extent.  Not having one directly involved in his life seemed to bother Danny more than the rest of us because his father lived around the corner, made promises which he did not keep and sometimes ignored Danny when he saw him on the street.  Danny was very gullible, hoping against hope, despite the repeated disappointment. Danny was very sensitive and withdrew as a child.

Affidavit of Michelle Dotson, ¶ 2 (attached hereto).

33.     Richard Lee himself admits to being an absentee father to his son, and

acknowledges the terrible impact this had on Daniel:

> My efforts on my son's behalf were far too little and too late. Although I tried over the years I was never there for him. I could tell when he was growing up that he felt left out and needed me much more than I was able to give...he needed his father to set an example for him and to be there for him and I could not. He never got in my face for abandoning him, bit his early behavior, the acting out, clearly was an attempt to get my attention. Unfortunately by the time I realized that, the damage had been done.

Affidavit of Richard Lee, ¶ 6 (attached hereto).

34.     Eventually, Teresa returned from South Carolina, and the relationship with Eugene Cook ended shortly thereafter. A string of paramours followed, none of which were better suited at parenting than Richard Lee or Eugene Cook. They made little effort with any of the children. Regina remembers that "Danny, Darren and I were never made to feel comfortable. I think they resented that we were evidence of our mother's other relationships." Affidavit of Regina Cook, ¶ 3 (attached hereto). Worse, even after her return to Philadelphia, Daniel's mother did not want him back and he remained at his grandmother's house.

35.     None of this evidence was presented to the jury.

### Daniel's History of Drug and Alcohol Abuse

36.     Abandoned and neglected by both parents, subjected to regular beatings by his aunt, and living away from his mother and siblings, Daniel began to exhibit negative and self destructive behavior. His first of several suicide attempts happened at age twelve, when he slashed his wrists. That same year, he began his descent into substance abuse, starting with marijuana and alcohol. By his early teenage years, he was smoking marijuana, drinking alcohol, skipping school and hanging out with a "rough" crowd. At age fiftenn he was snorting cocaine on a daily basis. His grades deteriorated and he became a chronic truant, as evidenced by school

records. His absenteeism soared, reaching a high of 115 absences in 1985. <u>See</u> School Records (attached hereto). With no encouragement at home and no adult guidance, he finally quit school in 1987. <u>Id.</u>

37. While still a young teenager, Daniel Gwynn had become a chronic crack cocaine and alcohol abuser. He used crack cocaine every day, and mixed this with corn liquor, rum and vodka at least several times a week. His father, by then also a crack cocaine user, had first-hand knowledge of his son's downward spiral – not because he was a concerned and involved parent, but rather because they frequented the same crack houses:

> I was familiar with what he was getting into because I had used drugs myself . . . I heard of his use through some of my suppliers. I would see him from time to time at crack houses.

Affidavit of Richard Lee, ¶ 4 (attached hereto).

38. When Daniel turned nineteen, his mother died after a battle with cervical cancer. He took his mother's death very hard, and at that point his drug use spiralled completely out of control. He began to steal regularly to support his drug use. He stopped grooming, and became unkempt. According to his father, "[h]is mother's sickness and death [ ] affected Danny greatly and only drove him deeper into addiction." <u>Id.</u> at ¶ 5. Jeanette McDaniel remembers that:

> After Teresa's death Danny was even more devastated. His appearance changed dramatically. He was dirty, gaunt and disappeared for days at a time. On a daily basis, his crack cocaine addiction was at approximately $100 a day He was constantly stealing from family, neighbors and friends to support his habit and, as a result, was frequently beaten by those who tired of his thefts.

Affidavit of Jeannette McDaniel, ¶ 6 (attached hereto). Daniel's cousin Raymond tried to reach out to Daniel about his drug abuse, but to no avail:

> He took his mother's death very hard and seemed to give up. I would try

> talking to him about his problem but he always insisted that he had it
> under control.  He was very gullible and easily persuaded while high, not
> at all in control.  His addiction was the worst thing about Danny.

Affidavit of Raymond Mills, ¶ 4 (attached hereto).

39.     None of this evidence was presented to the jury.

**B.      Mental Health Mitigation Not Investigated or Presented by Trial Counsel**

40.     Given Mr. Gwynn's history of childhood neglect and abuse, and his personal history of drug and alcohol abuse, it was incumbent upon trial counsel to have Daniel evaluated for the presence of mental illness.  As with all other aspects of the investigation of Mr. Gwynn's case, trial counsel ineffectively failed to investigate and develop mental health mitigating evidence.

**Psychological and Cognitive Impact of Childhood Abuse Endured By Mr. Gwynn**

41.     Children raised in an environment of abuse and neglect such as Daniel suffer life-long debilitating psychological problems.  Trial counsel failed to conduct any investigation whatsoever into the impact that Daniel's violent upbringing had on his mental state, or its connection to his subsequent crack-cocaine and alcohol abuse.  This is information that the sentencing jury should have had before it when deciding whether to spare Daniel's life or condemn him to die.

42.     The available psychiatric/psychological literature, as well as case law, uniformly document the fact that children who endure dysfunctional, abusive or neglect-filled childhoods such as Daniel will be psychologically impaired.

43.      As abused children become adults, they cannot trust; they develop paranoia, suspiciousness, difficulties with interpersonal relationships and self image problems; they have

poor judgement, depression and panic attacks; and they have difficulty understanding their place in the world.  Helfer & Kempe, THE BATTERED CHILD, Chapters 9-10, 17-20 (4th ed. University of Chicago Press); Kaplan & Sadock, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY, 1365-67 (5th ed.) (schizoid and paranoid disorders have direct correlations to childhood abuse); id. at 1964-66 (childhood abuse results in cognitive and developmental impairment; post-traumatic stress disorder; pathological object relationships; primitive defense mechanisms; impaired impulse control; poor self-concept and depression; masochistic and self-destructive behavior; difficulties in school adjustment; and central nervous system impairment). Had trial counsel bothered to have Daniel evaluated by a mental health professional, he would have been able to present this information to the jury that sentenced Daniel to death.

44.    Indeed, this knowledge was readily available at the time of Daniel's trial. Because trial counsel made no effort at investigating the psychological ramifications of abuse, the jury never learned that child abuse causes a constellation of psychiatric deficits, including cognitive and development impairment, impaired impulse control, poor self-concept and depression, masochistic and self destructive behavior, and difficulties in school adjustment. COMPREHENSIVE TEXTBOOK OF PSYCHIATRY, 1965 (5th ed.).

45.    As abused, neglected children grow into young adulthood, they may never have learned to adequately recognize, verbally express, and cope with their own emotions.  They may be prey to difficulties in impulse control.  They may not have learned how to use their cognitive skills in solving life problems nor how to trust anyone enough to ask for advice.  THE BATTERED CHILD at 376-77. A mental health professional would have been able to explain to the jury that Daniel's actions and behaviors through his teenage years through the time of the offense were

reflective of these types of deficits and consistent with his abusive upbringing.

46.   Moreover, because of trial counsel's failure to consult with a mental health

professional, the jury also never learned that:

> While abuse and neglect have short-term effects which are visible physically, the long-term developmental effects, which may not be apparent until adolescence or adulthood, are often worse.  The following are particularly significant examples:
>
>> limited ability of the victim to relate to others;
>>
>> social isolation with superficial, yet dependent, and unstable relationships;
>>
>> poor self-esteem;
>>
>> fear of failure and unwillingness to try which all add up to problems which can lead to failure;
>>
>> developmental delays and difficulties in cognitive learning; and
>>
>> limited ability to cope with the ordinary problem solving needed for daily living.

THE BATTERED CHILD at 362.

47.   Additionally, the jury was unaware of the scientific correlation between victims

of parental abuse and future violent behavior:

> The identification with parental violence as a life-style may lead to social "misfits" who are hostile and unable to get along with anyone or to delinquency and sometimes violent criminal activity . . . Studies of delinquency . . . have shown . . . that abuse and violence within the family had occurred in 88 percent of the delinquents who committed murder (as opposed to 58 percent in "ordinary" delinquents.).

THE BATTERED CHILD at 362.  None of these facts were presented to the jury that sentenced

Daniel Gwynn to death.

## Daniel Gwynn's Profound Mental Illness

48.   Because trial counsel did not consult with, or have Daniel evaluated by, a mental

14

health professional, the jury never learned that at the time of the offense, Daniel suffered from depression, borderline personality disorder, psycho-substance abuse disorder, and post-traumatic stress disorder.[2]

### i. **Borderline Personality Disorder**

49. Borderline personality disorder and depression are serious mental illnesses. Individuals with borderline personality disorder exhibit a "pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that begins by early adulthood and is present in a variety of contexts." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL HEALTH DISORDER, 650 (4th ed, 1999). They are:

> severely dysfunctional...In the absence of a relationship, disassociative episodes, substance abuse, and desperate impulsive behavior can occur...Stressful experiences — often the absence of a relationship or an external structure — can result in a variety of transient, psychotic like cognitive and perceptual distortions, such as a feeling of not existing, disassociative experiences, ideas of reference, hypnogogic phenomena, and unrealistic accusations of mistreatment...Repetitive suicide threats, gestures and attempts are common and often bring these persons into treatment...such self-destructive acts are usually precipitated by threats of separation from others, by rejection...the acts may also occur during disassociated states, when self-mutilation may help the person feel real while also expiating feelings of badness.

KAPLAN & SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHOLOGY, 1440 (6th ed., 1995).

50. Individuals with borderline personality disorder suffer from symptoms that include delusions and hallucinations, and may also exhibit some thinking disturbances. Id.

51. Based upon his comprehensive evaluation of Mr. Gwynn, Dr. Dougherty

---

[2] On July 19-20, 2000, Petitioner was evaluated by Dr. Jay Jackman, a forensic psychiatrist. He was also examined on April 11, 2001, by Dr. Edward Dougherty, a forensic psychologist.

concluded that he suffers from the debilitating impact of borderline personality disorder:

> The combination of these disorders is considered a severe mental health condition. Mr. Gwynn's Borderline Personality Disorder is a previous pattern of instability of interpersonal relationships, self-image and affects and marked impulsivity. Mr. Gwynn, when faced with real or imagined abandonment, experiences profound changes in his affect, cognition and his behavior. <u>It is noted that under extreme stress he is likely to become paranoid and disassociate. In this state his ability to act purposefully is impaired</u>.

Affidavit of Dr. Edward J. Dougherty at 12 (attached hereto). Again, the jury heard none of this evidence.

### ii. <u>Depression</u>

52.     Likewise, the jury was unaware that depression also beset Mr. Gwynn. Untreated depression is extremely debilitating. The psychiatric/psychological literature is very clear: depression grossly impairs and undermines judgment and the capacity for rational decision making. One who suffers with such depression views himself and everything around him in an extremely negative light. The sufferer makes self-accusations which are typically unjustified and/or blown out of proportion. Furthermore, the severely depressed person experiences feelings of and/or morbid preoccupation with worthlessness; excessive, inappropriate and often delusional guilt; and recurrent thoughts of death. Furthermore, psychotic symptoms are not uncommon. Depressed persons often have fleeting auditory hallucinations with extremely unpleasant content along the lines of their delusions. Suicidal ideation is quite common among those who suffer from depression. Significantly, this suicidal intent may be expressed in both direct and indirect ways – both active attempts to take one's life and passive facilitation of one's

death are common.[3]

53.     Indeed, Mr. Gwynn attempted to commit suicide on a number of occasions, the first attempt being when he was approximately twelve years old.  At the time, he tried to slit his wrists: he still bears the scars from that attempt.  Over the years, he continued his suicide attempts.

54.     Because trial counsel failed to have Mr. Gwynn evaluated by a mental health professional, the jury was unaware that he suffered from numerous psychotic features and delusional thinking associated with both depression and borderline personality disorder:

> A number of aspects of Mr. Gwynn's self-description suggest that he experiences unusual perceptual sensory events (perhaps including full-blown hallucinations) as well as unusual ideas that may include magical thinking or delusional beliefs. His thought processes are marked by confusion, distractability, and difficulties in concentration.  He experiences his thoughts as blocked withdrawn or somehow influenced by others.

Affidavit of Dr. Edward J. Dougherty at 8 (attached hereto).

### Psychiatric/Psychological Impact of Crack-Cocaine Abuse

55.     As stated earlier, Mr. Gwynn has a long history of chronic drug abuse.  He began his drug use when he was in sixth grade, smoking marijuana.  By ninth grade he was using cocaine, and by the time he turned sixteen he was using crack cocaine on a daily basis.  His crack cocaine addiction was severe and long-lasting, spanning many years prior to the offense at hand.

56.     Trial counsel clearly knew Mr. Gwynn was a crack addict.  Indeed, voluntary

_____

[3] See, e.g., KAPLAN & SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY (6th Ed.).

intoxication was the only substantive defense presented on Mr. Gwynn's behalf during the guilt phase of his trial. Nonetheless, trial counsel failed to present to the jury just what it means from a psychiatric standpoint to be a "crack addict."

57. At and around the time of the offense, Mr. Gwynn reported the following psychiatric and cognitive symptomology:

- <u>Mr. Gwynn suffered from both auditory and visual hallucinations</u> while under the influence of crack-cocaine (he would hear things and sometimes see things that were not there);

- <u>Mr. Gwynn became excessively paranoid</u> while under the influence of crack-cocaine and regularly felt "people were watching him" and "people were coming to get him";

- Mr. Gwynn reports that while under the influence of crack cocaine, <u>he believed that he "had special powers"</u> and could tell just by looking at a car whether or not it contained valuables to steal;

- <u>Mr. Gwynn would hear "voices"</u> while under the influence of crack-cocaine;

- Mr. Gwynn became "jumpy" and <u>his judgment was impaired</u> while under the influence of crack-cocaine.

<u>See</u> Affidavit of Dr. Jay Jackman (attached hereto).

58. Indeed, cocaine intoxication, cocaine dependence, and cocaine abuse are all recognized psychiatric disorders. <u>See</u> DSM IV, Sections 304.20 (Cocaine Dependence); 305.60 (Cocaine Abuse); and 292.89 (Cocaine Intoxication).

59. Consulting the DSM IV, trial counsel would have learned that the essential feature of cocaine intoxication "[i]s the presence of clinically significant maladaptive behavior or psychological changes that develop during, or shortly after, use of cocaine." DSM IV, at 223.

60. Chronic crack cocaine abuse such as that exhibited by Petitioner leads to memory loss, irritability, impaired judgement, memory impairment, impaired perception, paranoia,

changes in sociability, hypervigilance, interpersonal sensitivity, anxiety, tension, anger, impaired

social and occupation al functioning, a delusional state, emotional lability, rambling speech,

paranoid ideation, hallucinations and headaches.  Crack cocaine abuse also causes mood changes

such as depression, suicidal ideation and disturbances in attention and concentration.[4]

 61. None of this information was presented to the jury that sentenced Mr. Gwynn to

death.

### iii. Indicia of Post-Traumatic Stress Disorder Not Investigated By Trial Counsel

 62. As a result of Mr. Gwynn's traumatic and violent upbringing, he also suffers from

many of the symptoms of post-traumatic stress disorder.  According to Dr. Jay Jackman,

> Mr. Gwynn exhibits many of the symptoms of Post Traumatic Stress
> Disorder ("PTSD"), as a result of his traumatic and dysfunctional
> childhood.  PTSD is a severe mental and emotional impairment.  The
> symptoms of PTSD include hypervigilance; depression; difficulty
> concentrating; sudden outbursts of panic or anger; sleep disruption and
> recurring nightmares; flashbacks; feelings of detachment and
> estrangement from others; social isolation; restricted affect; inability to
> experience love or warmth; paranoia; suspiciousness; memory problems;
> and inability to experience pleasure in life. PTSD sufferers often have
> little insight into the nature or source of their problems.

Affidavit of Dr. Jay M. Jackman (attached hereto).

 63. PTSD is well-recognized as one of the debilitating effects of abuse:

> **Post-traumatic stress disorder**:  Many abused children become
> overwhelmed by the frightening psychological and physical assault, which
> they perceive as a danger to their psychological integrity.  They
> experience severe panic, helplessness, and fear of annihilation, with
> nightmares, sleep disturbances, and regressive behavior.  They exhibit a
> striking tendency to reenact the traumatic situation, in overt behavior and
> symbolically, in fantasy, play, and drawing.  They exhibit an
> intensification of symptoms during exposure to events that symbolize or

---

[4]See Affidavit of Dr. Jay M. Jackman (attached hereto).

resemble the abusive situation.  Reenactment of the trauma may be
regarded as a defensive reaction that permits the abused child actively to
master and control a trauma that might otherwise be initiated by the
environment and without warning.

COMPREHENSIVE TEXTBOOK OF PSYCHIATRY, 1965 (5th ed.).

64.     Petitioner's experts have concluded that the mental and cognitive deficits and

substance abuse outlined above constitute an extreme emotional disturbance and substantially

impaired his capacity to appreciate the criminality of his conduct and to conform his conduct to

the requirements of the law.

65.     Because trial counsel failed to investigate Mr. Gwynn's background, and failed to

have him evaluated by a mental health professional in preparation for the penalty phase, none of

this evidence was presented to the jury that sentenced him to death.

**C.      Trial Counsel Failed to Prepare Witnesses for their Penalty Phase Testimony**

66.     Counsel for Mr. Gwynn interviewed witnesses who testified at the penalty phase

of Petitioner's trial. They recalled being told by trial counsel that the chances of Petitioner being

sentenced to death were minimal.  As a result, they were surprised when they were told

immediately after the guilt phase verdict that they were to testify, and they were ill prepared to

do so.  None of them had any understanding of what mitigation was.

67.     Mr. Gwynn's father, Richard Lee, remembers initiating contact with Petitioner's

lawyer, prior to the trial and later convening a meeting of Petitioner's other family members:

Present were Beatrice Gwynn, Danny's maternal grandmother who had
raised him, Jeanette McDaniel, her children, Danny's half siblings, Regina
and Darren and I.  Mr. Mandell was very uncomfortable and seemed in a
hurry to leave.  He was looking around the neighborhood suspiciously as
he arrived and was not at ease, even though we welcomed him and tried to
make him comfortable.  He spent less than an hour, between 15 and 45
minutes, with us as a group.  He explained that although the prosecutor

was seeking the death penalty, he doubted that Danny would get it because the evidence did not warrant it. He tried to reassure us that although Danny might have to serve some time in jail because of the confession, he would not get the death penalty.

