# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANIEL GWYNN, :
          Petitioner, :
                  :           Civil Number: 08-5061
      v. :
                  :
JEFFREY A. BEARD, :           **THIS IS A CAPITAL CASE**
Commissioner, Pennsylvania :
Department of Corrections; LOUIS :
B. FOLINO, Superintendent of the :
State Correctional Institution at :
Greene; and FRANKLIN J. :
TENNIS, Superintendent of the :
State Correctional Institution at :
Rockview, :
                  :
          Respondents. :

## FIRST AMENDMENT TO PETITION
## FOR A WRIT OF HABEAS CORPUS

Leigh Skipper, Esq.
Chief Federal Defender
James Moreno, Esq.
Renee Edelman, Esq.
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
The Curtis Center, Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

Matthew Stiegler, Esq.
Post Office Box 18861
Philadelphia, PA 19119
(267) 297-7117

Counsel for Petitioner

Dated:     April 2, 2010

## PRELIMINARY STATEMENT

Notes of testimony of proceedings in the state court will be cited by "N.T." followed by the relevant date and page number. The trial was transcribed using exclusively capital letters; for ease of reading standard capitalization has been substituted here.

The Pennsylvania Supreme Court issued two substantive opinions in this case: one on direct appeal (Commonwealth v. Gwynn, 723 A.2d 143 (Pa. 1998)); and the second on appeal of his in post-conviction proceedings (Commonwealth v. Gwynn, 943 A.2d 940 (Pa. 2008)). These opinions will be cited, respectively, as Gwynn I and II.

All other citations are either self-explanatory or will be explained.

All emphasis in this Petition is supplied unless otherwise indicated.

Pursuant to this Court's Local Civil Rule 9.4 (2) & (3), Petitioner has filed a fact-based petition. A memorandum of law to support this Petition will be filed according to this Court's order of March 22, 2010.

Petitioner will file an appendix containing relevant exhibits to this Amendment.

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... iii

RELEVANT PROCEDURAL HISTORY ..................................................................... 1

STATEMENT OF FACTS ..............................................................................................2

    A. The Evidence Presented at Trial ......................................................................... 2

    B. The Evidence Not Disclosed to the Defense. .................................................... 4

        1. The Murder of Glen Taylor and Threats Against the Witnesses ...................... 4

            a. The Murder.............................................................................................. 4

            b. The Identification................................................................................... 6

            c. The Threats............................................................................................. 7

            d. The Trial.................................................................................................. 9

            e. The Fire ................................................................................................. 10

        2. The Lorraine Irby Fire and Other Suspicious Fires ......................................... 13

        3. Other Arson Fires at 4504 Chestnut Street ...................................................... 15

        4. The Photographic Identification of Gwynn and
           the Prosecutor's Representations at his Trial .................................................. 16

        5. Other Evidence Tending to Show Unreliability of Evidence Against Gwynn ..20

GROUNDS FOR RELIEF ............................................................................................22

I.    THE PROSECUTION SUPPRESSED MATERIAL EXCULPATORY AND IMPEACHMENT
      EVIDENCE AND KNOWINGLY MADE FALSE REPRESENTATIONS TO THE COURT; THE
      IDENTIFICATION PROCEDURE USED IN THIS CASE WAS IMPERMISSIBLY SUGGESTIVE;
      THE SUM OF THE UNDISCLOSED EVIDENCE DEMONSTRATES THAT GWYNN IS INNOCENT;
      ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO UNCOVER THE
      EVIDENCE THE COMMONWEALTH SUPPRESSED. ..............................................................22

PRAYER FOR RELIEF ...............................................................................................24

Petitioner Daniel Gwynn, through undersigned counsel, hereby submits this amendment to Claim XIII of his Petition for Writ of Habeas Corpus.

## RELEVANT PROCEDURAL HISTORY

1.　　This is a capital habeas corpus proceeding.　Gwynn was convicted of first degree murder and sentenced to death in the Philadelphia County Court of Common Pleas in connection with the arson death of Marcia Smith.

2.　　On March 7, 2009, Petitioner filed a Petition for Writ of Habeas Corpus in this Court (hereinafter the "Petition").[1]　Claim XIII of the Petition asserted that Gwynn is actually innocent and alleged that the prosecution at trial suppressed material exculpatory information, knowingly made false representations to the court, relied upon an impermissibly suggestive identification procedure, and other related allegations. *See* Petition at 84-94. Since filing his Petition, Petitioner has continued his investigation of the facts related to this claim.

3.　　On September 15, 2009, Petitioner filed a Motion for Discovery seeking production of documents necessary to develop the facts of these allegations. The Commonwealth voluntarily provided certain documents to Petitioner on January 12 and March 17, 2010.

4.　　On March 19, 2010, this Court granted Petitioner's discovery motion. Petitioner has not yet received any documents pursuant to the Court's discovery order, and he anticipates filing an additional amendment to his habeas petition upon completion of discovery proceedings. The allegations herein incorporate evidence obtained by Petitioner through investigation and voluntary discovery subsequent to filing his habeas petition, in addition to evidence referenced in Claim XIII of his Petition.

---

[1] Petitioner refiled the original petition on March 24, 2009, with certain typographical

## STATEMENT OF FACTS

**A.    The Evidence Presented at Trial**

5.    On November 20, 1994, there was a fire at 4504 Chestnut Street in Philadelphia, Pennsylvania.[2] The building where the fire occurred was an abandoned apartment building that was occupied by six homeless people. One of the squatters, Marcia Smith, died in the fire. Five survived: John Antrom, Donald Minnick, Larry Hawkins, Terry McCullough and Rosalie Jones.