Mr. Mandell never told us what he expected of us, he never met with us individually, he never explained what mitigation was nor suggested that he might want us to testify. He never asked any questions about Danny, his personality, his childhood, his teenage years nor his addiction. I did not understand the importance of my childhood as it had effected my ability to be a better father to my son. Nor was it explained to any of us at that brief group meeting, what information about Danny's upbringing might be important.

Mr. Mandell had seemed very uncomfortable with us and left in a hurry with an eye on the Pitbull in the next door driveway. I would have been willing to testify about his family history had he asked me to do so or explained the importance of it. As it was, he called the four or five of us who had sat through the trial as witnesses without further preparation on the day of the sentencing hearing. He told us only to ask the jury to spare Danny's life because he had been a good son, brother, nephew or grandson. In hindsight, the way we were asked to testify actually may have hurt Danny in the eyes of the jury but we did not know any better. We did what Mr. Mandell asked us to do.

Affidavit of Richard Lee, ¶¶ 6-8 (attached hereto).

68.     Mr. Gwynn's sister, Regina Cook, similarly remembers that:

I never met my brother's lawyer, Lee Mandell, until just before the trial. My aunt, Jeannette McDaniel, with whom I lived at the time, asked me to be present for a meeting with him. I remember that we all waited for Mr. Mandell in our living room. He was late. Danny's father, Richard Lee, my aunt, Jeannette, my grandmother, Beatrice Gwynn, my brother, Darren and some of my cousins were present. Mr. Mandell finally arrived and told us that he could not stay long. He seemed anxious, nervously shifting his weight from foot to foot, fidgeting and looking around over his shoulder like he was expecting something bad to happen.

Mr. Mandell told us that he did not think that Danny would get the death penalty. He explained to us that because Danny had made a confession, he probably would have to go to prison. He was in a hurry to leave and did after only a few minutes.

I attended Danny's trial. I remember being shocked and hurt when the verdict against Danny was returned. Despite what Mr. Mandell had told us about Danny not getting the death penalty, he was now facing that very thing as a result of the guilty verdict. After the jury found him guilty, Mr. Mandell took us into a small room and told us that he would next put each of us on the stand to ask the jury to spare Danny's life.

I was only a teenager at the time and remember being frightened, both because I had to testify and did not know what to expect, and also because I was afraid for my brother.

I look back now and realize that I was not at all prepared to testify. I simply did not know what to say, or what if anything I should be sharing with the jury about Danny's upbringing. Had Mr. Mandell asked, I would have told him and the jury everything that I knew. However, he never explained the purpose of the sentencing hearing beyond telling us to beg for Danny's life. He never told us anything about mitigation, the possibility of a sentencing hearing or what it meant to Danny's case. There was no preparation, no questions asked or answered and no explanation of what we could say beyond asking for his life. In fact, Mr. Mandell never asked us anything about Danny. Mr. Mandell never talked with us about what we knew about the case. He never talked with us individually. He never told us that we might have to testify. No investigator ever contacted us before or during the trial.

Affidavit of Regina Cook, ¶¶ 2-6 (attached hereto).

69.     Mr. Gwynn's traumatic life history constitutes substantial mitigation in and of itself, and counsel was ineffective for failing to investigate, develop and present that evidence. Additionally, the above-described life-history information, which comes from Mr. Gwynn's records and the accounts of people who knew him and his history, is information that counsel should have provided to a mental health expert in order to obtain a full and reliable mental health evaluation for capital sentencing.

70.     Counsel's failure to conduct an adequate investigation, obtain readily accessible records and interview available witnesses, resulted in his failure to adequately prepare for the sentencing phase of the trial. Counsel had at his disposal family members who were willing to

discuss all aspects of Mr. Gwynn's life. Counsel could have easily obtained school records that documented a decline in Petitioner's performance, his truancy and subsequent withdrawal from school. Counsel could have, but did not, obtain prison records that documented his drug and alcohol abuse, suicide attempts and diagnosis of depression.[5] Consequently, significant and compelling mitigation was not presented to the jury.

71.     In short, as a result of counsel's deficient performance, only a minute part of the story was presented. No expert was retained to explain Mr. Gwynn's severe alcohol abuse and the impact it had on his existing significant mental illnesses. The lay witness testimony that was presented therefore actually became aggravating, because no one was not able to draw the necessary connections between Mr. Gwynn's background, abuse, neglect, drug and alcohol abuse and mental health deficiencies.

### D.     Mr. Gwynn Was Prejudiced by Trial Counsel's Failures

72.     Prejudice here is clear. Effective trial counsel would have investigated, developed

and presented the substantial mitigation set forth above. Trial counsel was anything but effective, and this compelling mitigation was never presented to the jury that would sentence Mr.

---

[5] See, e.g., Prison Health Services Receiving Screening Records, attached hereto, dated 6/9/94 and 6/10/94. Among the data documented in these records is the following: "Last [Suicide] attempt x 3 years ago - slit wrists - denies current thoughts." "Daily" drug use. "Cocaine and marijuana". "Daily" alcohol use. Corn Liquor/Vodka/Rum. "Street Drugs: Crack every day 1 hr. 8 yrs." "$100/day." Hahnemann University Correctional Mental Health Services Program Records dated 12/2/94 include the following diagnoses: "Adjustment Disorder. Depressed Mood. Crack abuse x 9 years. Anxiety Reaction. High Stress Situation." (Sinequan was prescribed for his depression.) Progress Notes dated 5/30/95 include the following: "Pt. Wants to see psychiatrist...Suicidal ideation." Sick call requests reveal that Mr. Gwynn asked to see a psychiatrist on several occasions.

Gwynn to death.

73.     Effective counsel would have presented mitigating evidence, from documentary records and people familiar with Mr. Gwynn's life, showing that Mr. Gwynn's childhood was cruelly marred by abuse and trauma and that Mr. Gwynn was suffering from mental and emotional impairments.

74.     The background information is substantial, compelling mitigating evidence. Moreover, this history – e.g., childhood trauma, extreme polysubstance abuse and mental health impairments – makes obvious that substantial mental health-related mitigation could have been presented by counsel at the time of sentencing.  Mr. Gwynn suffers and suffered at the time of the offense from serious and debilitating mental health impairments.

75.     A mental health expert would have explained to the jury that Mr. Gwynn suffers, and suffered at the time of the offense, from borderline personality disorder, depression, polysubstance abuse and the indicia of post-traumatic stress disorder, and would have described the debilitating effects of these.  Mr. Gwynn  was suffering from all of these problems at the time of the offense, and they provide substantial mental health-related mitigation.

76.     A mental health expert in possession of this information would also have explained to the jury the ramifications of chronic substance abuse. S/he would have explained that Mr. Gwynn's drug and alcohol dependency and use interacted with his other deficits and left him with severe mental health impairments.  Mr. Gwynn suffered from all of these problems at the time of the instant offense, and they provide even more mental health-related mitigating evidence.

77.     In short, effective counsel could have presented overwhelming mitigating

evidence establishing multiple mitigating circumstances under 42 Pa. C.S. § 9711(e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance"), (e)(3) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired") and additional mitigating factors under (e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").

78.     Here, however, trial counsel presented the testimony of unprepared family members and family friends who knew only of Mr. Gwynnr's crack-cocaine addiction and its impact on his behavior: he stole everything he could to support his drug habit. They also told the jury that up until he began using crack-cocaine, he was a "good boy" and never got into trouble. The only other bit of family history that even hinted at a darker side to his family history was testimony that he lived with his grandmother while his mother lived for a while in South Carolina.

79.     Indeed, the gist of the alleged mitigation evidence presented by counsel consisted of statements such as that Mr. Gwynn: "[w]as starting to stink a lot...starting to stink and not dressing – wearing [sic] leaving the same stuff on"; that he hung out with a "rough" crowd; that he began to steal things; that he became "secretive"; that he lied all the time; that he was "sneaky" and "conniving." See N.T. 11/06/95 at 25-26, 50, 55-56, 61-62.

80.     Clearly, this was far from mitigating. Rather, it painted a very unsympathetic picture of a man the jury just found guilty of first degree murder. Indeed, absent expert testimony to put into context the ugly behaviors being described by family members and friends, the jury was left with nothing upon which predicate a sentence other than death, which it did

after deliberating for less than an hour and a half.

81.     Compounding this harm was trial counsel's decision to have Mr. Gwynn testify at his sentencing hearing totally unprepared.  Like the other lay witnesses who testified, trial counsel failed to explain to Mr. Gwynn what type of evidence constitutes mitigation under Pennsylvania law, and failed to incorporate Mr. Gwynn's testimony into trial counsel's non-existent theory of for defending Mr. Gwynn during the penalty phase. Other than to digress about the evils of drugs, Mr. Gwynn conveyed nothing to the jury that was mitigating. In fact, his testimony was rambling and incoherent.[6]

---

[6] For example:

You can look out here in the street and you see so many different people, you think just because they walking around here with a nice little job that they not on drugs or something.  You know.  I've been sitting up in crack houses and I've seen people come in there, they got business, and they got all this, they got money, they got a family, but they want crack.  Why? You know.

I still couldn't understand sometimes why I wanted it.  But once you start you just don't want to stop it, you know.  It's like — it's a never ending story.  Once you take that first hit, bam, you're out there, you [sic]flying.  You [sic] like a cloud jumping off a building, you know, with no parachute, and you just feel the breeze coming through you, you know.  It's like exciting at the time.  And then when you [sic] coming down you start feeling scared and paranoid like somebody's watching you, like the eyes have walls and all these type things [sic], you know, and it's really scarey [sic] feeling when you're coming down, so you start getting this feeling in your stomach, you know, that you got to have it again, you know, that it's the urge, this craving that's burning inside you that you got to have it.  And it never stops. You got to have it.  If you don't have it you gonna die.  That's how you feel.

And that's how I felt.  I had to have it.  So I stole for it, you know.  And I hurt a lot of people by stealing from them. By betraying their trust in me.  Yeah betraying their trust in me, you know.

I'm sorry for a lot of the things that I've done basically.  Basically everything that I've done in the past was good but then when I started messing with the drugs, it just took over a whole different part of my life.  It was like on one side you [sic] got the devil and

82.     Moreover, the prejudice from counsel's error in this respect contributed to the cumulative prejudice Mr. Gwynn suffered from counsel's deficient performance in other respects and from other penalty phase errors.

83.     Counsel's woefully inadequate performance at the penalty phase constituted a breakdown in the adversarial process and renders the result fundamentally unreliable.  Counsel neglected to properly investigate and prepare for the capital sentencing proceeding ,and as a result, failed to present the substantial mitigating evidence that was readily available, including evidence of Mr. Gwynn's deprived, abusive and traumatic childhood, and his history of mental illness.  These errors deprived Mr. Gwynn of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## II.     TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-STAGE OF PETITIONER'S TRIAL BY FAILING TO PROCURE AND PRESENT ANY EVIDENCE IN SUPPORT OF THE ONLY DEFENSE OFFERED TO THE CHARGE OF FIRST DEGREE MURDER – VOLUNTARY INTOXICATION, AND BY FAILING TO INVESTIGATE AND PRESENT THE READILY AVAILABLE PSYCHIATRIC EVIDENCE OF DIMINISHED CAPACITY; TRIAL COUNSEL ALSO FAILED TO PRESENT READILY AVAILABLE

---

on the other side you [sic]got an even deeper darker devil, you know.  There's no saint there any more you know, because, one [sic] side you got crack, the other side you [sic] got your friends, okay, and your friends they always saying yeah, you ain't [sic] nothing but this and that, you know, putting you down because you make good grades in school or you want to — you would rather hang around with the girls because they're more intelligent and, you know, you learn more by hanging around them, you know, and then you got your crack and it's like well, I ain't [sic] got to listen to none [sic] of them, you know, because I'm my own man, you know, and I'm up in the world, you know.  I'm feeling high, you know, nothing else in the world matters but that high.

NT 11/6/95 at 92-93.  Notably, Dr. Dougherty observed that "of note is the marked contrast between his ability to express himself during the trial and the way he was able to express himself during the clinical interview. During the clinical interview he spoke in a very coherent, straightforward manner."  Affidavit of Dr. Edward J. Dougherty at 6 (attached hereto).

**EVIDENCE OF PETITIONER'S GOOD CHARACTER.**

84.     All other allegations, facts and claims contained in this Petition, its attachments and the other submissions made in this litigation are incorporated as if fully set forth herein.

85.     Trial counsel rendered ineffective assistance in violation of Mr. Gwynn's right to the effective assistance of counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution by failing to investigate and present any evidence in support of the only defense offered to the charge of first degree murder: voluntary intoxication.

86.     Trial counsel failed to present any of the wealth of readily available evidence of Mr. Gwynn's crack-cocaine intoxication at the time of the offense.  Additionally, trial counsel failed to present expert medical testimony concerning Mr. Gwynn's extensive history of crack-cocaine addiction, his history of crack-cocaine induced blackouts and the long-term impact of crack-cocaine on cognition, impulsivity and memory, and evidence of his borderline personality disorder.  As a result, the jury never heard about the synergistic impact of both his mental illness and his crack-cocaine abuse on his inability to form specific intent to kill at the time of the offense.

87.     Trial counsel also failed to present any evidence of Mr. Gwynn's good character during the guilt phase of the trial, evidence that was readily available from witnesses who would testify during the penalty proceedings.

**A.     Trial Counsel Failed to Investigate, Develop and Present Evidence in Support of the Defense of Voluntary Intoxication and Diminished Capacity**

88.     Trial counsel's opening argument made clear that Petitioner's primary defense was  diminished capacity based on voluntary intoxication.  Despite having procured absolutely no evidence in support of any defense theory whatsoever, counsel, in his opening statement

immediately declared Mr. Gwynn's innocence: "Ladies and Gentlemen, Daniel Gwynn is innocent of murder." N.T. 10/31/95 at 31. He promised the jury that he would present abundant evidence in support of the defense of voluntary intoxication:

> Now, ladies and gentlemen, you're going to hear that Daniel Gwynn is a drug addict. Daniel Gwynn used drugs often and for long periods of time. **And you're going to hear that whatever Daniel Gwynn did on November 19 and November 20 he was under the influence of drugs because he was a drug addict** and because he had been using drugs for some period of time, and because whenever he got the opportunity he needed to get high, he took drugs. You're going to hear that.

N.T. 10/31/95 at 32.

89. However, trial counsel **presented no witnesses** at all during the guilt phase. He merely cross-examined two Commonwealth witnesses regarding Mr. Gwynn's drug usage. These witnesses were the surviving occupants of the burned building, not persons close to Petitioner. One testified that he had seen Petitioner use cocaine "about four times" and that Petitioner appeared to be high one full day prior to the fire. N.T. 10/31/95 at 71-2, 80 (testimony of Donald Minnick). The other witness answered affirmatively defense counsel's questions whether he had observed Petitioner use cocaine "several times" and whether Petitioner was high all but one of the times the witness saw him, although the witness never stated how many times or over what period of time he had seen Petitioner. N.T. 10/31/95 at 151, 156 (testimony of John Antrom). Finally, the prosecution entered into evidence Petitioner's own post-arrest statement, wherein he stated that he smoked crack and marijuana a lot, got high every day, and was "real high" when he accidentally started the fire. N.T. 11/1/95 at 20, 22.

90. Trial counsel did not call a single witness to substantiate any of the representations made by counsel during his opening statement. Trial counsel presented no lay

witnesses to describe Mr. Gwynn's long-term crack-cocaine addiction or his drug usage on the day of the offense.  Trial counsel presented no expert medical witness to explain the ravages of crack-cocaine addiction and to put Mr. Gwynn's drug use the day before and the day of the offense into context concerning his state of mind at the time of the offense.  As a result, the jury was left with the impression that the defense presentation could not live up to its earlier billing.

91.     Despite counsel's failure to present any relevant evidence, counsel continued to rely on diminished capacity as the centerpiece of his closing arguments.  Counsel apparently sought to accomplish through mere repetition of argument what he could not through presentation of evidence:

> Remember, he's a crack addict. He uses crack all the time. He smokes crack. Crack is extremely addictive. He has to take it all the time. Here's a man whose mental state is influenced by the crack. Was he in such a state of mind as to rationally know what he was doing by throwing the match on the floor?
> . . . .
> Daniel Gwynn is a drug addict. I think there's ample evidence to demonstrate that. He's been using crack for considerable period of time, based on the Commonwealth's witnesses. Every time he comes into that building he's high. Every time he comes in to that building he's smoking crack or using crack in some form. He's a drug addict.
>       Am I asking sympathy for him? No. But you have to consider that in the light of what he says, in the light of what took place here because the judge is going to explain to you that voluntary intoxication, basically somebody either drinking alcohol or taking drugs on their own, not forced upon them by somebody else or medicated by somebody else, that, ladies and gentlemen, can negate specific intent to kill that's required of first degree murder. The judge is going to tell you that.
> . . . .
> Ladies and gentlemen, you've heard from several witnesses, you've heard from the defendant's own lips he's a crack addict.  He smokes crack.
> . . . .
>       These, ladies and gentlemen, I submit to you, are the tools of the piper, a man with a longstanding drug addiction to crack cocaine, extremely addictive substance.
> . . . .

Why do I point that out to you? Again merely to show to you to buttress the argument this man is a drug addict. He's constantly in a need to get high. . . .

. . . .

Ladies and gentlemen, I want you to consider the evidence very carefully, very thoughtfully, and try to understand if you can, what goes on in the mind of a crack addict, one who's used crack for so long and needs it so badly that they have to do it all the time.

N.T. 11/2/95 at 85, 95, 107, 108, 109, 111.

92. Contrary to trial counsel's assertions, merely being under the "influence" of crack is not legally sufficient to establish a defense of voluntary intoxication. Trial counsel's explanation to the jury of what constitutes voluntary intoxication – "mental state was influence by crack" – was a clear misstatement of the law, further underscoring trial counsel's lack of preparation. In essence, trial counsel presented no defense at all on behalf of Mr. Gwynn.

93. Post-conviction counsel conducted the investigation that trial counsel failed to do, and discovered a wealth of evidence in support of a defense of voluntary intoxication. Had trial counsel conducted an investigation of Mr. Gwynn's his long history of crack-cocaine use and addiction and had consulted with a mental expert concerning the impact of Mr. Gwynn's use on his state of mind at the time of the offense, he would have uncovered substantial evidence in support of a voluntary intoxication defense to first degree murder.