6.    At Gwynn's capital murder trial, Antrom and Minnick testified that the day before the fire, they had an confrontation with a man they knew only as Rick. They testified that this incident began when Rick assaulted Smith and attempted to rape her. N.T. 10/31/95 at 55-58, 120-21, 130-32. To protect her, the other occupants engaged in a brutal fight with Rick which lasted for seventy minutes. Id. at 59, 73-79, 122-24, 133-42. They thoroughly defeated Rick in this fight, forcing him to flee the house. Id. at 59, 75, 124, 140. One occupant of the building testified that Rick threatened to get revenge on his way out of the building. Id. at 124, 142-43, 159. When they were asked the next day by the police who started the fire, the surviving occupants all agreed it had to have been Rick, even though they did not see who started the fire. Id. at 107; Minnick Interview Notes (undated & unsigned) at 2, attached as Exhibit 7; McCullough Interview Notes (undated & unsigned) at 1, attached as Exhibit 11; Antrom Interview Notes (undated & unsigned) at 1, attached as Exhibit 15; Complaint or Incident Report (11/20/94), attached as Exhibit 26.

7.    The survivors' statements refer to their antagonist only as "Rick." See Statements

---

and attributional errors corrected. All page references herein refer to this corrected filing.
    [2] The same building spanned two addresses on Chestnut Street: 4504 and 4506. For convenience, we refer herein to the address as 4504 Chestnut Street.

and Interview Notes of Antrom, Minnick, McCullough, Jones and Hawkins, attached as Exhibits 7-23.[3] As one witness recounted, Rick was "the bully of the building." Statement of Jones (11/20/94, 12:40 p.m.) at 2, attached as Exhibit 21.

8.    Police officers reported that they subsequently showed Antrom, Minnick and McCullough a group of photographs which included Gwynn's photograph, and that the men identified Gwynn as Rick. Statement of Antrom (11/20/94, 12:56 p.m.) at 1, attached as Exhibit 18; Statement of Minnick (11/20/94, 1:00 p.m.) at 1, attached as Exhibit 10, Statement of McCullough (11/20/94, 1:10 p.m.) at 1, attached as Exhibit 14. At trial, Minnick and Antrom identified Gwynn as Rick.[4] N.T. 10/31/95 at 61, 119.

9.    When Gwynn – who had a long history of severe crack cocaine addiction – was arrested, he was held for more than seventeen hours without access to cocaine or medical treatment for the symptoms of his withdrawal. N.T. 10/25/95 at 16, 33; see also Affidavit of Dr. Jay M. Jackman, at ¶ 18, attached as Exhibit 5. He was interrogated for up to five and a half hours before signing a confession. N.T. 11/1/95 at 13, 33 (Gwynn brought to interrogation room by interrogating officers between 1:00 and 1:30 p.m.; confession signed at 6:40 p.m.).

10.    The interrogating detective also already had reviewed the fire investigator's preliminary report. N.T. 11/1/95 at 29, 44. Four days before Detective Mangoni interrogated Gwynn, the police produced a report of an interview of Fire Department Lieutenant Thomas

---

[3] Petitioner has documentation of four statements given by Antrom, four by Minnick, four by McCullough, three by Jones, and two by Hawkins on the day of the fire. Except where direct quotations or references are provided, these reports will be cited collectively as "Statements and Interview Notes."

[4] Neither Hawkins nor Jones identified Gwynn as Rick in their statements to the police. Jones did not identify Gwynn as Rick in her trial testimony. Hawkins never testified.

Lawson on November 26, 1994. Statement of Lt. Thomas Lawson (11/26/94, 8:15 p.m.), attached as Exhibit 25. In this report, the fire investigator provides a wealth of details about the fire, including the specific sites on the third floor landing and stairway where samples for gasoline testing were taken, and a full description of the confrontation between Rick and the occupants of the building the day before the fire.

11.     Fire investigators testified at trial about the key characteristics of the fire. They testified that the fire was set deliberately, in the early morning, using gasoline as a liquid accelerant. N.T. 11/1/95 at 86-67; N.T. 11/2/95 at 57-58. The gasoline was poured on the hallway stairway and landings to prevent the occupants from escaping from the four story building. N.T. 11/1/95 at 64-78, 126-27. One of the occupants survived by jumping from an upstairs window. N.T. 10/31/95 at 62.

**B.      The Evidence Not Disclosed to the Defense**

**1.      The Murder of Glen Taylor and Threats Against the Witnesses**

**a.      The Murder**

12.     In August 1993 – *approximately fifteen months prior to the November 1994* fire for which Gwynn was convicted and sentenced to death – two men murdered a homeless squatter named Glen Taylor.[5]  Taylor's murder took place at 4504 Chestnut Street in Philadelphia, the very same building Gwynn later was convicted of burning down.

13.     Taylor was beaten to death with a pipe. One person who heard the attack described it as a "continuous beating": "Shit, it must about been eighty times [that Taylor was hit], it seemed like they was beating dude for about twenty five minutes." Statement of Anthony

---

[5] Taylor's first name also is spelled "Glenn" in prosecution and court documents.