94. <u>At guilt phase, the jury never heard that</u>:

- Mr. Gwynn became addicted to crack cocaine as a teenager;

- Mr. Gwynn began smoking marijuana and drinking beer in his early teens;

- Mr. Gwynn would see his father, who had abandoned Danny and his family when he was a young boy, in local crack houses – he too, was an addict;

- He stole regularly from his own family to support his severe drug addiction;

- His school performance plummeted once he regularly began using crack cocaine;

- His behavior changed radically once he became addicted to crack cocaine;

- He used drugs every day;

- He was a crack-cocaine addict for eight and one half years;

- He became disheveled and malodorous;

- He became transient and lived often on the streets;

- His focus was solely on attaining his next high.

See Affidavits of Jeannette McDaniel; Joyce Mills; Richard Lee; Regina Cook (attached hereto); N.T. 11/6/95 at 29-30; 27; 29; 33; 50.[7]

95.     Nor was the jury provided with any information concerning Mr. Gwynn's crack-cocaine use shortly before the offense itself.  And such evidence was readily available.  For example, had trial counsel conducted an investigation designed to uncover evidence in support of a voluntary intoxication defense, he would have discovered that Mr. Gwynn spent the entirety of the day before the offense procuring and smoking crack-cocaine.  See Affidavit of Michelle Dotson (attached hereto).  In his statement to police, Mr. Gwynn stated that the fire started when he threw down a match after lighting his crack pipe. Surely, stopping to light his crack pipe after pouring gasoline in the area he was standing is indicative of his impaired mental state; not the specific intent to kill.

96.     Moreover, armed with this information, competent counsel would have presented

---

[7] The testimony referenced above took place during the penalty phase and was not presented to the jury during the guilt phase of Mr. Gwynn's trial.  Thus, when the jury was considering the merits of Mr. Gwynn's defense of voluntary intoxication, this evidence was not before them.

this evidence to a mental health expert to substantiate the impact of Mr. Gwynn's crack cocaine usage immediately prior to the offense on his state of mind. Here, the available, yet unpresented, psychiatric and psychological evidence fully supports Petitioner's voluntary intoxication defense to first degree murder.

97. Mr. Gwynn has since been evaluated by Dr. Jay M. Jackman. Dr. Jackman is a psychiatrist who specializes in drug and alcohol addiction. After an assessment and evaluation of Mr. Gwynn, Dr. Jackman concluded that at the time of the offense, Mr. Gwynn labored under a diminished capacity and could not form the specific intent to kill:

> I have concluded that at the time of the offense, Mr. Gwynn's ability to form the specific intent to kill was substantially diminished because of the changes in his mental state brought on by his chronic crack-cocaine abuse and, as importantly, by his crack-cocaine binge that began a day or so before the murder and continued throughout the weekend.

See Affidavit of Dr. Jay Jackman at 4 (attached hereto).

98. Dr. Jackman observed that Mr. Gwynn reports the typical symptoms and cognitive and psychiatric changes common with crack-cocaine abuse. At and around the time of the offense, Mr. Gwynn reports the following psychiatric and cognitive symptomology:

- Mr. Gwynn suffered from both auditory and visual hallucinations while under the influence of crack-cocaine (he would hear things and sometimes see things that were not there);

- Mr. Gwynn became excessively paranoid while under the influence of crack-cocaine and regularly felt "people were watching him" and "people were coming to get him";

- Mr. Gwynn reports that while under the influence of crack cocaine, he believed that he "had special powers" and could tell just by looking at a car whether or not it contained valuables to steal;

- Mr. Gwynn would hear "voices" while under the influence of crack-cocaine;

- Mr. Gwynn became "jumpy" and <u>his judgment was impaired</u> while under the influence of crack-cocaine.

<u>See</u> Affidavit of Dr. Jay Jackman (attached hereto). None of this information was presented to the jury that rejected Mr. Gwynn's contention, totally unsupported by evidence at the time of trial, that he could not form the specific intent to kill at the time of the fire.

99. Dr. Jackman would also have been able to educate the jury about the well-recognized, severe, psychiatric consequences associated with crack-cocaine abuse and chronic use, and its impact on Mr. Gwynn's ability to form specific intent to kill:

- Memory loss;

- Depression;

- interpersonal hypervigilence;

- anxiety;

- changes in sociability;

- impaired social and occupational functioning;

- Delusional state;

- Mood changes;

- Suicidal ideation;

- Hallucinations;

- Headaches;

- Irritability;

- Change in cognition;

- Impaired judgment;

- Forgetfulness;

- Emotional lability;

- Memory impairment;

- Disproportionate reactive aggression;

- Paranoid ideation;

- acute toxic psychosis;

- severe state of transient panic;

- Misinterpretation of events.

Id. at 3-4.

100. Because trial counsel did not investigate the impact of crack-cocaine on Mr.

Gwynn's mental state at the time of the offense, the jury also never learned anything about the

well-recognized ravages of crack-cocaine use and addiction:

- The intensity and duration of the acute manifestations [of cocaine] correlate with the rate of rise and height of the peak blood level and are subsequently reflected in brain concentrations. Crack smoking produces a faster rise and higher blood levels result in the earlier-onset and most prominent clinical psychological signs and symptoms;

- The acute psychological effects begin when cocaine reaches the brain, which occurs within seconds by any route of administration;

- The major psychological functions affected by cocaine are mood, cognition, drive states such as hunger, sex, thirst, and consciousness;

- Adverse psychological effects commonly follow chronic cocaine use including anxiety and a depression with panic and hopelessness. Many of the effects may be as a result of cocaine-induced changes in the brain, which are quite persistent;

- During cocaine intoxication, a state virtually indistinguishable from hypomania or frank mania is typical. Thoughts race and the user speaks in rapid, often pressured manner. The user is garrulous and grandiose with tangential and incoherent speech;

- Use of cocaine can produce can also produce a psychotic syndrome characterized by paranoia, impaired reality testing, anxiety, a stereotyped compulsive repetitive pattern of behavior, and vivid visual, auditory and tactile hallucinations...;

- Extreme anger with threats or acting out of aggressive behavior may occur;

- Mood changes, such as depression, suicidal ideations, irritability, emotional lability,or disturbances in attention and concentration are common;

- Addicts continue to seek cocaine even though their lives are being destroyed;

- Cocaine must produce a state similar to a delusion in users;

- The sensation of being out of control accompanied by intense apprehension of impending doom is a regular occurrence with addictive cocaine use and is indistinguishable from panic disorder;

- With increasing doses, acts and decisions of poor judgment and indiscretions are more common;

- The effects of cocaine on the brain appear persistent and difficult to reverse;

- The potential for deleterious impact of cocaine on selected memory functions is quite serious.

See JOYCE H. LOWINSON ET AL, EDS., SUBSTANCE ABUSE: A COMPREHENSIVE TEXTBOOK, 171-86, 818 (1997).

101.    Indeed, had trial counsel merely consulted the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (hereinafter referred to as DSM IV), counsel would have discovered that cocaine intoxication, cocaine dependence, and cocaine abuse are all recognized psychiatric disorders.  See DSM IV, Sections 304.20 (Cocaine Dependence); 305.60 (Cocaine Abuse); and 292.89 (Cocaine Intoxication).

102.    Consulting the DSM IV, trial counsel would have learned that the essential feature of cocaine intoxication "[i]s the presence of clinically significant maladaptive behavior or

psychological changes that develop during, or shortly after, use of cocaine." DSM IV, at 223.

Moreover, counsel would have learned that the symptomology of cocaine intoxication includes:

- Affective blunting;

- Anger;

- Impaired judgment;

- Anxiety;

- Tension;

- Grandiosity;

- Fatigue;

- Social withdrawal.

DSM IV, at 223. None of this information was presented to the jury that rejected Mr. Gwynn's voluntary intoxication defense.

103.     Not only would Dr. Jackman (or any other competent mental health professional) have been able to educate the jury about the cognitive and psychiatric ravages of crack-cocaine abuse and chronic use, <u>he would have told the jury that at the time of the offense, Mr. Gwynn did not have the capacity to form the specific intent to kill</u>. <u>See</u> Affidavit of Dr. Jay M. Jackman at 4 (attached hereto). Dr. Jackman's conclusion that Mr. Gwynn did not have the ability to form specific intent to kill at the time of the offense is predicated upon the following facts as well as the clinical data concerning the ravages of crack-cocaine abuse outlined above:

> [M]r. Gwynn's ability to form specific intent was diminished because of the changes in his mental state brought on by his chronic crack-cocaine abuse and, as importantly, by his crack-cocaine binge that began a day or so before the murder and continued throughout the weekend. The information I reviewed indicates Mr. Gwynn ingested a significant amount of crack-

37

cocaine in a relatively short period of time. Mr. Gwynn also has a
history of blackouts and memory impairments associated with his
crack-cocaine abuse.

Id. at 5.

104. In addition to his failure to present to the jury the overwhelming evidence of Mr.

Gwynn's diminished capacity due to his crack-cocaine abuse and multi-day long crack-cocaine

binge at the time of the offense, trial counsel also failed to investigate and present to the jury the

readily available evidence of Mr. Gwynn's mental illness, which when combined with his crack-

cocaine abuse and usage at the time of the offense, further supported his claim of diminished

capacity.

105. Mr. Gwynn was also evaluated by Dr. Edward J. Dougherty, a forensic

psychologist. Dr. Dougherty concluded, based upon an extensive clinical forensic psychological

evaluation of Mr. Gwynn and review of records and family affidavits, that at the time of the

offense, Mr. Gwynn also suffered from borderline personality disorder and post-traumatic stress

disorder, as well as psycho-substance abuse disorder. See Affidavit of Dr. Edward J. Dougherty,

at 11 (attached hereto).

106. Indeed, had counsel bothered to consult with a mental health expert, he would

have discovered the synergistic impact of crack-cocaine abuse and the debilitating constellation

of psychiatric symptoms associated with the serious mental illness suffered by Mr. Gwynn. For

example, Dr. Dougherty observed that:

A number of aspects of Mr. Gwynn's self-description suggest that
he experiences unusual perceptual sensory events (perhaps
including full-blown hallucinations) as well as unusual ideas that
may include magical thinking or delusional beliefs. His thought
processes are marked by confusion, distractability, and difficulties
in concentration. He experiences his thoughts as blocked

withdrawn or somehow influenced by others.

Id. at 8.  In discussing the constellation of mental illnesses suffered by Mr. Gwynn on his

cognition, Dr. Dougherty stated:

> The combination of these disorders is considered a severe mental
> health condition.  Mr. Gwynn's Borderline Personality Disorder is
> a previous pattern of instability of interpersonal relationships, self-
> image and affects and marked impulsivity.  Mr. Gwynn, when
> faced with real or imagined abandonment, experiences profound
> changes in his affect, cognition and his behavior.  It is noted that
> under extreme stress he is likely to become paranoid and
> disassociate.  In this state his ability to act purposefully is
> impaired.

Id. at 12.

107.    The severe cognitive impairments associated with chronic depression, when

combined with Mr. Gwynn's rampant crack-cocaine abuse and usage at the time of the offense

further impacted his ability for form the specific intent to kill. For example, perception and

cognition during depression includes profound depressive stupors, delusions, hallucinations, and

clouding of consciousness. Untreated depression is extremely debilitating.  It grossly impairs and

undermines judgment and the capacity for rational decision making.  One who suffers from such

depression views himself and everything around him in an extremely negative light.  The

sufferer makes self accusations which are typically unjustified and/or blown out of proportion.

Furthermore, the severely depressed person experiences feelings of and/or morbid preoccupation

with worthlessness; excessive, inappropriate and often delusional guilt; and recurrent thoughts of

death.  Furthermore, psychotic symptoms are not uncommon.  Depressed persons often have

fleeting auditory hallucinations with extremely unpleasant content along the lines of their

delusions.  Suicidal ideation is quite common among those who suffer with depression.

Significantly, this suicidal intent may be expressed in both direct and indirect ways -- both active attempts to take one's life and passive facilitation of one's death are common.[8]

108.    Adding borderline personality disorder to the mix of psychiatric impairments impacting Mr. Gwynn's cognitive state at the time of the offense exponentially increased their impact.  The essential feature of borderline personality disorder "[i]s a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that begins by early adulthood and is present in a variety of contexts."  DSM IV at 650.  Borderline personality disorder also causes "affective instability that is due to a marked instability of mood." Id. at 651.  Individuals plagued with this debilitating mental illness, such as Mr. Gwynn, also display periods of intense inappropriate anger that reflect an extreme reactivity to interpersonal stress. Id.  The impact of borderline personality disorder includes "profound changes in self-image, affect, cognition, and behavior." Id. at 650. Consistent with Mr. Gwynn's history, sufferers of borderline personality disorder have a high incidence of substance abuse.

109.    This evidence, in combination with the evidence of Mr. Gwynn's profound crack-cocaine abuse and usage at the time of the offense would have provided the jury with ample evidence to conclude his capacity to form the specific intent to kill was substantially diminished, warranting conviction of a lesser degree of murder.

110.    Because trial counsel failed to conduct any investigation whatsoever into the merits and substance of Mr. Gwynn's only proffered defense – voluntary intoxication and diminished capacity – Mr. Gwynn was left virtually defenseless.  Mr. Gwynn was prejudiced by

---

[8] See. e.g., KAPLAN & SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY(6th Ed.)

his counsel's ineffectiveness.[9]

111.    Moreover, the prejudice from counsel's error in this respect contributed to the cumulative prejudice Mr. Gwynn suffered from counsel's deficient performance in other respects and from other guilt phase errors.

### B.    Trial Counsel Failed to Investigate, Develop and Present Evidence of Mr. Gwynn's Good Character

112.    Trial counsel ineffectively failed to investigate, develop and present to the jury evidence from a number of witnesses of Mr. Gwynn's character as a peaceful, honest, non-violent man, evidence that would have supported the defense theory that Mr. Gwynn lacked the specific intent to kill and undermine the Commonwealth's portrayal of Mr. Gwynn as a violent bully.

113.    Counsel's failures constituted deficient performance and prejudiced Petitioner, in violation of his Sixth Amendment right to effective assistance of counsel.

114.    Evidence of Mr. Gwynn's character was important to the Commonwealth's theory of the case.  Mr. Gwynn was portrayed as a violent bully who had raped Ms. Smith on past occasions and was looking to rape her again the day before the fire.  The Commonwealth contended that he was so enraged by his encounter with the residents of 4504-4506 Chestnut Street that he threatened to kill them and acted on that threat early the following morning.

---

[9] To the extent that appellate counsel attempted to present to the Pennsylvania Supreme Court evidence in support of his claim of ineffective assistance of counsel for trial counsel's failure to present expert testimony concerning Mr. Gwynn's diminished capacity defense, he too, was ineffective for failing to have Mr. Gwynn evaluated and for his failure to investigate and present all of the readily available evidence.  However, the Pennsylvania Supreme Court has also held that the proper forum in which to effectively raise and litigate ineffective assistance of counsel claims is through the Post Conviction Relief Act.

115.     Evidence of Mr. Gwynn's character was equally important to the defense theory of the case.  Mr. Gwynn's defense of diminished capacity rested entirely on the jury believing Mr. Gwynn's statement to the police that he did not intend to harm anyone and that he had ingested substantial amounts of crack cocaine at the time of the fire.[10]

116.     Although trial counsel met with members of Mr. Gwynn's family briefly before trial, including Jeannette Mills (then McDaniel), Richard Lee and Regina Cook, he never discussed with them the testimony they could provide at either the guilt phase or penalty phase. Trial counsel never asked any of Mr. Gwynn's family members to testify during the guilt phase.

117.     Jeannette Mills, Richard Lee, Regina Cook and Michelle Dotson were available and willing to testify as to Mr. Gwynn's character during the guilt phase of the trial, but were never asked to do so.  In fact, Mills, Lee and Cook all willingly testified on Mr. Gwynn's behalf during the penalty phase.

118.     Trial counsel did not have a reasonable strategic basis for failing to investigate, develop and present this evidence, which support the account of the fire and the description of Mr. Gwynn's drug use at the time of the fire contained in the statement made by Mr. Gwynn.

119.     Mr. Gwynn was prejudiced by trial counsel's failure to obtain and introduce this evidence. Moreover, the prejudice from counsel's error in this respect contributed to the cumulative prejudice Mr. Gwynn suffered from counsel's deficient performance in other respects and from other guilt phase errors.

III.     **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO ADEQUATELY CHALLENGE THE CONSTITUTIONALITY OF THE PURPORTED TERRY STOP AND**

---

[10] As discussed above, trial counsel was ineffective for basing the entire defense of diminished capacity on Mr. Gwynn's confession.

SUBSEQUENT <u>MIRANDA</u> VIOLATION.

120.    All other allegations, facts and claims contained in this Petition, its attachments and the other submissions made in this litigation are incorporated as if fully set forth herein.

121.    Trial counsel rendered ineffective assistance by failing to properly challenge the legality of the purported <u>Terry</u> stop and illegal detention of Petitioner and the subsequent <u>Miranda</u> violation in contravention of Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

122.    Daniel Gwynn was illegally stopped by a police officer while walking down the street, placed in the back of a police car against his will, handcuffed, and, after an illegal search of his belongings (after the officer had already patted down Petitioner for the officer's safety), the arresting police officer questioned Petitioner without administering <u>Miranda</u> warnings – with his incriminating responses introduced against him at trial.  The police officer taking these actions had no probable cause to arrest Mr. Gwynn.

123.    On direct appeal, Mr. Gwynn challenged the legality of the arrest, the legality of the interrogation, and counsel's ineffectiveness for failing to seek suppression of his post-arrest confession based on the illegality of the arrest which produced it. The Pennsylvania Supreme Court found no illegal arrest because it regarded these events as a permissible investigative stop pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), rather than an arrest.  The court found no <u>Miranda</u> violation because the officer's questioning did not constitute custodial interrogation. It did not address the claim of ineffective assistance of counsel.

124.    The state court's conclusions are unreasonable.  Mr. Gwynn's arrest and interrogation were clear violations of his constitutional rights.  The physical evidence and

statement to the police that directly resulting from Mr. Gwynn's arrest and interrogation were the inadmissible fruits of an illegal arrest and custodial interrogation. Counsel's abject failure to properly litigate these issues amounted to a denial of the effective assistance of counsel guaranteed by the Sixth Amendment.

125.    The arresting officer was Joseph Surina.  Officer Surina testified at the pre-trial suppression hearing that, prior to stopping Mr. Gwynn, he had not seen Mr. Gwynn do anything illegal.  N.T. 10/25/95 at 29.  He testified that he became suspicious of Mr. Gwynn while on routine patrol after seeing Gwynn several times over the course of his patrol, although Mr. Gwynn did not leave the area upon encountering him.