4

Daniels (8/14/93, 9:25 p.m.) at 2, attached as Exhibit 50. Taylor suffered sixteen broken ribs, his lungs, liver, kidney, and spleen all were torn, and he died by drowning in his own blood. Lupton N.T. 11/29/94 at 127, attached as Exhibit 32. [6] During the incident, the killers invited one of the squatters up to see the room where some of the beating had occurred: they "told me that they wanted to show me how they painted Lorraine's room," and "there was blood on the floors and the walls." Statement of Carol Smith (8/18/93) at 1, attached as Exhibit 51. The first police officer on the scene described what he found: "There was blood splattered on the walls in the front and rear apts. on the 2nd floor. The blood was smeared on the walls in the hallway between the two apartments. In the rear apartment, there was a pool of blood on the floor, and the bed had blood on it too." Statement of Michael Root (8/8/93, 2:40 p.m.) at 2, attached as Exhibit 52.

14.     The apparent motive for the killing was that the victim's girlfriend owed one of the killers $25 for drugs. Lupton N.T. 11/22/94 at 17-18, 119, attached as Exhibit 31.

15.     John Antrom, Donald Minnick, Larry Hawkins, and Terry McCullough -- the same persons who later survived the fire and purportedly identified Gwynn -- were critical eyewitnesses in Taylor's murder case. [7] Minnick was beaten so severely in the same incident that he was hospitalized for five days with serious head injuries. Lupton N.T. 11/17/94 at 157-160, attached as Exhibit 29. Minnick was beaten "literally to within an inch of his life." Commonwealth v. Lupton, No. 0989-1000, at 7 (Pa. C.C.P. Nov. 22, 2000), attached as Exhibit 53. Minnick regarded Taylor as a brother, Hawkins considered Taylor his son, and they all were

---

[6] Citations to the trial of Gary Lupton for the murder of Glen Taylor will be indicated as "Lupton N.T."

[7] The other two eyewitnesses to the Taylor murder, Lorraine Irby and Carol Smith (who later became Carol Mack), are discussed infra ¶¶ 40-49.

extremely close. Statement of Minnick (8/8/93, 5:50 p.m.) at 1, attached as Exhibit 37;

Statement of Hawkins (8/8/93, 4:00 p.m.) at 1, attached as Exhibit 39; Statement of Antrom

(8/8/93, 3:50 p.m.) at 1, attached as Exhibit 41.

### b. The Identification

16.     When Larry Hawkins, John Antrom, and Terry McCullough spoke to the officers

investigating Taylor's death on August 8, 1993, they each reported that two men were

responsible for the beating. Hawkins, Ex. 39 at 3-6; Antrom, Ex. 41 at 2-4; Statement of

McCullough (8/8/93, 4:00 p.m.) at 3-6, attached as Exhibit 43. One was Maurice Johnson,

whom they referred to as Reese. Id.

17.     The other was a man they knew only as Rick. Hawkins, Ex. 39 at 3 ("the other

guy who I think is Rick"); Antrom, Ex. 41 at 2-4 ("Two guys named 'Reese' and 'Rick'");

McCullough, Ex. 43 at 5 ("Rick, don't know his last name").

18.     Two days later, on August 10, 1993, they were shown photo arrays, and they

stated that the man they called Rick was actually named Gary Lupton. Statement of Hawkins

(8/10/93, 4:25 p.m.) at 1 ( "The first time I seen Rick was when all this happened. We found out

that his real name is Gary."), attached as Exhibit 40; Statement of Antrom (8/10/93, 4:00 p.m.) at

1 ("His name is Gary. I called him Rick."), attached as Exhibit 42; Statement of McCullough

(8/10/93, 4:45 p.m.) at 1, attached as Exhibit 44.

19.     Lupton was on probation for a prior conviction for possession of a sawed-off

shotgun. Commonwealth v. Lupton, No. 0989-1000, at 4 (Pa. C.C.P. Oct. 18, 1993), attached as

Exhibit 54. He reported having been fired from a job as a fireman. Lupton Court Bail Program

form, attached as Exhibit 55.

20.     Johnson had a series of prior felony convictions. Extract of Criminal Record, attached as Exhibit 56. He was being prosecuted for rape. Lupton N.T. 11/21/94 at 57, attached as Exhibit 30.

### c.     The Threats

21.     Both Rick/Lupton and Johnson repeatedly and emphatically declared their intention to kill the squatters or have them killed if they cooperated with police.

22.     Rick/Lupton told Antrom after Taylor's murder that "if Reese [Maurice Johnson] gets picked up I am going to carry out the rest of the orders. I am going to have you killed. I'll get someone to 'spray' the building." Antrom, Ex. 42 at 2.

23.     Both Rick/Lupton and Johnson told McCullough that "If I tell the police anything about beating up Donald they would kill me." McCullough, Ex. 43 at 6. Two days later, McCullough told police, "Reese and Rick were saying that if the police came looking for them then they would know we told on them and that they had back-up that would take care of us." McCullough, Ex. 44 at 2. Rick/Lupton told Minnick "not to tell the cops or he would come back and finish it up." Statement of Minnick (8/10/93, 6:40 p.m.) at 2, attached as Exhibit 38.

24.     At Lupton's trial, Antrom testified:

> Gary [Lupton] said if you, Terry, call the police or if Maurice get picked up, they will have someone to kill you, and they will have the building sprayed.
> Q.     And who said that they would have the building sprayed?
> A.     Gary.
> Q.     And what did you understand that to mean?
> A.     Kill everyone in the building.

Lupton N.T. 11/17/93 at 65, Ex. 29. Antrom went on to testify that Johnson threatened them by saying, "'If any of y'all tell who did this to him, that we'll kill you.'" Id. at 70. "Then Gary said

"If Maurice get picked up, I will be the one to carry out the orders to have the building sprayed."
Id.