126.    Officer Surina testified that his suspicions were aroused because Mr. Gwynn was present in a well-known drug area where a lot of burglaries had occurred, Mr. Gwynn walked past the passenger side of his patrol car when he approached, Mr. Gwynn wore a backpack that had something brown sticking out of it that at first was covered by a flap and then later was not, and Mr. Gwynn was talking to a woman who, when asked, told the officer that she did not know Mr. Gwynn. N.T. 10/25/95 at 18-20.

127.    When Officer Surina saw Mr. Gwynn on a street fenced on both sides, he pulled up to the defendant and "stopped him." Id. at 21.  The officer testified on direct examination that when he got out of his car, the following encounter occurred:

> I started walking towards him and he was looking all around and I grabbed him. And I asked him, I said where do you live and what's your name? He told me he was homeless and he told me his name was Daniel Gwynn, so at this time I asked him for some identification. He told me he had identification in his backpack. So I told him to take his backpack off and give me identification.
> At this time he took the backpack off and put it on the hood of the police car, and this time I frisked the male for my own protection. While I

was frisking the make he kept raising his hands and turning his head.

> Q.      Indicating turning his head from left to right.
> A.      To me it was an indication that he was looking to run. That was the indication I got. So at this time I took him, stuck him in the back of the police car.
> Q.      Did you handcuff –
> A.      No, I didn't.
> Q.      What did you do after sticking him in the police car?
> A.      After I stuck him in the police car, then called for backup, and while I was waiting for the backupI went through the backpack to look for the identification.
> Q.      Did you get a name?
> A.      I found – Yes, I found identification in the backpack in the name of Daniel Gwynn.

Id. at 22-23. At this point, Officer Surina testified, his backup arrived and noticed that Mr. Gwynn was attempting to exit the police car, "so at this point we took him out of the police car and handcuffed him." N.T. 10/25/95 at 24. At no point did Officer Surina testify that he any concern for his safety.

        128.     After handcuffing Mr. Gwynn, the officers ran a criminal records check on his name, and learned that he was wanted on five outstanding bench warrants. Officer Surina continued:

> A.      At this time I told the defendant, I said I could see why you wanted to run. You're wanted on five warrants, and the response to that was that he stated to me yeah, I know the detectives were over my house the other night. And I said detectives from where? He said from 55 and Pine. I said why were they over there? He said they were looking for me for a homicide.
> Q.      What did you do at that point?
> A.      At that point I stopped questioning him . . . .
>      . . . .

Id. at 23. The officer acknowledged that he did not give Mr. Gwynn any Miranda warnings prior to questioning him. Id. at 35. That same day, and without any break in custody, Mr. Gwynn was interrogated regarding the fire and provided an incriminating statement which was introduced

against him at trial.

129.     Trial counsel did not challenge the officer's failure to administer <u>Miranda</u>
warnings or the illegality of the initial stop and illegal arrest.

130.     At the close of evidence at the suppression hearing, Judge Savitt concluded:

> He was arrested. I find that, when he was told to go in to that car and the
> officer's own testimony was I stopped him. I stopped him. I thought he
> would run. I grabbed him. Now, he was under arrest at that point and
> that's it. I so find.
> . . . .
> I am satisfied from this record that when he grabbed him he arrested him
> and he had no probable cause for the arrest at that time on this record.

N.T. 10/25/95 at 105.  Judge Savitt nevertheless denied Mr. Gwynn's motion to suppress the

because he believed that the post-arrest discovery of Mr. Gwynn's outstanding warrants rendered

the illegal arrest moot.

131.     The Pennsylvania Supreme Court concluded that "no illegal stop, arrest or search

occurred."  <u>Gwynn I</u>, 732 A.2d at 149.  It found that the officer made a proper <u>Terry</u> stop

because the high incidence of crime in the area, a reported burglary,[11] Mr. Gwynn's "suspicious"

behavior and "the appearance of the knapsack" all supported reasonable suspicion to justify the

initial stop.  <u>Id.</u>  It stated, without citation to supporting authority, that "[t]he remaining actions

during the <u>Terry</u> stop constituted permissible preservation of the status quo while the officer

confirmed or dissipated his suspicions."  <u>Id.</u>  The Court found that probable cause to arrest Mr.

_____

[11]  On direct examination, Officer Surina mentioned nothing about a burglary as a basis
for stopping Gwynn.  On cross-examination, defense counsel asked the officer if he had any
information about a burglary around that time, and whether "When you got that information, did
you stop him at that point to investigate to see if anybody he fit the description, if there was any
description of a perpetrator?"  Officer Surina replied, "There was no description of a perp." N.T.
10/25/95 at 35.  To the extent this burglary actually occurred, it plainly provided no basis for the
stop.

Gwynn existed once the outstanding bench warrants were revealed.  Id.  It further stated that Mr. Gwynn's incriminating statements to Officer Surina "occurred during the Terry stop" and "did not occur as the result of custodial interrogation."  Id. at 149-50.

132.    The court did not address, and apparently simply overlooked, the three and a half pages of Mr. Gwynn's appellate brief which argued that trial counsel was ineffective for failing to challenge the confession as the fruit of the illegal arrest.

133.    Mr. Gwynn's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the illegal stop, custodial interrogation and arrest, the subsequent use of his illegally obtained statements against him at trial, and his trial counsel's failure to properly litigate these issues.

## IV.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO CHALLENGE THE VOLUNTARINESS OF MR. GWYNN'S CONFESSION – THE ONLY EVIDENCE LINKING HIM TO THE MURDER – AND BY FAILING TO PRESENT TO THE COURT THE CIRCUMSTANCES SURROUNDING THE CONFESSION, INCLUDING MR. GWYNN'S PSYCHIATRIC IMPAIRMENTS DUE TO CRACK-COCAINE WITHDRAWAL AND PROFOUND MENTAL ILLNESS IMPACTING ON THE CREDIBILITY AND RELIABILITY OF THE CONFESSION.

134.    All other allegations, facts and claims contained in this Petition, its attachments and the other submissions made in this litigation are incorporated as if fully set forth herein.

135.    Petitioner's conviction was obtained largely by way of his purported confession to the police. Indeed, his confession, which was not voluntary, reliable or accurate, was the only evidence linking Mr. Gwynn to the fatal fire.  Indeed, this demonstrably false confession demonstrates a significant difference between the "facts" of the confession and the actual evidence of the crime.  As described herein, Petitioner's false confession should never have been allowed into evidence: it was false, involuntary and unreliable due to the cognitive and

psychiatric impacts of Mr. Gwynn's severe crack-cocaine withdrawal, profound mental illness, and the tactics employed by the police, and thus it was obtained in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

136.    Moreover, Petitioner did not validly waive his <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), rights. In this case, the totality of circumstances shows that Petitioner did <u>not</u> make a knowing, intelligent and voluntary waiver of his <u>Miranda</u> rights; thus the resulting confession was constitutionally invalid. The admission of the statement against Petitioner at trial violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

137.    Trial counsel filed a pretrial motion to suppress Mr. Gwynn's statement and the trial court held a suppression hearing, but trial counsel failed to support the motion with the necessary expert testimony.  During the suppression hearing, counsel failed to present a mental health expert to establish Mr. Gwynn's diminished capacity due to either crack-cocaine intoxication or crack-cocaine withdrawal, or the synergistic impact of those two factors combined with Mr. Gwynn's existing mental illness.

138.    Trial counsel ineffectively failed to investigate, prepare and present the evidence of Petitioner's severe crack-cocaine withdrawal at the time of the confession, the phenomena of crack induced confabulation, his resulting mental and emotional state, including cognitive impairment, his profound mental illness (independent of his crack-cocaine abuse and withdrawal) the coercive nature of the police interrogation, and their impact on Mr. Gwynn's inability to make a knowing, intelligent and voluntary waiver of his rights.  Had trial counsel conducted this necessary investigation, he would have discovered a wealth of evidence to

48

support the motion to suppress the statement.

139.  The police in this case did not begin to interrogate Mr. Gwynn's until **fourteen hours after his arrest**.  He spent much of that time handcuffed to a chair in a windowless interrogation room.[12]  By the time the police began to actively interrogate Mr. Gwynn, he was in the throes of crack-cocaine withdrawal and could not knowingly, intelligently or voluntarily waive his right to remain silent, his right to counsel or resist the police pressure to confess.

140.  At the time of the interrogation, Mr. Gwynn suffered from diminished capacity as a result of the well-recognized ravages of crack-cocaine withdrawal, including severe depression, memory impairment, impaired judgment, emotional lability, and lack of self-respect. See Affidavit of Dr. Jay M. Jackman (attached hereto).

141.  Dr. Jackman, who evaluated Mr. Gwynn at the behest of post-conviction counsel, further states that:

> Crack cocaine withdrawal also causes a constellation of serious cognitive impairments.  For example, withdrawal causes severe depression, anxiety, sleep disturbance, and changes in personality. Another trait common in crack-cocaine withdrawal is overly compliant behavior and a lack of concern for one's personal well-being or self-interest.

Id. at 4.

---

[12] Upon information and belief, while he was waiting to be processed and prior to being placed in the interrogation room, Mr. Gwynn fell ill from the effects of crack-cocaine usage and/or withdrawal and was seen by a nurse or another medical professional at the Police Administration Building.  Mr. Gwynn told the nurse about his crack-cocaine consumption shortly before his arrest and the resulting symptoms of his intoxication and subsequent withdrawal.  Due to his symptoms, the nurse recommended that he be placed on suicide watch. Mr. Gwynn was then placed into a cell by himself, and his shoelaces and belt were taken from him.  Mr. Gwynn has never been provided with the documents related to his processing at the Police Administration Building or the Warrant Unit, despite his request for discovery in the PCRA Petition.

142.    Dr. Jackman concluded that because of Mr. Gwynn's severe crack-cocaine

withdrawal, his confession was not knowing, intelligent and voluntary:

> [M]r. Gwynn's statement to the police was not voluntary in that he suffered from a diminished capacity at the time he was interrogated.  The circumstances of the interrogation by the police of Mr. Gwynn, its longevity and the fact that he was suffering active crack-cocaine withdrawal throughout the duration of the interrogation lends credence to my conclusion that his capacity was diminished at that time.  It is well-known that crack-cocaine withdrawal creates intense, severe depression, making a person in Mr. Gwynn's situation far more susceptible to the enormous emotional pressure brought on by severe, unremitting withdrawal and the inherent pressure of police interrogation.  <u>When confronted with police pressure to confess, Mr. Gwynn's ability to act in his own best interests and to effectively process the information being presented to him was severely compromised by both the long-term impact of his chronic crack-cocaine abuse and by the severe symptoms of withdrawal that he experience at that time.</u>

<u>Id.</u> at 5.

143.    Counsel failed to present any evidence concerning the significant effects that

crack-cocaine addiction had on Mr. Gwynn's perception and memory of events.  Smoking crack

can cause delusions.  JOYCE H. LOWINSON ET AL, EDS., SUBSTANCE ABUSE: A COMPREHENSIVE

TEXTBOOK (1997) at 818.  Secondly, a phenomenon called cocaine-induced confabulation is

typical among crack addicts.  <u>See</u> <u>id.</u> ("Confabulation may be seen in two phases of high-dose

cocaine use.").  According to the text:

> Confabulation is a neuropsychiatric symptom characteristic of diffuse organic brain disease and/or dysfunction.  It refers to the unconscious filling in of memory gaps by imagined experiences, fabricated stories, or grossly distorted accounts of recent or remote events.  It is absolutely distinct from lying, which implies both motive and awareness of the distortion or untruth.  Confabulatory recall is inconsistent; it may change from moment to moment; and it may be induced unwittingly by suggestion.
> . . . .

> Confabulation may be seen in two phases of high-dose cocaine use. During the acute intoxication phase, the profound confusion, grandiosity, emotional lability, false sense of mastery, illusions, delusions, and hallucinations occasionally can induce certain users to confabulate "in real time." During the convalescent phase, after a period of abstinence from cocaine, the person gradually recalls fragments of past experience (many of which may have been originally misperceived) in a distorted way. In an attempt to preserve logical consistency, these may be linked with confabulated material. The more such confabulated material is ratified by the social setting and in particular by authority figures (e.g., physicians, attorneys, or law enforcement officers), the more likely it is to become a fully integrated and unquestioned part of that person's self-history. It even may go on to become the basis for future thoughts, conclusions, and actions.

Id. This information about the effect of crack abuse on the memory, not presented to the jury by trial counsel, totally discredits the notion that Mr. Gwynn's statement is voluntary and reliable.[13] Nevertheless, although information about cocaine-induced confabulation was available to trial counsel, he failed to investigate and present expert testimony on this well-established phenomenon and failed to present evidence of concerning the falsity of the confession.

144. Nor did trial counsel investigate the evidence of Mr. Gwynn's mental illness at the time of the confession, including chronic depression, borderline personality disorder and post-traumatic stress disorder. See Affidavit of Dr. Edward J. Dougherty, at 11. The synergistic impact of crack-cocaine withdrawal on the constellation of cognitive deficits Mr. Gwynn suffered as a result of his long-standing mental illness further provided trial counsel with evidence upon which to predicate a challenge to the voluntariness of Mr. Gwynn's confession.

---

[13] Indeed, a number of details recounted in Mr. Gwynn's were inconsistent with the reports of the surviving victims. Mr. Gwynn told police on the morning of the fire, he went to the building to apologize to the residents. He stated that he tried to apologize but had the door slammed in his face. However, all of the surviving victims denied seeing or speaking to anyone prior to the fire, and specifically denied that the saw or heard "Rick," the man they identified as the perpetrator, before the fire. These inconsistences undermine the reliability of the statement.

145. Trial counsel's failures prejudiced Mr. Gwynn, as evidenced by what actually occurred at the suppression hearing. After Mr. Gwynn completed his testimony at the suppression hearing, and after hearing no other evidence is support of his claim for suppression, the trial court observed that "[A]s far as I can see, there's very little argument you can present on the motion to suppress the statement." The court framed the issue before it as: "[w]hether or not the defendant was so high at the time." <u>Id.</u> at 99. Trial counsel agreed with the court's assessment. <u>Id.</u> However, after the court offered to hear what evidence counsel had to offer on that point, counsel threw in the towel:

> I leave it in the court's judgment to determine whether you believe that the testimony offered by the defendant as to when he had consumed the drugs and the effect they had on him was such as to negate the voluntariness of the statement.

<u>Id.</u> at 99. Counsel presented absolutely no evidence other than the testimony of Mr. Gwynn to support and validate the claim in his motion to suppress.

146. Moreover, trial counsel's failure to present to the jury these factors surrounding Mr. Gwynn's confession and his impaired mental state at the time deprived Mr. Gwynn of his right to present an adequate defense, even if the Court did allow the evidence to go to the jury. Trial counsel's ineffectiveness also undermines confidence in the jury's verdict and sentencing decisions.

147. Moreover, the prejudice from counsel's error in this respect contributed to the cumulative prejudice Mr. Gwynn suffered from counsel's deficient performance in other respects and from other guilt phase errors.

**V. THE TRIAL COURT ERRED IN PERMITTING THE COMMONWEALTH TO PRESENT UNRELIABLE, NOVEL SCIENTIFIC EVIDENCE.**

148. All other allegations, facts and claims contained in this Petition, its attachments and the other submissions made in this litigation are incorporated as if fully set forth herein.

149. The trial court erred in admitting unreliable and novel scientific evidence offered by the Commonwealth to meet its corpus delicti burden of demonstrating that the fire was intentionally set. The admission of this evidence violated Mr. Gwynn's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

150. At trial, the Commonwealth attempted to prove that the fire was intentionally set by establishing that an accelerant had been to used to start the fire in multiple locations. The Commonwealth introduced the testimony of Lt. Arthur Czajkowski, of the Philadelphia Fire Marshal's Office, regarding his use of an accelerant detecting canine at the crime scene. Lt. Czajkowski was allowed to testify that the canine named Gentry "alerted" to the presence of a hydrocarbon in four locations. Lt. Czajkowski further testified that he can tell when Gentry finds a hydrocarbon because the dog "slobbers." N.T. 11/1/95 at 150.

151. At the time of the trial, Lt. Czajkowski had testified only once before regarding his use of Gentry at a fire scene, although in that case the dog was used to locate a specific item and not to identify locations where a hydrocarbon was present. N.T. 11/1/95 at 154-58. Only forty such accelerant-detecting canines were then being used in the United States. N.T. 11/1/95 at 160-61. No court in Pennsylvania had ever ruled on the admissibility and reliability of the type of evidence the Commonwealth sought to present in Mr. Gwynn's case.

152. Trial counsel moved to exclude the evidence of the canine's "alerts." After a hearing on the issue, the trial court concluded that such evidence was admissible. See N.T. 11/1/95 at 143-171 (voir dire of Lt. Czajkowski); N.T. 11/2/95 at 5. On direct appeal, the

Pennsylvania Supreme Court concluded that the evidence was "relevant and sufficiently reliable." Gwynn I, 732 A.2d at 106. However, Gwynn I did not address whether the evidence was generally accepted or otherwise met the Frye standard for novel scientific evidence, but considered only whether the evidence was relevant and if a proper foundation had been laid for the admission of the evidence. Id. at 105-6.

153.    In fact, this evidence is not reliable or generally accepted, especially where, as here, not all of Gentry's "alerts" were  confirmed by laboratory testing,[14] and the trial court erred in allowing Lt. Czajkowski to testify about Gentry's "alerts." See National Fire Protection Association, NFPA 921 Guide for Fire and Explosion Investigations (2004 ed., 1998 ed.) ("Any canine alert not confirmed by laboratory analysis should not be considered validated"; "Unlike explosive- or drug-detecting dogs, these canines are trained to detect substances that are common to our everyday environment"; "The discriminatory ability of the canine to distinguish between pyrolysis products and ignitable liquids is remarkable but not infallible").

154.    Alternatively, if trial counsel had consulted with any of the authoritative materials on fire investigation available at the time of trial or an expert in the field, he would have found ample support for his motion to exclude the testimony regarding the canine's "alerts." See, e.g., George Dabdoub, et al., Accelerant Detection Canines and the Laboratory, 1995 Proceedings of the American Academomy of Forensic Sciences 19 (concluding that because dogs are "not very selective," "a positive alert must always be corroborated by the laboratory"); International

---

[14] Petitioner has never been provided access to any of the raw data and testing information regarding the testing of any of the samples or physical evidence collected at the fire scene, and thus is unable to determine whether the samples were tested properly or if the results were properly reported. See, generally National Research Counsel of the National Academies of Science, Strengthening Forensic Science in the United States: A Path Forward (2009).