25.     Three of these threats – "I'll get someone to spray the building," "they had back-up that would take care of us," and "they will have someone to kill you" – referred specifically to Johnson and Rick/Lupton having associates who would carry out the revenge murders for them. Lupton's reference to "carry[ing] out the rest of the orders" also implies the involvement of others; see also Affidavit of John Antrom ¶ 4 ("[T]he guys that beat up Glenn Taylor were two of the drug boys."), attached as Exhibit 1. In addition, as described infra at ¶¶ 41-42, Lupton offered to pay a fellow inmate to prevent another squatter witness to Taylor's murder from testifying against him, causing that inmate to fear for the squatter's safety, and Johnson's step-father threatened to kill the same witness.

26.     Antrom testified that these threats left him "kind of scared" – "we were kind of scared for our lives." Lupton N.T. 11/17/94 at 70-71, Ex. 29; see also Antrom, Ex. 1 at ¶ 9 ("We were worried that the drug boys or their friends would come back and mess with us, or hurt us like they hurt Donald."); id. ¶ 14 "I was always worried after the [Lupton] trial that the drug boys or any of their friends might come back and hurt or kill us. That is what they threatened to do to us if they got caught."). As the prosecutor at Lupton's trial explained, "And was John Antrom scared? You better believe he was scared." Lupton N.T. 11/23/94 at 113, Ex. 32; see also id. at 116 ("Did he stay around to tell the police what he knew or did he run away and try to protect himself because he had a reason to be scared? He knew the defendant, he knew what the defendant had threatened to do, and he didn't know where the defendant was or when he would come back.").

27.     Both the trial judge and the prosecutor from Lupton's and Johnson's case recognized how vulnerable the squatters were to the threats being carried out.

28.     At the close of Lupton's preliminary hearing, the presiding judge considered releasing him on bail. She asked Lupton, "is there any question in your mind that you're not supposed to have any contact with that abandoned building," and "if you see those people you better act like you don't see them. Do you understand that?" She continued:

> I'm going to issue a protective order for all the Commonwealth witnesses. These people who I heard from the last two days are very vulnerable people. You have three brothers living in a situation, I mean they're at the bottom. I don't want you anywhere near them. You hear me?

Lupton Preliminary Hearing N.T. 9/29/93 at 37, attached as Exhibit 28; see also id. at 38 ("Don't even look at them if you see them."); ("[Y]ou may see them. You better walk across the street if you do because you're already in trouble.").

29.     When the prosecutor moved to revoke Lupton's bail less than a month later, she concluded the motion thus: "Gary Lupton is presently on probation for possession of a sawed-off shotgun. He knows all the witnesses in this case, men and women who are homeless and the most vulnerable members of society." Commonwealth's Petition for Revocation of Bail, Commonwealth v. Lupton, No. 0989-1000, at 4 (Pa. C.C.P. Oct. 18, 1993), attached as Exhibit 57.

### d.     The Trial

30.     Antrom and Minnick both testified for the prosecution at Gary Lupton's murder trial. They testified against Lupton on November 17, 1994 – three days before the building where they were living was burned down.

31.     Antrom testified that Rick was Gary Lupton:

> Q. Okay. And do you remember on that date straightening out the
>    situation issue that Rick was in fact Gary Lupton?
> A. They had showed me some photos.
> Q. Okay. And that was straightened out as to Rick and Gary?
> A. Yes, yes.

Lupton N.T. 11/17/94 at 119, Ex. 29. Antrom and the other squatters testified that Johnson and Rick/Lupton committed the murder and assault. Lupton, who was represented by experienced retained counsel at trial, acknowledged he and Johnson were in fact present at the scene, and he never has asserted otherwise since. Lupton testified in great detail as to their actions and Taylor's death, ultimately asserting that he was in the room but it was Johnson who bludgeoned Taylor. Lupton N.T. 11/22/94 at 134-61, Ex. 31; see also Commonwealth v. Lupton, No. 0989-1000, at 7 (Pa. C.C.P. Nov. 22, 2000) (noting "the Commonwealth presented overwhelming evidence of the defendant's guilt"), Ex. 53.

32. During closing arguments, the prosecutor addressed the question of Rick/Lupton's motive for terrorizing the squatters and ultimately beating one to death over $25. She said: "Why was it so important, ladies and gentlemen? I would contend, ladies and gentlemen, that it was so important because by his actions and what you heard testified to in this courtroom, the man was a bully." Lupton N.T. 11/29/94 at 129, Ex. 32.

### e. The Fire

33. Less than three days after the squatters testified at Lupton's trial that Rick was Gary Lupton and that Rick/Lupton and Johnson had murdered Taylor, the fire occurred.[8] Antrom, Minnick, Hawkins, and McCullough were all still squatters in the building, and all were asleep inside when the fire was set.

34.     Officers investigating the fire that morning asked the squatters who was responsible for the fire. The squatters reported that Rick had been there a day earlier and fought with Antrom and Minnick.

35.     In at least fourteen different statements given after the fire, the squatters identify one suspect: Rick. None distinguish this Rick from Rick/Lupton. None mention Daniel Gwynn. See Statements and Interview Notes of Antrom, Minnick, McCullough, Jones and Hawkins, Exs. 7-23.