Association of Arson Investigators, <u>IAAI Forensic Science Committee Position on the Use of Accelerant Detection Canines</u> (Sep. 1994) (finding that "[a]ny alert or indication not confirmed by laboratory analysis must be considered a false positive...for the purposes of origin and cause determination" and "[i]f the forensic laboratory examination of the sample is negative for the presence of identifiable ignitable liquids, any positive indication by the canine of the sample *must* be deemed as *not relevant*").

155.    Even if the Court allowed this testimony to go to the jury, trial counsel could have relied upon these resources to undermine the credibility of Lt. Czajkowski's testimony regarding the canine.

156.    Moreover, under Pennsylvania law, relevant "evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Pa.R.E. 403.  Lt. Czajkowski's testimony was unduly prejudicial and misleading, and had limited probative value because it was based upon novel, unreliable science. It's admission violated due process. Trial counsel was also ineffective for failing to seek the exclusion of Lt. Czajkowski's testimony on this basis.

**VI**.    **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO CHALLENGE THE GRAVE RISK AGGRAVATING FACTOR BECAUSE MR. GWYNN'S DIMINISHED CAPACITY AT THE TIME OF THE OFFENSE NEGATED HIS ABILITY TO BE "PRACTICALLY CERTAIN" THAT HIS CONDUCT POSED A GRAVE RISK TO OTHERS.**

157.    All other allegations and facts contained in this petition and its attachments are incorporated as if fully set forth herein.

158.    Trial counsel rendered ineffective assistance in violation of Mr. Gwynn's right to

the effective assistance of counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution by failing to challenge the applicability of the grave risk aggravating circumstance in this case and by failing to present evidence of Mr. Gwynn's diminished capacity at the time of the offense, negating the element of intent required in order for the jury to find the presence of this aggravating factor.

159.    The trial court instructed the jury that they were to consider whether Mr. Gwynn's conduct "created a substantial likelihood that a person other than the deceased would be killed." N.T. 11/6/95 at 144.  In so doing, the court instructed the jury that before finding this aggravating factor, they must also conclude that Mr. Gwynn **"[w]as practically certain that his conduct would cause such a result."** Id.   The trial court further reiterated this point by further instructing the jury that: "Now, members of the jury, it's for you to determine from the facts of this case whether or not the defendant knowingly created a grave risk of death to person other than the deceased." Id.

160.    During the course of Mr. Gwynn's penalty phase presentation, trial counsel failed to present any evidence whatsoever challenging Mr. Gwynn's ability to be "practically certain" of anything, let alone creating a "grave risk" to others.  As the record reflects, trial counsel failed to present any expert testimony concerning Mr. Gwynn's state of mind at the time of the offense (or his mental health generally).  Abundant evidence was readily available.

161.    At the behest of post-conviction counsel, Mr. Gwynn was evaluated by Dr. Jay Jackman.  Dr. Jackman concluded that at the time of the offense, Mr. Gwynn labored under a diminished capacity and could not form the specific intent to kill, a fact necessarily encompassing his ability to be "practically certain" of creating a grave risk to others:

> [M]r. Gwynn's ability to form specific intent was diminished because of the changes in his mental state brought on by his chronic crack-cocaine abuse and, as importantly, by his crack-cocaine binge that began a day or so before the murder and continued throughout the weekend. The information I reviewed indicates Mr. Gwynn ingested a significant amount of crack-cocaine in a relatively short period of time. Mr. Gwynn also has a history of blackouts and memory impairments associated with his crack-cocaine abuse.

Affidavit of Jay Jackman at 5 (attached hereto).

162.    In addition, had counsel conducted an investigation into Mr. Gwynn's background and prior mental health history, he also would have been able to present to the sentencing jury expert testimony about the synergistic impact of Mr. Gwynn's profound crack-cocaine addiction and his mental illness, including chronic depression, borderline personality disorder and post-traumatic stress disorder. See Affidavit of Dr. Edward J. Dougherty, at 11 (attached hereto).

163.    The significant mitigation evidence compiled by post-conviction counsel and described in Claim I, supra, also demonstrates Mr. Gwynn's inability to be "practically certain" that his actions posed a grave risk to others. This evidence includes the well-known ravages of crack-cocaine abuse: impaired judgment; memory impairment; mood changes; psychotic syndrome; paranoia; impaired reality testing; affective blunting. It also includes the impact of his serious mental illness: impaired ability to purposefully act; changes in cognition, affect and behavior. See, e.g., Affidavit of Edward J. Dougherty, at 12 (attached hereto). None of this information was presented to the jury that eventually concluded he was "practically certain" that his actions posed a grave risk to others and sentenced him to death.

164.    This evidence from Dr. Jackman and Dr. Dougherty demonstrates prejudice. Had

it been presented at trial, there is a reasonable probability of a different outcome, given the weakness of the aggravating factors and the strength of the mitigation in this case.

165.    Trial counsel's failure to investigate the issue of the medical/psychiatric implications of crack-cocaine abuse and Mr. Gwynn's mental illness, his failure to even consult with a mental health expert, and his failure to have Mr. Gwynn evaluated by such a professional, constitute ineffective assistance of counsel.

166.    Finally, counsel's failure to present to the jury expert testimony concerning Mr. Gwynn's diminished capacity at the time of the offense as it pertains to the specific intent to cause "grave risk" deprived Mr. Gwynn of evidence raising a reasonable doubt as to the applicability of this aggravating factor.

167.    Moreover, the prejudice from counsel's error in this respect contributed to the cumulative prejudice Mr. Gwynn suffered from counsel's deficient performance in other respects and from other penalty phase errors.

VII.    PETITIONER IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE BECAUSE THE "GRAVE RISK OF DEATH TO ANOTHER" AGGRAVATING CIRCUMSTANCE IS VAGUE AND OVERBROAD, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

168.    All other allegations and facts contained in this petition, its attachments and the other submissions accompanying this petition are incorporated as if fully set forth herein.

169.    Petitioner's death sentence was based in part on the jury's finding of aggravating circumstance 42 Pa.C.S. § 9711(d)(7): "In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense."  The application of this aggravating circumstance to Petitioner's case was error.

170.    The "grave risk" aggravating circumstance is unconstitutionally vague and

overbroad.

171.     The Pennsylvania Supreme Court has not subjected the "grave risk" aggravating circumstance to a consistent narrowing construction.  Instead, the (d)(7) aggravating circumstance has been broadly applied.  See, e.g., Commonwealth v. Smith, 518 Pa. 15, 540 A.2d 246, 260 (1988) (upholding the (d)(7) aggravating circumstance where all bullets hit the victim and "[t]here were several people on the porch in very close proximity to the murder victim and the shooting who could have been struck by a ricochet, a 'pass through' bullet, or a missed shot").

172.     The failure to give this aggravating circumstance a consistent narrowing construction was especially damaging in this case because during the course of his closing arguments at the penalty phase of Petitioner's trial, the prosecutor urged upon the jury an interpretation of the (d)(7) aggravating circumstance that is even broader than its already overbroad plain language.  The prosecutor argued as follows:

> You've already found the two aggravating circumstances; that the defendant committed a killing while in the perpetration of a felony.  You already found that in your verdict.  And that in the commission of this, he placed others in a grave risk of death or serious bodily injury. I'm sorry. Risk of death.
>
> Now, you're already found that by finding the five counts of aggravated assault. The reason I called the Lieutenant back today was to give you an idea of really how many lives, because that's the most significant of all the factors, mitigating or aggravated, I suggest to you that you're going to hear.  How many lives he put at risk because he was mad.  **You've heard there were 38 individuals in the one building adjacent to that.  And 144 men and women had to do what they did best to put out that fire.  Not to mention the five people who had come out of this house and of course the one woman who died.  But you've already found that.**

*          *          *

59

How do you balance the six lives that were just clearly affected by this, the 38 that very well could have been affected, and the 114 that put out the flames he started. How can you when you weigh what this man did to those people say the fact that he was nice at 15 or 16 now overbalances that. How?

     \*  \*  \*

Legally putting it, just looking at it from a purely intellectual standpoint, how can you sit there and say that those innocent lives do not outweigh his actions or his conduct?

N.T. 11/6/95 at 107-108, 115. (emphasis added).

173. The prosecutor's argument grossly misstated the language of the (d)(7) aggravating circumstance, arguing that it covered the neighbors and firefighters and that this constituted the "<u>knowing</u>" creation of a "<u>grave risk of death</u>." This argument was not objected to by trial counsel and never corrected by the trial court. This resulted in the jury's weighing and finding of an invalid aggravator that could not properly narrow the class of persons eligible for the death penalty.

174. The above described errors violated Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution. Trial counsel was ineffective for failing to raise and properly litigate these issues, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

175. For all of the reasons stated above, the use of this aggravating circumstance as support for Petitioner's death sentence violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Trial counsel was ineffective for failing to object properly to the presentation of the (d)(7) aggravating circumstance to the jury, for failing to object to the prosecutor's overly broad presentation of it, and for failing to move to exclude this aggravating circumstance and then to properly challenge this aggravator in post-verdict

motions and on direct appeal.  Petitioner is entitled to relief from his death sentence.

**VIII.  MR. GWYNN'S CONVICTION AND SENTENCE OF DEATH MUST BE REVERSED BECAUSE THE COMMONWEALTH ENGAGED IN PROSECUTORIAL MISCONDUCT BY ARGUING TO THE JURY THAT MR. GWYNN "MADE A CONSCIOUS DECISION TO MURDER SIX PEOPLE." THE TRIAL COURT FAILED TO CORRECT THIS ERROR, AND TRIAL COUNSEL FAILED TO OBJECT TO THIS IMPROPER LINE OF ARGUMENT, IN VIOLATION OF MR. GWYNN'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

176.    All other allegations and facts contained in this petition and its attachments are incorporated as if fully set forth herein.

177.    The Commonwealth violated Mr. Gwynn's right to due process, a fair trial, his right to be free from cruel and unusual punishment and his right to the effective assistance of counsel in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by repeatedly arguing to the jury that Mr. Gwynn "made a conscious decision to murder six people" when in fact Mr. Gwynn was not charged with a single count of attempted murder.

178.    Mr. Gwynn was charged with murder in the first degree, arson, and five counts of aggravated assault. In its opening statement, the Commonwealth told the jury that Mr. Gwynn tried to kill six people:

> Now, we're here because as the evidence will show on November 20, 1994, this Defendant decided to kill six people.  This is not going to be a who done it.  This will be what did he do, because you will hear from a statement the Defendant gave that he admits this crime.

N.T. 10/31/95 at 19. This argument was both improper and untrue.

179.    Mr. Gwynn was never charged with attempted murder.

180.    Under clearly established Pennsylvania law at the time of Mr. Gwynn's trial, aggravated assault was defined, in pertinent part, as:

> (a) Offense defined – A person is guilty of aggravated assault if he:
>
> (1) attempts to cause serious bodily injury to another, or causes
> such injury intentionally, knowingly, or recklessly under
> circumstances manifesting extreme indifference to the value of
> human life;

18 Pa. C.S.A. § 2702, at 1.  Aggravated assault is a lesser included offense of attempted murder.

See Commonwealth v. Anderson, 538 Pa. 574, 582, 650 A.2d 20, 24 (1994).  It is not the same

offense, hence the difference in the intent necessary to establish the offense: "[s]pecific intent to

kill – is greater than and necessarily includes the intentional, knowing, or reckless infliction of

serous bodily injury, the intent required for aggravated assault." Id. at 582.

181.    Despite the clear state of the law, the Commonwealth told the jury that:

> You'll hear that fortunately in this case while some people were
> injured no one was seriously injured.  However, we will prove to
> you that the attempt to kill these people constitutes aggravated
> assault.

N.T. 10/31/95 at 19.  Again, while aggravated assault is a lesser included offense of attempted

murder, the intent element is less.  Since Mr. Gwynn was not charged with attempted murder of

the other occupants of the building, to argue to the jury that he tried to kill them was improper

and prejudicial.

182.    This line of improper argument did not end with the Commonwealth's opening

statement.  In its closing argument, the Commonwealth again painted Mr. Gwynn as someone

who was on trial for murder as well as multiple counts of attempted murder:

> And that is the mind set of a murderer.  That is the mind set of a
> person who whether they're voluntarily intoxicated or not made a
> conscious decision to end the life of six people, six people who
> might be different from you and me, but six people whose lives
> were almost ended by that man.

N.T. 11/2/95 at 123.

183.     The Commonwealth repeatedly crossed the line into improper argument that was designed to inflame the jury and divert it from its proper fact-finding task.  In a case where the only evidence linking Mr. Gwynn to the fatal fire are his own words – words spoken while under the psychological impact of severe crack-cocaine withdrawal and after he was held for fourteen hours before his interrogation began – to repeatedly argue to the jury that Mr. Gwynn made a conscious decision to kill six people, when he was not charged with attempted murder, constitutes gross prosecutorial misconduct.

184.     The prosecutor made other improper arguments during guilt-phase closing arguments, again without objection from counsel. He stated: "I have all the respect in the world for Mr. Mandell. I actually feel sorry for him having to argue to you that some of the things he had to argue because there is just nothing else there." N.T. 11/2/95 at 115.  He further stated: "When you have nothing to argue you just insult the people who came before you. And I'm not blaming Mr. Mandell, he has a job to do but that's all he's left with."  Id. at 119-20.

185.     These remarks injected the prosecutor's personal opinion – "I actually feel sorry for him" – regarding the strength of the evidence and regarding defense counsel's good faith and motivations in presenting the defense. The prosecutor's message to the jury was that the prosecutor disbelieved defense counsel's assertions and attributed them to the fact that counsel was obligated to present a defense – "he has a job to do" – and "that's all he's left with." Id. This was improper and prejudicial, and competent counsel should have objected.

186.     The trial court erred in allowing the prosecutor to engage in this line of improper

64

argument, in violation of Mr. Gwynn's rights to due process and a fair trial. Trial counsel rendered ineffective assistance by failing to object to the prosecutor's improper and inflammatory remarks, in violation of Mr. Gwynn's Sixth Amendment rights.

187. Moreover, the prejudice from the court's error and counsel's error in this respect contributed to the cumulative prejudice Mr. Gwynn suffered from counsel's deficient performance in other respects and from other guilt phase errors.

## IX. PETITIONER'S SENTENCE MUST BE VACATED BECAUSE THE PROSECUTOR'S PENALTY PHASE CLOSING ARGUMENT DEPRIVED PETITIONER OF HIS RIGHT TO A FAIR CAPITAL SENTENCING PROCEEDING IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

188. All other allegations and facts contained in this petition and its attachments are incorporated as if fully set forth herein.

189. In this case, the prosecutor's penalty phase closing argument was improper from start to finish. A sentence of death cannot stand when the prosecutor has made arguments that may have misled the jury into imposing the sentence for irrelevant and impermissible reasons.

190. The trial court failed to correct any of this improper argument. Trial counsel failed to object to any of the improper arguments.

191. These errors, both individually and collectively, deprived Petitioner of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Denigration of Mercy**

192. The prosecutor belittled the jury's potential consideration of mercy by telling the jury that they should not be at all swayed by the testimony presented by Petitioner's family, and that they should not show any mercy towards the Petitioner himself:

> You only have one decision to make, and that is [sic] legal one, and I say that at

the outset because there was no dispute that what you see, what you saw here and what you see in any situation is emotion and sorrow, but I think you recognize that. I think you recognize that that's not something, one family's tears now are not any worse or any better than one family's fears a year ago when they lost a loved one. Your decision is simply a questions of law. And I didn't ask you then and I'm not going to ask you to be influenced or swayed by any passion or sorrow you might feel for anyone.

NT 11/6/95 at 106.

### Improperly Denigrating the Jury's Consideration of the Age Mitigator

193. The prosecutor asked the jury to disregard the Petitioner's age as a mitigating

factor. In doing so, he improperly denigrated their consideration of age as a mitigating factor.

194. The prosecutor told the jury as the following.

...Number four is the age of the defendant. They say the fact that he was two months from his 25th birthday is a mitigating circumstance. If he was 17 when this happened, you would be instructed absolutely, that's a mitigating circumstance. When you're 18 you can vote, you can fight for your country, you can do just about anything. When you're 21 there's no way anybody could consider you to be anything less than an adult, and this was a man by his own mouth [sic] said he wanted to accept adult responsibilities at 14 by having children with woman after woman. He wanted to have a baby. And now they tell you well, he's a little too young. **That's a mitigating factor? How is the age of almost 25, 24 years and ten months a mitigating factor? How does that mitigate? Do you really believe he didn't know what he was doing at that point in his life?** Do you really believe he was so young that he could not appreciate his criminality?

NY 11/6/95 at 112-113 (emphasis added).

195. The prosecutor's improper statement to the jury led them to believe that the age of

the Petitioner was irrelevant in this case because statutorily, it was limited to a person of youth.[15]

---

[15]A jury could find that Petitioner's age of twenty five could be mitigating for a number of reasons. A jury might find that it was significantly mitigating that Petitioner had lived that many years without having been convicted of any serious criminal offense. Or, a jury might have determined that Petitioner's age was mitigating because of the likelihood that, if sentenced to life, he could be imprisoned for at least fifty years or more. The essential point is that the

**Petitioner's Alleged Irresponsibility**

196.    The prosecutor also stigmatized and stereotyped the defendant as a promiscuous, high school drug addicted dropout who was hell bent on having an untold number of out-of wedlock children.  He argued:

> [A]nd this was a man by his own mouth [sic] said he wanted to accept adult responsibilities at age 14 by having children with woman after woman.  He wanted to have a baby...[h]e wanted to be his own man.  He wanted to hang with another group.  He did something when he decided he didn't want to go to school anymore.  He wanted to take drugs and all of the terrible pressures of that job, that awful job...He made the choice and that's why we're here.

NT 11/6/95 at 112-13, 115.

197.    Here the prosecutor's comments incited the jury to sentence Petitioner to death not because he deserved to die but because of some dislike they may have had for the painted stereotype. Moreover, these comments were an attempt by the prosecutor to direct the jury towards considerations of prejudice and/or lead the jury away from its responsibility to resolve the basis on the basis of the evidence actually relevant to its deliberations.

**Other Improper Arguments**

198.    The prosecutor improperly and incorrectly inflated the grave risk aggravating circumstance, giving the jury the erroneous impression that Mr. Gwynn created a "grave risk" to individuals living in the adjacent building as well as to firefighters.