36.     There is no evidence indicating that the witnesses realized that Lupton was incarcerated during his trial. To the contrary, John Antrom stated, "When I went to court for Glenn Taylor's murder I was not sure if the drug boys were in jail. They could have been out on the street." Antrom, Ex. 1 at ¶ 13; see also id. ¶ 11 ("We stayed away from the building for several weeks. We knew the drug boys were around but we wanted to stay clear of them."). This confusion is unsurprising.  Lupton was not arrested until weeks after Johnson was arrested, and when the squatters were subpoenaed to appear at Johnson's preliminary hearing, Lupton was still free, was subpoenaed to appear along with them, and waited with them in the same witness room. See Notice of Appearance, attached as Exhibit 46; PCRA of Gary Lupton, No. 0989-1000, at 2 (Pa. C.C.P. Nov. 2, 1998), attached as Exhibit 58.  When Minnick and Antrom testified at Lupton's jury trial prior to the fire, Lupton was in street clothes. Order, Commonwealth v. Lupton, No. CP 9310-0977 (Pa. C.C.P. Nov. 15, 1994), attached as Exhibit 59. There is no evidence that the squatters were aware Lupton was in custody at the time they gave their statements.

---

[8] Minnick and Antrom testified on a Thursday, the trial did not reconvene until the

37.     Three of the detectives who investigated the Taylor murder also investigated the fire. Two of these detectives – Detectives Perks and Santiago – heard the witnesses identify Rick as the perpetrator in both cases. In the Taylor murder, Detective Perks interviewed McCullough, who identified one of the perpetrators as Rick. McCullough, Ex. 43 at 3-7. Detective Perks again interviewed McCullough regarding the fire, and heard McCullough again identify the perpetrator as Rick. Statement of McCullough (11/20/94, 9:35 a.m.) at 3-6, attached as Exhibit 13. Detective Santiago interviewed Hawkins in the Taylor murder, and heard him identify one of the perpetrators as Rick. Hawkins, Ex. 39 at 3-12. In the Gwynn case, Detective Santiago interviewed Officer Nikki Jones, who stated that, at the scene of the fire, Minnick identified Rick as the perpetrator. Statement of Jones (11/20/94, 9:40 a.m.) at 4-5, attached as Exhibit 24. Detective Mangoni, who took the statement from Gwynn and interviewed Jones and Hawkins, also interviewed witnesses in the Taylor murder, including Carol Smith, one of the people squatting in the building at the time of Taylor's death. Statement of Smith (8/18/93), attached as Exhibit 45.

38.     None of the foregoing facts regarding the Taylor murder were ever disclosed to the defense. The prosecution never disclosed that the same witnesses who identified Gwynn as Rick had, in prior statements and sworn testimony, identified another man as Rick. The prosecution never disclosed that these witnesses reported numerous death threats from Rick and his co-defendant. And they never disclosed that Rick's murder trial was ongoing at the time of the fire and the fire victim witnesses had testified against Rick only days before the fire was set.

following Monday, and the fire occurred early on the intervening Sunday morning.

## 2. The Lorraine Irby Fire and Other Suspicious Fires

39. The preceding suppressed information alone would have been a bombshell in Gwynn's case. There is more. Antrom, Minnick, Hawkins, and McCullough were not the only witnesses to Glen Taylor's murder who cooperated with the police to arrest and convict Johnson and Lupton. Nor were they only ones who reported to police that Johnson and/or Lupton threatened to have them killed if they did so. Nor were they the only ones who were victims of arson after testifying.

40. Lorraine Irby also was an occupant of the apartment building at 4504 Chestnut Street at the time of Glen Taylor's murder. Like the others, she was interviewed by the police and implicated "Reese" and "Rick," and she also testified for the prosecution at Lupton's trial. See Statement of Irby (8/10/93, 4:45 p.m.) at 1, attached as Exhibit 35; Lupton N.T. 11/17/93 at 242, Ex. 29.

41. Like the others, she also reported to police that she had been threatened with death if she cooperated. In an August 26, 1993 police report, Irby explained that Lupton and Johnson's father appeared to be following her over a series of days. Statement of Irby (8/26/93; 1:20 p.m.) at 2-3, attached as Exhibit 36. On one occasion, upon seeing the two men she went into a friend's house and stayed there. Id. Late at night, Johnson's step-father entered the house and told the friend "that he knew I was there + that he was going to kill me for turning his son in." Id.; see also Complaint or Incident Report (8/25/93) (Irby reporting to police that Johnson's step-father "entered the premises and stated that 'he was going to kill [Irby] or that 'his family was going to kill her.'"), attached as Exhibit 47; Statement of Irby (8/8/93, 11:20 p.m.) at 3, attached as Exhibit 33; Statement of Irby (8/9/93, 2:55 a.m.) at 2, attached as Exhibit 34;

Affidavit of Stacie Brown at ¶ 8, attached as Exhibit 2.

42.     Further, at Lupton's trial, Lupton's fellow inmate John Witherspoon testified that Lupton "offered Witherspoon money, if he, Witherspoon, could do something to stop Irby from testifying." Commonwealth v. Lupton, No. 0989-1000, at 3 (Pa. C.C.P. Nov. 22, 2000), Ex. 53.[9] Lupton provided Witherspoon with several addresses where he believed Irby could be found. Witherspoon contacted authorities because he was "concern[ed] for the safety of Irby." Id.

43.     Unlike the other squatters, Irby never returned to 4504 Chestnut and thus was not there at the time of the fire. Brown, Ex. 2 at ¶ 6. After the Taylor murder and the ensuing threats, she stopped staying at that building, although she remained in the area. Id. at ¶ 9.

44.     On March 8, 1995 – while Gwynn was in jail awaiting trial, and less than four months after Irby testified and the fire at 4504 Chestnut occurred – Irby was at a small apartment building at 4600 Spruce Street in Philadelphia where she regularly stayed. Id. at ¶ 10.[10] This four story building was approximately four blocks away from 4504 Chestnut Street. The building caught fire. Id.; Fire Marshal's Logs at 9, attached as Exhibit 48. To escape the fire, Irby was forced to jump from an upper floor window, breaking her back in the process. Brown, Ex. 2 at ¶ 10. An elderly woman died in the fire. Office of the Medical Examiner Case Registration Summary at 1-2, attached as Exhibit 49.