199.    During his closing, the prosecutor told the jury the following:

> Now, one part of that says because I have to prove to you beyond a reasonable doubt the two aggravating circumstances.  You've already found the two

---

legislature did not place any limit on the age mitigator, the Constitution would not allow any such limitation yet the prosecutor gave that impression.

aggravating circumstances; that the defendant committed a killing while in the perpetration of a felony. You already found that in your verdict. And that in the commission of this, he placed others in a grave risk of death or serious bodily injury. I'm sorry. Risk of death.

Now, you're already found that by finding the five counts of aggravated assault. The reason I called the Lieutenant back today was to give you an idea of really how many lives, because that's the most significant of all the factors, mitigating or aggravated, I suggest to you that you're going to hear. How many lives he put at risk because he was mad. **You've heard there were 38 individuals in the one building adjacent to that. And 144 men and women had to do what they did best to put out that fire. Not to mention the five people who had come out of this house and of course the one woman who died. But you've already found that.**

NT 11/6/95 at 107-108.

200.     The facts simply do not support a finding that the defendant "knowingly caused a grave risk of death" to the neighbors or to firefighters. The prosecutor's argument was overbroad and misstated the language of the (d)(7) aggravating circumstance. The (d)(7) aggravating circumstance states as follows: "In the commission of the offense the defendant **knowingly created a grave risk of death to another person** in addition to the victim of the offense."

201.     This statement on the part of the prosecutor is particularly offensive given the fact that the defendant was laboring under a diminished capacity at the time of the offense and thus could not form the specific intent to kill, let alone "knowingly create" a grave risk of death to the 38 neighbors and purported 114 firefighters.

202.     The prosecutor also argued improperly at closing argument at penalty phase by attempting to diminish the jury's sense of responsibility for imposition of sentence by blaming the defendant. Specifically, he told the jury that

One of his witnesses said to you you will — you're supposed to kill him or words to that affect. No, you didn't do anything. The reason we're here is because he did something...He made the choice and that's why we're here.

68

NT 11/6/95 at 114-5.

203.     This was improper. The prosecutor's argument led the jury to believe that the responsibility for determining the appropriateness of the defendant's death rested elsewhere.

**Conclusion**

204.     The Commonwealth's misconduct in this case is clear.  The prosecutor repeatedly invited the jury to base its decision on passion and prejudice, deflecting it from its duty.  In the context of this case, these improper arguments undermined the fundamental fairness of the sentencing proceeding. They violated Mr. Gwynn's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

205.     Moreover, the prejudice from the trial court's error and counsel's error in this respect contributed to the cumulative prejudice Mr. Gwynn suffered from counsel's deficient performance in other respects and from other penalty phase errors.

X.     **THE PROSECUTOR USED HIS PEREMPTORY CHALLENGES IN A RACIALLY DISCRIMINATORY MANNER AND AS PART OF A DISCRIMINATORY POLICY OF THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE, IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

206.     All other allegations and facts contained in this Petition and its attachments are incorporated as if fully set forth herein.

207.     The Equal Protection Clause of the United States Constitution forbids the prosecutor from striking potential jurors on account of their race or on the assumption that African American jurors will be unable to impartially consider the prosecution's case against an African American defendant.  Batson v. Kentucky, 476 U.S. 79 (1986).

208.     Any Batson claim requires a three step analysis.  First, the Petitioner must set

69

forth a prima facie case of discrimination. An inquiry into the prosecutor's motives for his challenges is required where the facts and circumstances "raise an inference" of exclusion on the basis of race. The burden of production then shifts to the Commonwealth, which must demonstrate a race neutral reason for its strike. If the Commonwealth meets its burden, the Petitioner must demonstrate that the purported race neutral reason is, in fact, a pretext for purposeful discrimination.

209.    Petitioner is an African American man. As set forth below, the Commonwealth here used at least three of its peremptory strikes in a racially discriminatory manner to strike African Americans from the jury:

- **James Payne**, <u>see</u> N.T. 10/26/95 at 157-163, who had served as a juror in a criminal case previously. He had a lot of friends who were police officers. Mr. Payne was able to vote for the death penalty in an appropriate case, and stated that he would decide the case based upon the facts presented to him and the law provided by the court, and that he would be a fair and impartial juror.

- **Brenda Pone, III,** <u>see</u> N.T. 10/27/95 at 57-63, a mental health worker with a college degree who explained that she would be able to be a fair and impartial juror, and that she would vote for the death penalty in appropriate circumstances

- **Cheryl Seaborough**, <u>see</u> N.T. 10//27/95 at 107-111, a medical coordinator. She had served previously in a criminal case.

210.    Accordingly, Petitioner has set forth of <u>prima facie</u> case of racial discrimination in the use of peremptory challenges by the Commonwealth. He is therefore entitled to either an evidentiary hearing on this claim, so that the Commonwealth may offer rebuttal to his prima facie <u>Batson</u> case, or in the alternative, a new trial under <u>Batson</u>.

211.    Additionally, the record demonstrates that the Commonwealth had no race-neutral reason for striking these African American prospective jurors. Indeed, these stricken African American prospective jurors had characteristics that would ordinarily be favored by the

Commonwealth in a criminal prosecution. When asked, two of the three stated that they could, under proper circumstances, impose the death penalty.[16] Two expressly stated that they had finished high school, one attained a college degree and the other had 1½ years of education beyond high school. Two were expressly questioned and all indicated that they could be fair and impartial jurors.

212. Moreover, the prosecutor's racially discriminatory use of peremptory challenges was not limited to Petitioner's trial, but was part of a systematic prosecutorial practice over a period of time. Recent revelations about the Philadelphia District Attorney's Office's training of Assistant District Attorneys indicate that racial discrimination in jury selection was a policy of the District Attorney's Office and that Assistant District Attorneys were instructed to use peremptory strikes in a racially discriminatory manner. Thus, Petitioner is also entitled to relief under the standard enunciated in <u>Swain v. Alabama</u>, 380 U.S. 202 (1965).

213. In April 1997, the Philadelphia County District Attorney's Office released[17] a 1986 training videotape of former prosecutor Jack McMahon instructing his colleagues on the topic of jury selection ("McMahon Tape"). On this videotape, Mr. McMahon instructed members of the Philadelphia District Attorney's Office to exclude venirepersons based on improper race and gender considerations.

214. For example, Mr. McMahon advised his colleagues to reject African American

---

[16] Cheryl Seaborough was not asked the question.

[17] Insofar as the Commonwealth in this case was aware of videotapes and other materials revealing the District Attorney's Office's policy and training methods, as described above, and failed to provide this important evidence to the defense in this case, the Commonwealth has violated Petitioner's rights pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.

petit jurors, McMahon Tape Transcript at 25 ("I know I'm not taking Reynard Boiken"); young black women, id. at 57 ("young black women, are very bad"); African Americans who come from poor neighborhoods, id. at 21 ("you don't want any jurors from 33rd and Diamond"); and older black women when there is a young black defendant. Id. at 56. The tape also shows that, in Mr. McMahon's experience, his fellow prosecutors were engaging in such racial discrimination in jury selection: "I've seen DAs who strike them because they're black, and that's kind of like a rule, 'Well, they're black, I've got to get rid of them.'" Id. at 56.

215.    Notably, Mr. McMahon did not advise his colleagues to strike all African American jurors. Rather, he advised his colleagues to manipulate the selection process so as to achieve a pre-ordained racial mix while appearing to not run afoul of Batson. E.g., McMahon Tape Transcript at 59. He further advised his colleagues to prepare pretextual reasons for their racially and gender-biased jury strikes, id. at 69-71 ("but I think the policy that we have been using is that ... to be aware of this case, and the best way to avoid any problems with it is to protect yourself. And my advice would be in that situation is when you do have a black jury, you question them at length.... So, sometimes under that line you may want to ask more questions of those people so it gives you more ammunition to make an articulable reason as to why you are striking them, not for race."). Mr. McMahon also counseled his colleagues to pick biased white jurors, id. at 63 ("I've had good luck with teachers that teach in the public school system ... they may be so fed up with the garbage that they've had in their schools ... If you get like a white teacher teaching in a black school that's sick of these guys ....").

216.    Moreover, a study by respected statisticians David Baldus and George Woodworth shows that the odds of a defendant in Philadelphia receiving the death sentence are

3.9 times higher if the defendant is black than if the defendant is white and suggests that one major reason for this disparity was the District Attorney's pervasive practice of striking black jurors, at a rate of 52% in cases from 1983 to 1993, compared with a rate of 23% for other potential jurors. <u>See</u> Richard Dieter, *The Death Penalty in Black and White: Who Lives, Who Dies, Who Decides*, at 1, 8-14, 22-23 (June 1998). The prosecutor's racially discriminatory use of peremptory challenges thus was not limited to Petitioner's trial, but was a systematic prosecutorial practice over a period of time. Therefore, Petitioner is also entitled to relief under the standard enunciated in <u>Swain v. Alabama</u>, 380 U.S. 202 (1965). <u>Cf</u>. <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989) (municipal liability for civil rights violation can be established based upon a "training program [that is] closely related to the ultimate injury").

217. Petitioner has, at the very least, set forth a <u>prima facie</u> case of racial discrimination in the use of peremptory challenges by the Commonwealth. He is therefore entitled to a new trial under <u>Batson</u> and its progeny. Moreover, insofar as the prosecutor's racially discriminatory use of peremptory challenges was not limited to Appellant's trial, but was part of a systematic prosecutorial practice over a period of time, Petitioner is also entitled to relief under <u>Swain v. Alabama</u>, 380 U.S. 202 (1965).[18] The withholding of information about the

---

[18] In this context, it is also noteworthy that (as of March 2, 2009) Pennsylvania has 2224 prisoners on death row, of whom 133 are African American and 72 are white. <u>See</u> PENNSYLVANIA DEPARTMENT OF CORRECTIONS, PERSONS SENTENCED TO EXECUTION IN PENNSYLVANIA AS OF MARCH 2, 2009, available at www.cor.state.pa.us/portal/lib/portal/ Execution_List.pdf. Thus, the ratio of Black-to-White death row inmates in Pennsylvania is 1.95-to-1. According to the most recent statistics compiled by the United States Department of Justice, Pennsylvania's ratio of Black-to-White death row inmates was the highest in the nation as of the last day of 2007 (1.81-to-1). By comparison, the national ratio was .75-to-1, and the ratio for the combined Southern states was .80-to-1. UNITED STATES DEPARTMENT OF JUSTICE, CAPITAL PUNISHMENT 2007, available at www.ojp.gov/bjs/pub/html/cp/2007/tables/ cp07st04.htm. The figures from Philadelphia County are even more shocking. As of March 2,

District Attorney's Office's practices (at trial and on direct appeal) violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.

218.    To the extent that prior counsel failed to properly raise and litigate this issue, counsel provided ineffective assistance.  These errors worked to deny Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**XI.    MR. GWYNN IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE COMMONWEALTH WAS PERMITTED TO INCORPORATE INTO THE SENTENCING PROCEEDINGS IRRELEVANT AND INFLAMMATORY EVIDENCE OF NON-STATUTORY AGGRAVATING CIRCUMSTANCES, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

219.    All other allegations, facts and claims contained in this Petition, its attachments and the other submissions made in this litigation are incorporated as if fully set forth herein.

220.    Mr. Gwynn is entitled to a new sentencing hearing because the Commonwealth was permitted to incorporate into the sentencing proceedings irrelevant non-statutory evidence in aggravation of sentence, and the jury was instructed that it was appropriate to consider all of this evidence in its sentencing deliberations, in violation of the Eighth and Fourteenth Amendments.

221.    The capital sentencing jury in this case was exposed to and considered a wide range of irrelevant, non-statutory aggravating evidence that was incorporated from the guilt stage into the sentencing stage of trial and that so undermined the truth-determining process as to render the sentencing proceedings in this case inherently unreliable.

222.    The Commonwealth introduced at trial a wide range of information that was inappropriate for the jury's consideration at sentencing. This included trial exhibits unrelated to

_____

2009, there are 110 death row inmates that were prosecuted by the Philadelphia District Attorney, of whom 94 are Black, 9 are White, and 7 are Hispanic or Asian.  Thus, the ratio of Black-to-White death row inmates from Philadelphia County is a remarkable 10.44-to-1.

penalty phase; improper and inflammatory arguments that Mr. Gwynn consciously tried to murder six people; and evidence of prior bad acts, such as automobile theft, the failure to appear at court proceedings and other criminal charges.

223.    During the trial, the jury was told repeatedly that Mr. Gwynn had five outstanding bench warrants at the time of his arrest.  The arresting officer testified that Mr. Gwynn had "five outstanding warrants" and "bench warrants for failing to appear in court."  N.T. 10/31/95 at 170. The prosecutor emphasized the number of warrants, asking the officer what procedure he follows when someone has "not five but one bench warrant."  Id. at 171.  The arresting officer testified that he told Mr. Gwynn that he had "five outstanding warrrants."  Id.  The officer who transported Mr. Gwynn to the warrant unit and then to the Police Administration Building for booking also informed the jury that they had to do paperwork for Mr. Gwynn's "five warrants." N.T. 11/1/95 at 6.

224.    The court expressly informed the jury that it was to take all of this testimony into consideration in determining Mr. Gwynn's sentence.  The court stated: "You should consider **all the evidence and arguments** of both the Commonwealth and the defendant, **including the evidence you heard during the earlier trial.**" N.T. 11/6/95 at 154.[19]  Consideration of this non-

---

[19]  The presiding judge did issue a limiting instruction at the close of the *guilt* phase:

> You have heard evidence in this case which tended to prove that the defendant may have been guilty of certain improper conduct for which he is not on trial.  That evidence was for *a limited purposed and that's to tend to show you or to tie in or to be relevant to the circumstances in this case.* The evidence must not be considered by you in any way other than for that purpose.  You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer *guilt*.  If you find the defendant *guilty* it must be because you're convinced by the evidence that he committed the crime

statutory aggravating evidence in Mr. Gwynn's capital sentencing proceedings violated the Eighth and Fourteenth Amendments.

225.    The trial court failed to provide any penalty phase jury instructions concerning the jury's use of prior bad acts evidence.  Thus, the court allowed the jury to consider this inadmissible evidence in determining whether Mr. Gwynn should be executed. The failure to give an appropriate limiting instruction denied Mr. Gwynn his Eighth and Fourteenth Amendment rights.

226.    Trial counsel was ineffective for failing to object to the incorporation of this evidence at the penalty phase, and – after it was incorporated – for failing to request an appropriate limiting instruction on this and the other non-statutory aggravating evidence.  Trial counsel was also ineffective for failing to request an instruction specifically to inform the jury that they could not consider the evidence of Mr. Gwynn's bench warrants at all in their sentencing determination.

227.    This inflammatory evidence was not a proper basis for the jury's sentencing deliberations, and Mr. Gwynn would have been entitled to a limited instruction had counsel requested one.  Trial counsel's deficient performance prejudiced Mr. Gwynn because there is a reasonable probability that, properly instructed, the jury would not have voted for a death sentence.  Moreover, the prejudice from counsel's error in this respect contributed to the cumulative prejudice Mr. Gwynn suffered from counsel's deficient performance in other respects

---

charged, not because you believe he is wicked or has committed other improper conduct.

N.T. 11/2/95 at 164-65.  Nothing in this guilt-phase instruction suggested that the jury should not consider the bench warrants in deciding whether to impose a sentence of death.

and from other penalty phase errors.

228. The jury's consideration of this evidence violated Mr. Gwynn's rights under the Eighth and Fourteenth Amendments to the United States Constitution. Counsel's failure to take any remedial steps to preclude the consideration of this evidence, either by objection or request for a cautionary instruction also denied Mr. Gwynn the effective assistance of counsel, in violation of the Sixth Amendment.

229. Moreover, the prejudice from counsel's error in this respect contributed to the cumulative prejudice Mr. Gwynn suffered from counsel's deficient performance in other respects and from other penalty phase errors.

## XII. MR. GWYNN'S DEATH SENTENCE MUST BE VACATED BECAUSE THE "PROPORTIONALITY REVIEW" PERFORMED BY THE PENNSYLVANIA SUPREME COURT DID NOT PROVIDE HIM THE MEANINGFUL APPELLATE REVIEW MANDATED BY FEDERAL CONSTITUTIONAL LAW.

230. All other allegations and facts contained in this petition and its attachments are incorporated as if fully set forth herein.

231. Mr. Gwynn's death sentence must be vacated because the Pennsylvania Supreme Court failed to provide him meaningful proportionality review, in violation of federal constitutional law.

232. Mr. Gwynn's sentencing jury found three aggravating circumstances: that he committed the killing while in the perpetration of a felony (arson); that in the commission of the offense he knowingly created a grave risk of death to other persons; and that he had been convicted of another murder either before or at the time of the offense at issue. See 42 Pa.C.S. § 9711(d)(6) and (7). The jury also found two mitigating circumstances, namely, that Mr. Gwynn had no significant prior history of criminal convictions and other evidence of his character and

record and the circumstances of the offense.  <u>See</u> 42 Pa.C.S. § 9711(e)(1) and (e)(8).

<u>Commonwealth v. Gwynn</u>, 723 A.2d 142 (Pa. 1998).

233.    On December 14, 1998, appellate counsel filed in the Pennsylvania Supreme Court a Supplemental Application For Reargument Based On The Omission By This Honorable Court To Conduct The Required Proportionality Review Pursuant To 42 Pa. C.S. Section 9711 (h)(3).

234.    As demonstrated below, the database relied upon the Pennsylvania Supreme Court in this case is fundamentally flawed and inaccurate.  Insofar as the court relied upon the AOPC database in reaching its conclusions in Mr. Gwynn's case, the court's conclusion rests upon unreliable and faulty information.  Insofar as the court did not rely upon the AOPC database, or relied upon information external to the AOPC database, the court's conclusions are likewise faulty.  In either case, Mr. Gwynn's death sentence cannot stand.  Further, there was no proper notice to appellate counsel of what would be considered for purposes of the "proportionality review" in this case, or appropriate opportunity to be heard, or other steps necessary for the defendant/appellant to be afforded due process.  <u>See</u> discussion <u>infra</u>.

235.    At the time of Mr. Gwynn's direct appeal, the Pennsylvania Supreme Court was required by statute to determine whether the sentence of death imposed in each case is "excessive or disproportionate to the penalty imposed in similar cases."  42 Pa. C.S. § 9711(h)(3)(iii).  The Court itself has explained that it relies upon a database, prepared and maintained by the AOPC, to determine the universe of "similar cases," and to conduct its proportionality review.