45.     The fire marshal's investigation revealed that the fire was deliberately set. Fire Marshal's Logs, Ex. 48 at 9. It was ignited in the early morning hours during darkness. Id. It was started using gasoline as a liquid accelerant. Brown, Ex. 2 at ¶ 10. The gasoline was poured

---

[9] The Commonwealth voluntarily provided other volumes of the Lupton trial transcript but has not provided this volume to date.

[10] It is not yet known whether this address was among those provided by Lupton in the

on the stairways and landings in the hallway outside of the apartments, preventing residents from exiting their rooms. Id. As noted above, each of these signature features also was true of the fire the other witnesses against Johnson and Lupton survived.

46.     No suspect ever was arrested or tried for the Lorraine Irby fire.

47.     Although it occurred more than seven months before Gwynn's trial, no information about the Irby fire – neither its startling similarity to the fire at 4504 Chestnut nor Rick/Lupton's attempt while in jail to hire someone to prevent Irby from testifying – was ever disclosed to the defense in Daniel Gwynn's case.

**3.     Other Arson Fires at 4504 Chestnut Street**

48.     Nor did the prosecution ever disclose a pattern of intentionally set fires at 4504 Chestnut Street after Johnson's and Lupton's arrests and leading up to the fire which finally destroyed the building. Fire Marshal's Logs, Ex. 48 at 3-8.

49.     Carol Mack, who was a squatter in the building during that period, recalled that the building was firebombed with a bottle of gasoline. Brown, Ex. 2 at ¶ 13.

50.     The Philadelphia Fire Department files reveal that firefighters fought a one-alarm fire at 4504 Chestnut on May 30, 1994, roughly six months before the fatal fire. The fire marshal concluded that the cause of the fire was "incendiary," Fire Marshal's Logs, Ex. 48 at 3 – the same cause as the fire for which Gwynn was convicted, N.T. 11/1/95 at 82.

51.     When the fire marshal's office concludes that a fire was incendiary, it means their investigation has determined the fire was set "with willful and malicious intent." N.T. 11/1/95 at 103. A fire determined to be incendiary is an arson. Id. at 104.

---

course of soliciting a fellow inmate to prevent Irby from testifying.

52.     Exactly two months later, on July 30, 1994, the fire department responded to another fire at 4504 Chestnut. July 30 was a Saturday. The fire department was dispatched at 1:47 a.m. The fire investigation determined that the fire began when an open flame was used to ignite common combustibles. The fire marshal determined that this fire also was an arson. Fire Marshal's Log, Ex. 48 at 5.

53.     Approximately two months later, on September 24, 1994, the fire department responded to a third fire at 4504 Chestnut. Fire Marshal's Logs, Ex. 48 at 7. September 24 also was a Saturday, and again the fire was set after dark. Once again, the fire marshal determined that the fire was an arson. Id. This third arson occurred less than two weeks after the trial date was announced for Lupton and Johnson's murder trial. Commonwealth v. Johnson, Quarter Session file 1/24/94, attached as Exhibit 60.

54.     Approximately two months later, on November 21, 1994, the fire which finally destroyed the building occurred.

55.     No suspect ever was arrested or tried for the three prior arsons.

56.     The prosecution in Gwynn's case disclosed none of the recent prior arsons.

**4.     The Photographic Identification of Gwynn and the Prosecutor's Representations at his Trial**

57.     A few hours after taking the initial round of statements implicating a person identified only as Rick, the police investigating the fire – the officers investigating the fire included at least three detectives who also investigated the Taylor murder – returned to the crime scene and approached Antrom, Minnick and McCullough. According to the police reports, Antrom, Minnick and McCullough were shown "a group" of black and white photos – not an identified photo array, and with no express indication that any other suspects' photos were

16

included – and both men identified Daniel Gwynn's photo as Rick.[11] Antrom, Ex. 18 at 1; Minnick, Ex. 10 at 1; McCullough, Ex. 14 at 1.

58. The officer who reported showing the photographs from which Antrom, Minnick and McCullough identified Gwynn as Rick was identified as a potential Commonwealth witness at trial, but he never was called by the prosecution to testify under oath at either the suppression hearing or the trial. See List of Potential Witness Names, attached as Exhibit 27; N.T. 10/25/95 at 113-14.

59. The prosecution has never disclosed to the defense the photos that led to the identification of Gwynn as Rick. This is true even though Gwynn's trial counsel filed a pre-trial motion to suppress the identifications based on a suggestive photo identification procedure, and even though at the hearing on that motion the judge stated that he "would like counsel to see the photo spread." N.T. 10/25/95 at 117. At the suppression hearing, the prosecutor denied that he himself had ever seen the photos from which Gwynn was identified as Rick. Id.

60. The prosecutor stated to the court that "there's a good chance I would not use the photo" he had never seen because, "This was actually an unusual circumstance in that they knew the defendant and they told the police you already have a picture of him because he had been in

---

[11] It is unclear whether the other victims failed to identify Gwynn or were never shown the photos. Minnick's identification of Gwynn would have been subject to impeachment had counsel been aware of the gross unreliability of Minnick's prior identification of Lupton. Minnick testified at Lupton and Johnson's preliminary hearing that he had known Johnson, but not Lupton, before the incident. When Minnick was asked to identify which defendant was which in court, he got down from the witness stand, stood "eyeball to eyeball" with the two defendants, and pointed to Lupton as the person he knew. His in-court eyewitness identification, made under oath, was wrong. At the trial, he said he had not been wearing his glasses that day. See Lupton N.T. 11/28/94 at 76-78.

another photo display on another murder so the police came and," at which point he was interrupted by the judge. Id. at 6.