236.    Thus, the Pennsylvania Supreme Court has established two important criteria for

determining "comparison cases" for the purpose of comparative proportionality review. First, the determination of "similar cases" must involve a factual comparison of the full range of aggravating and mitigating features of the defendant and the offense. Second, the cases against which a given death sentence is compared for proportionality must include the entire universe of Pennsylvania death-eligible cases, first-degree murder convictions that have resulted in life sentences as well as those resulting in death sentences. As explained below, the proportionality information provided to the Pennsylvania Supreme Court by the Administrative Office of Pennsylvania Courts in this case – the information upon which the court relied – did not and could not provide the Court with a meaningful basis to perform its statutory and constitutional duty.

> **A.** **Mr. Gwynn Did Not Receive the Proportionality Review to Which He is Entitled.**

237. Mr. Gwynn did not receive the proportionality review to which he is entitled. At an evidentiary hearing on this matter, Petitioner will present evidence demonstrating that the defective proportionality information provided to the Pennsylvania Supreme Court by the Administrative Office of the Pennsylvania Courts, and upon which the court relies in conducting the proportionality review, made it impossible for the court to conduct a meaningful proportionality review in this case.

238. The AOPC database collects information on all death-eligible, first degree murder cases. At the outset then, the database has no means by which to include information about those cases where a defendant has entered a guilty plea, or where the jury is hung and the judge imposes a sentence. Moreover, the database has no method by which to include information about cases where a prosecutor chooses not to go forward with a first degree murder prosecution,

but where the facts of that case might be comparable to other death-eligible cases.

239.    The data collection method employed by the Pennsylvania Supreme Court collects information on mitigators _presented_ and aggravators _found_.  The decision to collect such information lacks any statistical relevance.  Further, there is nothing in the AOPC database which permits the database to correct for this error.  Indeed, for the database to collect statistically relevant information, it would have to collect and compare aggravators found with mitigators found.

240.    Despite the limited parameters of the AOPC data collection methods and their impact on the AOPC database, human data entry error has also corrupted the database.  Thus, the database includes entries that are statutory impossibilities: cases in which the death penalty was not sought but where aggravators and mitigators were supposedly found; death sentences where no aggravators were found; and life sentences where aggravators were found but no mitigators were found.

241.    Moreover, AOPC legal counsel, Zygmont Pines, has himself admitted in court testimony that the AOPC cannot ascertain the strength of mitigating evidence presented in a case, see Commonwealth v. Terry, N.T. 2/21/96 at 198, that nothing in its proportionality database permits the AOPC to identify, select out, or compare between specific types of mitigating evidence presented under 42 Pa. C.S. § 9711(e)(8),  Terry, N.T. at 243-49, and that the AOPC database provides no meaningful basis to do "any kind of qualitative review."  Id. at 198.

242.    The evidence summarized above demonstrates that systemic and case-specific defects in the information provided by the AOPC rendered meaningful comparative

proportionality review by the Court in this case impossible and, accordingly, Mr. Gwynn did not

receive the proportionality review to which he is entitled under 42 Pa. C.S. § 9711(h)(3)(iii).[20]

---

[20] Indeed, concern over the integrity of the AOPC database was widely shared prior to Legislature's recent repeal of statutory proportionality review. Recognizing the huge defects in the proportionality review process, Pennsylvania Governor Thomas Ridge on June 25, 1997. signed into law a bill eliminating statutory proportionality review (pursuant to 42 Pa.C.S. § 9711(h)(3)(iii)), from Pennsylvania's death penalty statute. Act of June 25, 1997, No. 28, § 1 (Act 28). In the weeks leading up to the passage and signing of this bill, legislators and prominent prosecutors appeared in newspapers around the Commonwealth calling for the elimination of statutory proportionality review out of concern over the lack of integrity of the process and data utilized by the Pennsylvania Supreme Court to conduct it. These key state leaders warned that because of data flaws and methodological infirmities, the courts would upset scores of Pennsylvania death penalty cases. The papers read:

> Warning that inaction could cancel almost every death sentence handed down in the past decade, some prosecutors and lawmakers are urging the General Assembly to swiftly approve new limits on appellate review . . . At issue is an arcane provision in Pennsylvania's death-penalty law that . . . allows the Supreme Court to affirm or vacate death sentences that the justices consider "excessive or disproportionate."

*Pressure Grows on Hill to Curb Appellate Review; Action Urged to Preserve Death Penalty*, THE HARRISBURG PATRIOT, June 6, 1997, 1997 WL 7520267. The Pittsburgh Post-Gazette ran similar articles:

> Ronald Eisenberg, deputy Philadelphia District Attorney, warned . . . that cases such as [Commonwealth v.] Gribble's . . . "ha[ve] . . . the potential to knock out every single existing death-penalty case in a single blow". . .

*Loophole for Death Row*, PITTSBURGH POST-GAZETTE, June 8, 1997, 1997 WL 4531427. THE HARRISBURG PATRIOT also referred to the <u>Gribble</u> matter:

> Lawmakers who voted to eliminate the 'proportionality review' section of the death-penalty statute said it was imperative to do so because of a pending case now before the state Supreme Court . . . 'This has the potential to invalidate every existing death penalty case in the state,' said Sen. Daniel Delp, R-York.

*Senate OKs Death Penalty Bill; Fearing Overturned Sentences, Lawmakers Scrap Provisions of Law*, THE HARRISBURG PATRIOT, June 17, 1997, 1997 WL 7521489.

**B.      The Defective Proportionality Review Provided Mr. Gwynn Violated His Constitutional Right to Due Process.**

243.      To conform with due process, a petitioner is entitled to notice and an opportunity to be heard.  In Mr. Gwynn's case however, the procedures developed and employed by the Pennsylvania Supreme Court for its mandatory proportionality review deprived him of these fundamental rights and thus violated his rights under the Eighth and Fourteenth Amendments.

244.      The Pennsylvania Supreme Court's review is not of-record, and is based on data collected by AOPC but not provided to appellate counsel prior to the court's consideration. Moreover, as the court recently acknowledged, it sometimes uses information external to the AOPC database in reaching its proportionality determination.[21]  Counsel, therefore, has no opportunity to determine what errors exist in the database or in any other information considered by the court, and to make appropriate challenges on direct appeal.

245.      Direct appeal counsel was never given proper notice of the comparison cases used to determine the proportionality of Mr. Gwynn's sentence; an opportunity to seek inclusion or exclusion of the comparison cases; an opportunity to be heard on the actual comparison; an opportunity to review the AOPC database and/or any additional information considered by the Court;[22] or an opportunity to seek correction of errors in that information.  Indeed, nothing in the Supreme Court's opinion explains whether the AOPC database was even used in Mr. Gwynn's case, or whether the Court relied on some other source of information.  This Court cannot but

---

[21]  In Mr. Gwynn's case, because the Pennsylvania Supreme Court failed to indicate whether it relied upon the AOPC database at all, one must assume that the Court relied <u>entirely</u> upon information external to the AOPC database.

[22]  Moreover, although the data is disclosed to judges who presumably will consider it responsibly, that does not cure the manifest constitutional deprivation.

conclude that direct appeal counsel had absolutely no input – and no opportunity to input – into the Pennsylvania Supreme Court's proportionality review.

246.    Barring counsel from the entire process – as was the case here – is not consistent with fundamental due process.  At the time of Mr. Gwynn's direct appeal, there was no mechanism by which appellate counsel could be fairly heard concerning any objections to this information.  This lack of proper notice and an opportunity to be heard violated Petitioner's due process rights under the Fourteenth Amendment to the United States Constitution.

247.    The lack of any meaningful proportionality review denied Mr. Gwynn his rights to a reliable ultimate determination of sentence, as required by the Eighth Amendment; his federal due process rights under the Fourteenth Amendment.

248.    Mr. Gwynn, as do all capital defendants, has a protected liberty interest in meaningful appellate review of his conviction and death sentence, including a meaningful proportionality review of his sentence by the Pennsylvania Supreme Court.  That liberty interest was denied because the "review" performed by the Pennsylvania Supreme Court was arbitrary and irrational.

249.    For the reasons described above, the "Proportionality Review" actually provided to Mr. Gwynn, assuming such analysis took place, by the Pennsylvania Supreme Court arbitrarily denied him the proportionality review mandated under Pennsylvania law and denied his right to due process of law and violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**XIII.    THE PROSECUTION SUPPRESSED MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE AND KNOWINGLY MADE FALSE REPRESENTATIONS TO THE COURT; THE IDENTIFICATION PROCEDURE USED IN THIS CASE WAS IMPERMISSIBLY SUGGESTIVE; THE SUM OF THE UNDISCLOSED EVIDENCE DEMONSTRATES THAT MR. GWYNN IS**

**INNOCENT; ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO UNCOVER THE EVIDENCE THE COMMONWEALTH SUPPRESSED.**

250. All other allegations, facts and claims contained in this Petition, its attachments and the other submissions made in this litigation are incorporated as if fully set forth herein.

251. In August 1993 – approximately fifteen months prior to the November 1994 fire for which Gwynn was convicted and sentenced to death – a homeless squatter named Glen Taylor was murdered at the same address. Donald Minnick, Larry Hawkins, John Antrom, and Terry McCullough – the same persons who later survived the fire and purportedly identified Gwynn – were critical eyewitnesses in Taylor's murder case. Gary Lupton and Maurice Johnson were charged with murdering Taylor and savagely beating Minnick, who was hospitalized for five days with serious head injuries. Minnick regarded Taylor as a brother, Hawkins considered Taylor his son, and all of them were extremely close to one another.

252. When Larry Hawkins, John Antrom, and Terry McCullough spoke to the officers investigating Taylor's death on August 8, 1993, they each reported that two men were responsible: Johnson and a man named Rick.

253. Two days later, they were shown photo arrays, and they stated that the man they called Rick was actually named Gary Lupton. (Hawkins: "The first time I seen Rick was when all this happened. We found out that his real name is Gary.") (Antrom identifying man in photo array: "His name is Gary. I called him Rick.").

254. At Lupton's trial – on November 17, 1994, three days before the fire in this case – Antrom confirmed that Rick was Gary Lupton. Commonwealth v. Gary Lupton, N.T. 11/17/94 at 119 (hereinafter "Lupton N.T.").

255. Antrom and McCullough both told police officers investigating the Taylor murder

84

that Johnson and Rick/Lupton had threatened to kill the squatters if the squatters told police what Johnson and Rick/Lupton had done.  Antrom told police that Rick/Lupton said, "if Reese [Maurice Johnson] gets picked up I am going to carry out the rest of the orders. I am going to have you killed. I'll get someone to 'spray' the building."  McCullough was asked "the last time you saw Rick & Reese," and he responded, "Last night when they threatened me. Both of them said – If I tell the police anything about beating up Donald they would kill me."  Two days later, McCullough told police, "Reese and Rick were saying that if the police came looking for them then they would know we told on them and that they had back-up that would take care of us."  Antrom testified at Lupton's trial that Johnson threatened them by saying, "If any of y'all tell who did this to him, that we'll kill you."  Antrom testified at trial that these threats left him "kind of scared." Lupton N.T. 11/17/94 at 70.

256.    Less than three days after Antrom testified under oath at Lupton's trial that Rick was Gary Lupton, the fire occurred.[23] Antrom, Minnick, Hawkins, and McCullough were all still squatters in the house. Officers investigating the fire that morning asked the squatters who was responsible for the fire. They all reported that Rick had been there a day ago and fought with Antrom and Minnick. In at least fourteen different statements given after the fire, the squatters identify one suspect:  Rick.  None differentiate this Rick from Rick/Lupton. None mention Daniel Gwynn.

257.    There is no evidence indicating that these homeless persons realized that Lupton was incarcerated during his trial. Lupton was not arrested until well after Johnson was arrested,

---

[23] Minnick and Antrom testified on a Thursday, the trial did not reconvene until the following Tuesday, and the fire occurred early on the Sunday morning between them.

and when the squatters were subpoenaed to appear at Johnson's preliminary hearing, Lupton was still free, was subpoenaed to appear along with them, and waited with them in the same witness room. When Minnick and Antrom testified at Lupton's jury trial prior to the fire, Lupton presumably was in street clothes. There is no evidence that the squatters ever learned that Lupton was in custody at the time of the fire.

258.    A few hours after taking the initial round of statements implicating Rick, the police investigating the fire – the officers investigating the fire included at least three of the same officers who investigated the Taylor murder – returned to the crime scene and approached Minnick and McCullough.  According to the police reports, Minnick and McCullough were shown "a group" of black and white photos – not an identified photo array, and with no express indication that any other suspects' photos were included – and both men identified Daniel Gwynn's photo as Rick.[24]

259.    The officer who reported showing the photographs from which Minnick and McCullough identified Gwynn as Rick was subpoenaed for trial, but he never was called by the prosecution to testify at either the suppression hearing or the trial.

260.    The prosecution has never disclosed to the defense the photos which led to the

---

[24] It is unclear whether the other victims failed to identify Gwynn or were never shown the photos. The police have not disclosed their activity sheets from this case.

Minnick's identification of Gwynn would have been subject to impeachment had counsel been aware of the gross unreliability Minnick's prior identification of Lupton. Minnick testified at Lupton and Johnson's preliminary hearing that he had known Johnson before the incident but not Lupton. When Minnick was asked to identify which defendant was which in court, he got down from the witness stand, stood "eyeball to eyeball" with the two defendants, and pointed to Lupton as the person he knew. His in-court eyewitness identification, made under oath, was wrong. At the trial, he said he had not been wearing his glasses that day. See Lupton N.T. 11/28/94 at 77-78 (summarizing testimony).

identification of Gwynn as Rick. This is true even though Gwynn's trial counsel filed a pre-trial motion to suppress the identifications based on a suggestive photo identification procedure, and even though at the hearing on that motion the judge stated that he "would like counsel to see the photo spread." N.T. 10/25/95 at 117. At the suppression hearing, the prosecutor denied that he himself had ever seen the photos from which Gwynn was identified as Rick. Id.

261.     The prosecutor stated to the court that "there's a good chance I would not use the photo" he had never seen because, "This was actually an unusual circumstance in that they knew the defendant and they told the police you already have a picture of him because he had been in another photo display on another murder so the police came and," at which point he was interrupted by the court. Id. at 6.

262.     Later in the hearing, the prosecutor argued that the suggestive photo identification motion should be denied because the witnesses had already known Gwynn. Defense counsel responded, "I've been told by the defendant he does not know these people." Id. at 112. After the trial court acknowledged that Gwynn was entitled to make the motion, the prosecutor stated, "He wasn't the prime suspect in the – it's another photo spread. He wasn't even the prime suspect. In other words, he was a filler and the people all knew him, you already got his photo, you showed it to us on that other occasion." Id. at 113.

263.     The judge stated that he wanted counsel to see the photo spread, and the prosecutor responded:

> Judge, I explained to Mr. Mandell, now may I just state this for the record
> so you understand. These folks were witnesses in a related – a completely
> unrelated homicide that took place in that same location. They're
> homeless and they had seen something. And there was someone
> completely unrelated to the defendant and they looked at photo spreads.
> They've known the defendant for a year. When this homicide happened

they're all telling the detectives who the defendant is, they said ["]You
already have the photo, they're in the other spread.["]

THE COURT: What about that other spread?

MR. RILEY: That other spread, it was three years ago.

THE COURT: It's nonexistent.

MR. RILEY: It's nonexistent.

N.T. 10/25/95 at 117. The prosecutor never identified for the court or the defense either the

victims or the defendants in the other murder, and he stated that this other murder occurred

"three years ago."

264. In short, the prosecutor represented that when the police investigating the fire

interviewed the squatters and asked them who Rick was, the squatters told the police that they

already had Rick's photo from the lineup – the lineup in which the prime suspects were

Rick/Lupton and Johnson. But according the to prosecutor, the witnesses did not tell the police

that Rick was Rick/Lupton or Johnson. Instead, according to the prosecutor, the squatters

remembered, more than a year later a photo of a man that was included in those arrays as a filler,

and were telling the police that filler photo of Gwynn was Rick.

265. If the prosecutor was correct that the squatters told the police investigating the

fire that Rick was someone in the Rick/Lupton and Johnson photo arrays, that fact was omitted

from the police reports that were disclosed to the defense. Again, the fire occurred during the

Taylor murder trial and at least three of the officers investigating the fire (including the officer

who reportedly elicited Mr. Gwynn's confession) also had investigated the Taylor murder.

266. Undersigned counsel have been unable to determine whether the prosecutor was

correct that the squatters said Rick was Daniel Gwynn and Rick/Gwynn's photo was in the

Rick/Lupton or Johnson photo arrays only as filler. The photo arrays from the Taylor murder, as well as the photos from this case, were never provided to trial counsel. The court files for Gary Lupton's case are now mysteriously missing. Counsel diligently have sought to obtain those files from the clerks of court at the Court of Common Pleas, the Superior Court, and the Supreme Court, but they have been told that the files are unexplainably lost. Petitioner alleges, on information and belief, that the prosecutor misrepresented the facts concerning the photo array.

267. The prosecution has never explained why the photographs from which the squatters identified Gwynn as Rick have not been disclosed.

268. The same persons testified and gave statements as eyewitnesses to two different crimes at roughly the same time. In each case, they told police that a perpetrator was a man they knew only as Rick. In each case they identified Rick on the basis of photographs shown by the police. Yet they identified two different men. Neither one of these men was ever been known by anyone else as Rick. None of the photographs were disclosed to Gwynn.

269. These extraordinary circumstances are all the more alarming in light of numerous inconsistencies in the statements and testimony of the witnesses who identified Gwynn, inconsistencies which cast further doubt on the reliability of their accounts and identifications.