61. Later in the hearing, the prosecutor argued that the suggestive photo identification motion should be denied because the witnesses had already known Gwynn prior to the fire. Defense counsel responded, "I've been told by the defendant he does not know these people." Id. at 112. After the trial court acknowledged that Gwynn was entitled to make the motion, the prosecutor stated, "He wasn't the prime suspect in the – it's another photo spread. He wasn't even the prime suspect. In other words, he was a filler and the people all knew him, you already got his photo, you showed it to us on that other occasion." Id. at 113.

62. The presiding judge stated that he wanted counsel to see the photo spread, and the prosecutor responded:

> Judge, I explained to Mr. Mandell, now may I just state this for the record so you understand. These folks were witnesses in a related – a completely unrelated homicide that took place in that same location. They're homeless and they had seen something. And there was someone completely unrelated to the defendant and they looked at photo spreads. They've known the defendant for a year. When this homicide happened they're all telling the detectives who the defendant is, they said ["]You already have the photo, they're in the other spread.["]
>
> THE COURT: What about that other spread?
>
> MR. RILEY: That other spread, it was three years ago.
>
> THE COURT: It's nonexistent.
>
> MR. RILEY: It's nonexistent.

N.T. 10/25/95 at 117. The prosecutor never identified for the court or the defense either the victims or the defendants in the other murder, and he stated inaccurately that this other murder occurred "three years ago."

18

63.     In short, the prosecutor represented that when the police investigating the fire interviewed the squatters and asked them who Rick was, the squatters told the police that they already had Rick's photo from the lineup – presumably the lineup in which the prime suspects were Rick/Lupton and Johnson. But, according to the prosecutor, the witnesses did not tell the police that Rick was Rick/Lupton or Johnson. Instead, according to the prosecutor, the squatters remembered more than a year later a mugshot that was included in those arrays as a filler, and told the police that filler photo of Gwynn was Rick.

64.     If the prosecutor was correct that the squatters told the police investigating the fire that Rick was someone in the Rick/Lupton and Johnson photo arrays, that fact was omitted from the police reports that were disclosed to the defense. Again, the fire occurred during the Taylor murder trial and at least three of the officers investigating the fire also had investigated the Taylor murder.

65.     Undersigned counsel have been unable to determine whether the prosecutor was correct that the squatters said Rick was Daniel Gwynn and Gwynn's photo was in the Rick/Lupton or Johnson photo arrays as filler. The photo arrays from the Taylor murder, as well as the photos from this case, have never been provided to Gwynn's counsel. No photo arrays are currently contained in the state court Quarter Sessions file for either case. Petitioner alleges, on information and belief, that the prosecutor materially misrepresented the facts concerning the photographic identifications.

66.     The Commonwealth has never explained why the photographs from which the squatters identified Gwynn as Rick have not been disclosed.

19

### 4. Other Evidence Tending to Show Unreliability of Evidence Against Gwynn

67.     These extraordinary circumstances are all the more significant in light of numerous inconsistencies in the statements and testimony of the witnesses who identified Gwynn, inconsistencies which cast further doubt on the reliability of their accounts and identifications.

68.     There are significant inconsistencies between the Rick initially described by the squatters and Daniel Gwynn. Most obvious is the name. There is absolutely no evidence, apart from the post-fire assertions of the squatters themselves, that Gwynn was ever known as Rick. No police record indicates that Rick is an alias of Gwynn's and no witness – apart from the squatters who had originally identified Rick as the person responsible – ever provided a statement or testified at trial that Gwynn used the name Rick.[12]

69.     Critical details of the squatters' stories about the fight with Rick changed from one early police interview to the next. For example, when McCullough described the initial confrontation with Rick, he told one officer, "Then Rick came to the room. He said, I'm not gonna bother you, I want her." Statement of McCullough (11/20/94, untimed & unsigned) at 1, attached as Exhibit 12. He told another, "when Rick came in the room, my room, both Donald & John were already there. Rick had a big stick - about 2 to 3 feet long -. He said he wanted to kill." McCullough, Ex. 13 at 4. Similarly, while McCullough claims that he heard Rick make threatening parting words after the fight, see McCullough, Ex. 12 at 1; McCullough, Ex. 13 at 5, both Minnick and Antrom deny that McCullough was present when Rick departed. N.T.

---

[12] There is no indication that Gwynn frequented the area around the apartment building where the fire and the Taylor murder occurred. Gwynn lived near 57th and Race Streets, and

10/31/95 at 80 (Minnick); id. at 142-43, 159 (Antrom). On the morning of the fire, Minnick told the police that Rick had made a threatening parting statement. Jones, Ex. 24 at 5. At trial, however, Minnick repeatedly denied that Rick made any kind of threat. N.T. 10/31/95 at 80, 101. These glaring inconsistencies, combined with the implausibility of their tale of a seventy minute one-sided fight, call into doubt the veracity of the squatters' account.

70.     According to Maurice Johnson, one of his associates was a man named Rick. Affidavit of Maurice Johnson at ¶ 1, attached as Exhibit 4. Johnson stated that he knew Rick, the same Rick who frequently hung around 4504 Chestnut Street during the period in question and was known to the squatters there. Id. Rick was a bully who could be aggressive. Id. at ¶ 5. Rick cannot be Daniel Gwynn, because Johnson stated that he saw Rick in their neighborhood in November 2008, at a time when Gwynn obviously was incarcerated on death row. Id. at ¶ 6.