270. There are significant inconsistencies between the Rick initially described by the squatters and Daniel Gwynn. Most obvious is the name. There is absolutely no evidence, apart from the assertions of the squatters themselves, that Gwynn was ever known as Rick. No police record indicates that Rick is an alias of Gwynn's and no witness – apart from the squatters who had originally identified Rick as the person responsible – ever provided a statement or testified at

trial that Gwynn used the name Rick.[25]

271.    Moreover, the squatters originally agreed that Rick had recently been released from prison and was currently on probation. Rosalie Jones told police, "He's been locked up before. He recently got out of jail." Antrom told them, Rick "is suppose[d] to be on probation." McCullough told them Rick got out of jail about a year earlier. But Gwynn had never been imprisoned prior to his arrest in this case.[26]

272.    Critical details of the squatters' stories changed from one early police interview to the next. For example, every version they provided of Rick's parting words after the fight differed from the last:

- "Before Rick left he said – It's not over, I will be back." (McCullough, in 9:35 a.m. interview with Officer Perks);
- "Rick ran out of the apt. & was saying he would get us. He said one way or the other he would make sure we would not stay in the building." (Antrom, in 9:40 a.m. interview with Officer McKelvie):
- "When [Rick] left, he said, "I'll get you, one way or the other." McCullough, in unsigned handwritten notes);
- "Thinks it was Rick because of what he said when leaving after getting beaten up. He said, 'I shall return and you're gonna be sorry.'" McCullough, in unsigned handwritten notes);
- "[Rick] said he would be back to get us because we can't stay in the bldg. forever." (Antrom in unsigned handwritten notes).

Similarly, when McCullough described the initial confrontation with Rick, he told one officer, "Then Donald Minnick came to the room. He said, I'm not gonna bother you, I want her."

---

[25] There is no indication that Mr. Gwynn frequented the area around the apartment building where the fire and the Taylor murder occurred. Mr. Gwynn lived near 57th and Race Streets, and was arrested near 40th Street and Haverford Avenue. He was once arrested near 55th and Race Streets, and once near 61st and Chestnut Streets.

[26] Moreover, the bullying predator Rick described by the squatters is completely at odds with the consistent description of Gwynn's non-aggressive personality given by those who knew him.

(McCullough, in unsigned handwritten notes). He told another, "when Rick came in the room, my room, both Donald & John were already there. Rick had a big stick - about 2 to 3 feet long -. He said he wanted to kill." (McCullough, in 9:35 a.m. interview with Officer Perks).

273. Given the timing of the fire relative to Minnick and Antrom's testimony at Lupton's trial, and given Johnson and Lupton's repeated threats, Johnson's or Lupton's associates had a powerful motive to commit the crime for which Gwynn was convicted.[27] According to Johnson, one of his associates was a man named Rick. Johnson has stated that he knew Rick, the same Rick who frequently hung around 4505 Chestnut Street during the period in question and was known to the squatters there. Rick was a bully who could be aggressive. Rick cannot be Daniel Gwynn, because Johnson stated that he saw Rick in their neighborhood in November 2008, at a time when Gwynn obviously was incarcerated on death row. Declaration of Maurice Johnson, attached hereto.

274. The description of Rick provided by Johnson is similar to that provided by the squatters to the police the morning of the fire. For example, Johnson described Rick as being 5'11" to 6'0", while Terry McCullough described him as six feet tall. Johnson described him as having close cut hair, as did McCullough. Johnson described Rick as having "prominent eyes," while Rosalie Jones described him as having "real big eyes." Johnson, like both McCullough and Jones, described him as a crack user. Johnson asserts that the Rick he knows was in prison with him in 1994, which is consistent with the squatters' assertion that at the time of the fire

---

[27] While Antrom and Minnick were testifying at Lupton's trial, their testimony was extremely damaging to Johnson also. For example, Antrom testified that Johnson played larger role in initiating the fatal dispute and that Johnson threatened to kill the rest of the squatters also. Lupton N.T. 11/17/94 at 70, 98-99.

Rick had recently been released from prison and was on probation.

275.    It is impossible to know whether Johnson's assertions are credible without discovery and an evidentiary hearing. But if they are true, they – along with the undisclosed material from the Taylor case – undermine confidence in the reliability of the prosecution's testimony used to convict Mr. Gwynn and sentence him to death.

276.    Given the cocaine withdrawal Mr. Gwynn was suffering at the time of his interrogation and the severe mental illness he suffered from throughout, it is not surprising that an individual who first attempted suicide at age twelve falsely would confess to causing the fire and death at issue here. Given that his inculpatory statement was taken by an officer involved in the Taylor investigation who already was aware of the preliminary results of the fire investigation, it is not surprising that this false confession contained some accurate details.  And given the prosecution's failure to disclose the Taylor case materials and the ineffective representation Gwynn received at the time of his penalty phase testimony, <u>see</u> Claim I, <u>supra</u>, it is not surprising  trial counsel failed to competently attack the reliability of that confession.

277.    The prosecution violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny by failing to disclose material exculpatory and impeaching evidence. The prosecution suppressed evidence tending to impeach the witnesses who identified Mr. Gwynn, particularly evidence related to the Taylor case. It suppressed evidence both that the eyewitnesses against Mr. Gwynn had identified another man as Rick, and that their identifications in the prior case were unreliable.  The prosecution suppressed the photos used for out-of-court identifications in both Mr. Gwynn's and Lupton's case.   The prosecution suppressed evidence, including the threats reportedly made after Taylor's murder, tending to show that Rick or another associate of

Lupton's and Johnson's committed the murder for which Mr. Gwynn was convicted. The suppressed evidence, viewed collectively, was material to the outcome of both phases of Mr. Gwynn's trial.

278.     The prosecution violated <u>Napue v. Illinois</u>, 360 U.S. 264 (1959) and its progeny. It falsely represented to the court that the witnesses against Mr. Gwynn told police officers they remembered that Mr. Gwynn had been filler in a prior lineup, and it falsely represented that the photo array from the Taylor murder investigation was nonexistent.

279.     Counsel rendered ineffective assistance of counsel in failing to competently challenge the witnesses' out-of-court identification and resulting inculpatory evidence and failing to competently develop and present evidence tending to show Mr. Gwynn's innocence. Had counsel performed competently, there is a reasonable probability the outcome at both the guilt and penalty phases of his trial would have been different.

280.     The photographic identification procedure used in this case was impermissibly suggestive in violation of Mr. Gwynn's due process rights under the Fifth and Fourteenth Amendments and <u>Neil v. Biggers</u>, 409 U.S. 188 (1972), and <u>Simmons v. United States</u>, 390 U.S. 377 (1968).

281.     The prosecution should have been judicially estopped from arguing that Mr. Gwynn was Rick, having already taken a contrary position in prior litigation, and as a result his conviction and sentence violate his due process rights under the Fourteenth Amendment.

282.     Mr. Gwynn's sentence of death violates <u>Herrera v. Collins</u>, 506 U.S. 390 (1993), because the foregoing constitutes a truly persuasive demonstration of actual innocence which would render his execution unconstitutional. This evidence also satisfies <u>Schlup v. Delo</u>, 513

U.S. 298 (1995).

283.    Discovery in federal court is necessary to the full and fair resolution of this claim.

**XIV.  PETITIONER IS ENTITLED TO A NEW TRIAL AND SENTENCING PROCEEDING BECAUSE THE CUMULATIVE EFFECT OF THE ERRORS IN THIS CASE UNDERMINES CONFIDENCE IN THE VERDICT AND DEATH SENTENCE.**

284.    All other allegations, facts and claims contained in this Petition, its attachments and the other submissions made in this litigation are incorporated as if fully set forth herein.

285.    Petitioner is entitled to relief from his conviction and death sentence based on each of the claims presented herein individually.  However, even if this Court finds that Petitioner is not entitled to relief on any particular claim, he is nevertheless entitled to relief because the cumulative effect of these errors was to deny him a fair trial and fair a capital sentencing proceeding and the heightened procedural safeguards constitutionally required in capital cases.

286.    Even if this Court concludes that any individual constitutional error in this case was harmless, or if it determines that Mr. Gwynn was insufficiently prejudiced to require relief on a particular claim, these errors are not harmless and non-prejudicial when assessed together. See e.g., Taylor v. Kentucky, 436 U.S. 478, 487-88 & n. 15, (1978) (cumulative effect of potentially damaging instructions and prosecution argument violated due process guarantee of fundamental fairness); United States ex rel Sullivan v. Cuyler, 631 F.2d 14, 17 (3d Cir. 1980) ("the cumulative effect of the alleged errors may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless").

287.    Claims of ineffective assistance of counsel must likewise be judged cumulatively, as well as individually.  Although each instance of counsels' failures requires relief individually,

in addition, the cumulative effect of each instance of counsels' failures is sufficiently prejudicial to require relief.

288.    The cumulative effect of the guilt phases errors in this case – including counsel's deficient representation, the Commonwealth's improper opening and closing arguments and other guilt-phase misconduct, and the admission of unreliable and novel scientific evidence – was so great as to amount to a violation of Mr. Gwynn's right to due process.

289.    The circumstances of this case also demonstrate that the cumulative effect of counsel's deficient penalty phase representation, and the constitutional errors committed by the court and the prosecutor, so undermined the fairness of the sentencing proceedings that Petitioner's sentence of death should be vacated.  Petitioner was denied his opportunity to present significant mitigation to the jury, while at the same time the jury was allowed to consider unfettered the irrelevant evidence of Petitioner's prior bad acts and was improperly encouraged to ignore its feelings of mercy toward Petitioner and disregard crucial mitigating evidence. These errors significantly weakened Petitioner's case in favor of life while bolstering the Commonwealth's position in favor of death.

290.    Moreover, in assessing the impact of cumulative error on capital sentencing proceedings, a court may consider "the possibility of guilt-phase error having a continuing, cognizable effect on the penalty phase." Cargle v. Mullin, 317 F.3d 1196, 1208 (10th Cir. 2003). Given the continuing impact of the guilt phase errors in this case, the Court should consider those errors in assessing the cumulative prejudice to Petitioner at the penalty phase.

291.    Consideration of these errors in assessing penalty phase cumulative prejudice is particularly appropriate because, *inter alia*, the record of the entire trial was incorporated into the

penalty phase, including the evidence of Petitioner's prior bad acts and bench warrants; no cautionary instruction regarding the irrelevance at the penalty phase of the evidence of prior bad acts and bench warrants was given; and trial counsel's ineffectiveness impacted all aspects of the trial.

292.     Collectively and cumulatively, these errors denied Petitioner his rights to due process of law and his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and require that he be afforded a new sentencing hearing.

### PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, all othe proceedings and submissions, Petitioner, DANIEL GWYNN, respectfully prays that the Court grant him the following relief:

(A)     That Petitioner be granted such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

(B)     That leave to amend this Petition be granted;

(C)     That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

(D)     That Respondents be Ordered to respond to this Petition; and

(E)     That Petitioner's conviction and death sentence be vacated.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Matthew Stiegler
Leigh Skipper, Esq.
Chief Federal Defender
Matthew Stiegler, Esq.
Renee Edelman, Esq.
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit

</div>

The Curtis Center, Suite 535 West
601 Walnut Street
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner Daniel Gwynn

## CERTIFICATE OF SERVICE

I, Matthew Stiegler, Esq., hereby certify, pursuant to Rule 5.1.2.5 of the Local Rules of Civil Procedure for the United States District Court - Eastern District, that on this 7th day of March, 2009, I caused the foregoing Petition For Writ of Habeas Corpus to be filed electronically and become available for viewing and downloading from the ECF system.  In this manner, the following party was electronically served:

> Thomas W. Dolgenos,
> Chief, Federal Litigation
> Philadelphia District Attorney's Office
> Three Penn Center South
> Philadelphia, Pennsylvania, 19107

> /s Matthew Stiegler
> Matthew Stiegler, Esq.


Dated: March 7, 2009
Philadelphia, PA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____            :
                                         :
DANIEL GWYNN,                            :
                 Petitioner,             :            Civil Number: 08-5061
                                         :
        v.                               :
                                         :            **THIS IS A CAPITAL CASE**
                                         :
JEFFREY A. BEARD, Commissioner,          :
Pennsylvania Department of Corrections;  :
LOUIS B. FOLINO, Superintendent of the   :
State Correctional Institution at Greene; and :
FRANKLIN J. TENNIS, Superintendent of    :
the State Correctional Institution at    :
Rockview,                                :
                                         :
                 Respondents.            :
_____            :

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY

Leigh Skipper, Esq.
Chief Federal Defender
Matthew Stiegler, Esq.
Renee Edelman, Esq.
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
The Curtis Center, Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner

Dated: Philadelphia, Pennsylvania
        March 7, 2009

i

Notes of testimony of proceedings in the state court will be cited by "N.T." followed by the relevant date and page number. The trial was transcribed using exclusively capital letters; for ease of reading standard capitalization has been substituted here.

The Pennsylvania Supreme Court issued two substantive opinions in this case: one on direct appeal (<u>Commonwealth v. Gwynn</u>, 723 A.2d 143 (Pa. 1998)); and the second on appeal of his in post-conviction proceedings (<u>Commonwealth v. Gwynn</u>, 943 A.2d 940 (Pa. 2008)). These opinions will be cited, respectively, as <u>Gwynn</u> I and II.

All other citations are either self-explanatory or will be explained.

All emphasis in this Petition is supplied unless otherwise indicated.

Pursuant to this Court's Local Civil Rule 9.4 (2) & (3), Petitioner has filed a fact-based petition. A memo of law to support this Petition will be filed within 60 days of this brief.

Petitioner will file an appendix containing relevant exhibits to this Petition.

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT ON EXHAUSTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      COUNSEL WAS INEFFECTIVE AT THE PENALTY PHASE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT MITIGATING EVIDENCE OF PETITIONER'S ABUSIVE CHILDHOOD, MENTAL HEALTH IMPAIRMENTS AND HISTORY OF SUBSTANCE ABUSE, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-STAGE OF PETITIONER'S TRIAL BY FAILING TO PROCURE AND PRESENT ANY EVIDENCE IN SUPPORT OF THE ONLY DEFENSE OFFERED TO THE CHARGE OF FIRST DEGREE MURDER – VOLUNTARY INTOXICATION, AND BY FAILING TO INVESTIGATE AND PRESENT THE READILY AVAILABLE PSYCHIATRIC EVIDENCE OF DIMINISHED CAPACITY; TRIAL COUNSEL ALSO FAILED TO PRESENT READILY AVAILABLE EVIDENCE OF PETITIONER'S GOOD CHARACTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

III.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO ADEQUATELY CHALLENGE THE CONSTITUTIONALITY OF THE PURPORTED TERRY STOP AND SUBSEQUENT MIRANDA VIOLATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

IV.     TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO CHALLENGE THE VOLUNTARINESS OF MR. GWYNN'S CONFESSION – THE ONLY EVIDENCE LINKING HIM TO THE MURDER – AND BY FAILING TO PRESENT TO THE COURT THE CIRCUMSTANCES SURROUNDING THE CONFESSION, INCLUDING MR. GWYNN'S PSYCHIATRIC IMPAIRMENTS DUE TO CRACK-COCAINE WITHDRAWAL AND PROFOUND MENTAL ILLNESS IMPACTING ON THE CREDIBILITY AND RELIABILITY OF THE CONFESSION . . . . . . . . . . . . . . . . . . . . . 48

V.      THE TRIAL COURT ERRED IN PERMITTING THE COMMONWEALTH TO PRESENT UNRELIABLE, NOVEL SCIENTIFIC EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VI.     TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO
        CHALLENGE THE GRAVE RISK AGGRAVATING FACTOR BECAUSE MR. GWYNN'S
        DIMINISHED CAPACITY AT THE TIME OF THE OFFENSE NEGATED HIS ABILITY TO BE
        "PRACTICALLY CERTAIN" THAT HIS CONDUCT POSED A GRAVE RISK TO OTHERS . . . . . 56

VII.    PETITIONER IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE BECAUSE THE "GRAVE
        RISK OF DEATH TO ANOTHER" AGGRAVATING CIRCUMSTANCE IS VAGUE AND
        OVERBROAD, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE
        UNITED STATES CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

VIII.   MR. GWYNN'S CONVICTION AND SENTENCE OF DEATH MUST BE REVERSED BECAUSE
        THE COMMONWEALTH ENGAGED IN PROSECUTORIAL MISCONDUCT BY ARGUING TO THE
        JURY THAT MR. GWYNN "MADE A CONSCIOUS DECISION TO MURDER SIX PEOPLE." THE
        TRIAL COURT FAILED TO CORRECT THIS ERROR, AND TRIAL COUNSEL FAILED TO OBJECT
        TO THIS IMPROPER LINE OF ARGUMENT, IN VIOLATION OF MR. GWYNN'S RIGHTS AS
        GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE
        UNITED STATES CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

IX.     PETITIONER'S SENTENCE MUST BE VACATED BECAUSE THE PROSECUTOR'S PENALTY
        PHASE CLOSING ARGUMENT DEPRIVED PETITIONER OF HIS RIGHT TO A FAIR CAPITAL
        SENTENCING PROCEEDING IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMEND
        MENTS TO THE UNITED STATES CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

X.      THE PROSECUTOR USED HIS PEREMPTORY CHALLENGES IN A RACIALLY DISCRIMINATORY
        MANNER AND AS PART OF A DISCRIMINATORY POLICY OF THE PHILADELPHIA DISTRICT
        ATTORNEY'S OFFICE, IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH,
        AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION . . . . . . . . . . 69

XI.     MR. GWYNN IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE
        COMMONWEALTH WAS PERMITTED TO INCORPORATE INTO THE SENTENCING
        PROCEEDINGS IRRELEVANT AND INFLAMMATORY EVIDENCE OF NON-STATUTORY
        AGGRAVATING CIRCUMSTANCES, IN VIOLATION OF THE EIGHTH AND FOURTEENTH
        AMENDMENTS TO THE UNITED STATES CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . 74

XII.    MR. GWYNN'S DEATH SENTENCE MUST BE VACATED BECAUSE THE "PROPORTIONALITY
        REVIEW" PERFORMED BY THE PENNSYLVANIA SUPREME COURT DID NOT PROVIDE HIM
        THE MEANINGFUL APPELLATE REVIEW MANDATED BY FEDERAL
        CONSTITUTIONAL LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

XIII. THE PROSECUTION SUPPRESSED MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE AND KNOWINGLY MADE FALSE REPRESENTATIONS TO THE COURT; THE IDENTIFICATION PROCEDURE USED IN THIS CASE WAS IMPERMISSIBLY SUGGESTIVE; THE SUM OF THE UNDISCLOSED EVIDENCE DEMONSTRATES THAT MR. GWYNN IS INNOCENT; ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO UNCOVER THE EVIDENCE THE COMMONWEALTH SUPPRESSED .................................. 84

XIV. PETITIONER IS ENTITLED TO A NEW TRIAL AND SENTENCING PROCEEDING BECAUSE THE CUMULATIVE EFFECT OF THE ERRORS IN THIS CASE UNDERMINES CONFIDENCE IN THE VERDICT AND DEATH SENTENCE .......................................... 94

PRAYER FOR RELIEF ........................................................ 96

CERTIFICATE OF SERVICE ..................................................... 98