71.     The description of Rick provided by Johnson is similar to that provided by the squatters to the police the morning of the fire. For example, Johnson described Rick as being 5'11" to 6'0", id. at ¶ 4, while Terry McCullough described him as six feet tall, McCullough, Ex. 13 at 5. Johnson described him as having close cut hair, Affidavit of Maurice Johnson at ¶ 4, as did McCullough, McCullough, Ex. 13 at 5. Johnson described Rick as having "prominent eyes," Affidavit of Maurice Johnson at ¶ 4, while Rosalie Jones described him as having "real big eyes," Jones, Ex. 21 at 3. Johnson asserts that the Rick he knows was in prison with him in 1994, Johnson, Ex. 4 at ¶ 1, which is consistent with the squatters' assertion that at the time of the fire Rick had recently been released from prison. See, e.g., Jones, Ex. 21 at 3.

---

was arrested near 40th Street and Haverford Avenue. He was once arrested near 55th and Race Streets, and once near 61st and Chestnut Streets.

72.     The undisclosed material from the Taylor murder and the other suspicious fires –

along with the serious credibility issues with the testimony used to convict Gwynn – cast grave

doubt on the prosecution's theory of guilt.

## GROUNDS FOR RELIEF

I.  **THE PROSECUTION SUPPRESSED MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE AND KNOWINGLY MADE FALSE REPRESENTATIONS TO THE COURT; THE IDENTIFICATION PROCEDURE USED IN THIS CASE WAS IMPERMISSIBLY SUGGESTIVE; THE SUM OF THE UNDISCLOSED EVIDENCE DEMONSTRATES THAT GWYNN IS INNOCENT; ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO UNCOVER THE EVIDENCE THE COMMONWEALTH SUPPRESSED.**

73.     The prosecution violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny

by failing to disclose material exculpatory and impeaching evidence. The prosecution suppressed

evidence tending to impeach the witnesses who identified Gwynn, particularly evidence related

to the Taylor case. It suppressed evidence that the eyewitnesses against Gwynn had identified

another man as Rick and that their identifications in the prior case were unreliable.  The

prosecution suppressed the photos used for out-of-court identifications in both Gwynn's and

Lupton's case.   The prosecution suppressed evidence -- including but not limited to the threats

made after Taylor's murder, the temporal proximity of the fire to the squatters' testimony at

Lupton's trial, Lupton's attempt while in jail to pay someone to prevent Irby from testifying and

provide them with addresses where Irby could be found, the similar arson fire which Irby

survived, and the other arson fires at 4504 Chestnut -- tending to show that Rick or another

associate of Lupton's and Johnson's committed the arson murder for which Gwynn was

convicted. The suppressed evidence, viewed collectively, was material to the outcome of both

phases of Gwynn's trial.

22

74.     The prosecution violated Napue v. Illinois, 360 U.S. 264 (1959) and its progeny. It falsely represented to the court that the witnesses against Gwynn told police officers they remembered that Gwynn had been filler in a prior lineup, and it falsely represented that the photo array from the Taylor murder investigation was nonexistent.

75.     Counsel rendered ineffective assistance of counsel in failing to competently challenge the witnesses' out-of-court identification and resulting inculpatory evidence and failing to competently develop and present evidence tending to show Gwynn's innocence. Had counsel performed competently, there is a reasonable probability the outcome at both the guilt and penalty phases of his trial would have been different.

76.     The photographic identification procedure used in this case was impermissibly suggestive in violation of Mr. Gwynn's due process rights under the Fifth and Fourteenth Amendments and Neil v. Biggers, 409 U.S. 188 (1972), and Simmons v. United States, 390 U.S. 377 (1968).

77.     The prosecution should have been judicially estopped from arguing that Gwynn was Rick, having already taken a contrary position in prior litigation, and as a result his conviction and sentence violate his due process rights under the Fourteenth Amendment.

78.     Gwynn's sentence of death violates Herrera v. Collins, 506 U.S. 390 (1993), because the foregoing constitutes a truly persuasive demonstration of actual innocence which would render his execution unconstitutional. This evidence also satisfies Schlup v. Delo, 513 U.S. 298 (1995).

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, and all other proceedings and submissions,

Petitioner, DANIEL GWYNN, respectfully prays that the Court grant him the following relief:

(A)    That leave to amend this Petition be granted;

(B)    That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

(C)    That Respondents be Ordered to respond to this Petition; and

(D)    That Petitioner's conviction and death sentence be vacated.

Respectfully submitted,

Renee Edelman

Matthew Stiegler, Esq.
Post Office Box 18861
Philadelphia, PA 19119
(267) 297-7117

Leigh Skipper, Esq.
Chief Federal Defender
James Moreno, Esq.
Renee Edelman, Esq.
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
The Curtis Center, Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

Counsel for Petitioner Daniel Gwynn

## CERTIFICATE OF SERVICE

I, Renee Edelman, Esq., hereby certify that on this 2nd day of April, 2010, I caused the foregoing First Amendment to Petition For Writ of Habeas Corpus to be served by first class mail, postage prepaid, on the following person:

Thomas W. Dolgenos,
Chief, Federal Litigation
Philadelphia District Attorney's Office
Three Penn Center South
Philadelphia, Pennsylvania, 19107

Renee Edelman, Esq.

Dated: April 2, 2010
Philadelphia, PA