# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ | : | |
| DANIEL GWYNN, | : | |
| Petitioner, | : | Civil Number: 08-5061 |
| | : | |
| v. | : | |
| | : | **THIS IS A CAPITAL CASE** |
| JEFFREY A. BEARD, Commissioner, | : | |
| Pennsylvania Department of Corrections; | : | |
| LOUIS B. FOLINO, Superintendent of the | : | |
| State Correctional Institution at Greene; and | : | |
| FRANKLIN J. TENNIS, Superintendent of | : | |
| the State Correctional Institution at | : | |
| Rockview, | : | |
| | : | |
| Respondents. | : | |
| _____ | : | |

## EXHIBITS TO THIRD AMENDMENT TO
## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY

Leigh Skipper
Chief Federal Defender
Renee Hurtig Edelman
James Moreno
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
The Curtis Center, Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner Daniel Gwynn

Dated: July 5, 2013

**INDEX TO EXHIBITS**

**A**    Report of Dr. Richard A. Leo

**B**    Affidavit of Joseph Thornton, dated August 29, 2011

**C**    Affidavit of Stacie Brown, dated September 8, 2011

# EXHIBIT A

**RICHARD A. LEO & ASSOCIATES, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

———————

(415) 661-0162 (Phone)
(415) 661-0172 (Fax)
Email: rleo@usfca.edu

July 1, 2011

Renee Edelman
Capital Habeas Unit
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
601 Walnut Street
Philadelphia, PA 19106

**Re:    Commonwealth of Pennsylvania v. Daniel Gwynn**

Dear Ms. Edelman,

This report is per your request in the above-referenced case of
*Commonwealth of Pennsylvania v. Daniel Gwynn.*

## I. Qualifications

I am a Professor of Law at the University of San Francisco and
formerly a Professor of Criminology and a Professor of Psychology at the
University of California, Irvine.  My areas of research training and
specialization include social psychology, criminology, sociology and law.
For almost two decades, I have conducted extensive empirical research on
the social psychology of influence and decision-making during police
interrogation, police interrogation training and practices, *Miranda*
requirements, the psychology of interrogation and confessions,
psychological coercion, police-induced false confessions, and wrongful
convictions.  In this time, I have analyzed several thousand cases involving
interrogations and confessions; I have researched, written and published

numerous peer-reviewed articles on these subjects in scientific journals; and I have written several books as well, including *Police Interrogation and American Justice* (Harvard University Press, 2008). I am regarded as a national and leading expert on these topics, and I have won numerous awards for my scholarship and publications. My scholarship has often been cited by appellate courts, including the United States Supreme Court on several occasions. To date, I have consulted with criminal and civil attorneys on more than one-thousand three-hundred (1,300) cases involving disputed interrogations and/or disputed confessions. I have been qualified as an expert witness two-hundred and twenty-three (223) times in state, federal and military courts in twenty-eight (28) states, including Pennsylvania. I have given many lectures to judges, defense attorneys, prosecutors and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in America, China and the Republic of Cypress. I attach a current copy of my Curriculum Vitae.

## II. Materials Reviewed

- *Commonwealth of Pennsylvania v. Daniel Gwynn*, 723 A.2d 143 (Pa. 1998)
- *Commonwealth of Pennsylvania v. Daniel Gwynn*, 943 A.2d 940 (Pa. 2008)
- Transcript of Preliminary Hearing Testimony (December 21, 1994)
- Transcript of Suppression Hearing (October 25, 1995)
- Transcript of Trial Testimony
  - October 31, 1995
  - November 1, 1995
  - November 2, 1995
  - November 6, 1995
- Petition for a Writ of Habeas Corpus (E.D. Pa.)
- Petition for Post-Conviction Relief Based Upon Newly Discovered Evidence (Pa. Ct. of Common Pleas)
- Affidavit of Jeanette McDaniel
- Affidavit of Joyce Mills
- Affidavit of Darlene Hill

- Affidavit of Michelle Dotson
- Affidavit of Michael Robinson
- Affidavits of Regina Cook (2)
- Affidavits of Richard Lee (2)
- Affidavit of Maurice Johnson
- Affidavit of John Antrom
- Declaration of Jay Jackman, M.D.
- Psychological Evaluation by Edward Dougherty, Ed.D
- Daniel Gwyn's Philadelphia School Records
- Daniel Gwynn's Mercy Catholic Medical Records
- Daniel Gwynn's Pennsylvania Department of Corrections General Records (June 20, 2005 and July 21, 2008)
- Daniel Gwynn's Philadelphia House of Detention Records
- Daniel Gwynn's Philadelphia Prison System's Records
- Daniel Gwynn's Philadelphia Industrial Correction Center Records
- Daniel Gwynn's Pre-Sentence Report
- Police Records
  - Statement of Daniel Gwynn (11/30/94, 3:30 p.m.)
  - Donald Minnick Interview Notes (undated)
  - Donald Minnick Interview Notes (11/20/94)
  - Statement of Donald Minnick (11/20/94, 10:45 am)
  - Statement of Donald Minnick (11/20/94, 1 pm)
  - Terry McCullough Interview Notes (undated)
  - Terry McCullough Interview Notes (11/20/94)
  - Statement of Terry McCullough (11/20/94, 9:35 am)
  - Statement of Terry McCullough (11/20/94, 1:10 pm)
  - John Antrom Interview Notes (undated)
  - John Antrom Interview Notes (11/20/94)
  - Statement of John Antrom (11/20/94, 9:40 am)
  - Statement of John Antrom (11/20/94, 12:56 pm)
  - Rosalie Jones Interview Notes (undated)
  - Rosalie Jones Interview Notes (11/20/94, 10:00 am)
  - Statement of Rosalie Jones (11/20/94, 12:40 pm)
  - Larry Hawkins Interview Notes (11/20/94, 10:30 am)

- o Statement of Larry Hawkins (11/20/94, 9:40 am)
- o Statement of Officer Nikki Jones (11/20/94, 9:40 am)
- o Statement of Lt. Thomas Lawson (11/26/94, 8:15 pm)
- o Complaint or Incident Report (11/20/94)
- o Statement of Officer Joseph Surina (11/30/94, 3:25 am)
- o Statement of Officer William McCusker (11/30/94, 3:30 am)
- Presentence Investigation Report
- Eugene Cook's North Carolina Criminal Record
- Fire Marshall's Report
- Letter from Dr. Jay Jackman to Renee Edelman, Esq. (3/16/09)

### III. Overview

It is my professional opinion that Mr. Gwynn's confession does not contain indicia of reliability. It does not contain any unique, non-public crime facts that were not already known to the detective who interrogated him, and it is not independently corroborated by any physical, medical or other credible evidence. Instead, it contains crime-specific details only on those issues that the detective knew about prior to interrogating Mr. Gwynn, and it is vague on issues that the detective interrogating Mr. Gwynn did not know about. Moreover, Mr. Gwynn's confession narrative contains errors of fact and/or impossibilities that suggest that he was ignorant of the true crime facts and thus casts doubt on the confession's veracity. Because Mr. Gwynn's interrogation was not electronically recorded, there is no objective record of what occurred and therefore no way of ruling out that Mr. Gwynn was not educated about those facts that he got correct, a phenomenon known as "contamination" that is not uncommon in police interrogations,[1] especially those leading to false confessions.[2] In my professional opinion, Mr. Gwynn's confession is not trustworthy evidence because it contains factual errors, indications that it was not made of personal knowledge, and

---

[1] Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).
[2] Brandon Garrett (2010). "The Substance of False Confessions." 62 *Stanford Law Review*.

lacks corroboration. I do not believe that Mr. Gwynn's confession reliably establishes or corroborates his guilt in this matter.

## IV. The Scientific Study of Police Interrogation and False Confessions

There is a well-established body of empirical social science research on the psychology of police interrogation and false confessions that dates back to 1908. This literature contains hundreds of peer-reviewed journal articles and books, and has produced a body of research findings that is generally accepted in the scientific community. This area of social scientific study is beyond common knowledge and contains findings that are highly counter-intuitive. For example, most lay people do not know that police are trained in highly specialized interrogation techniques that involve persuasion, manipulation, deception and sometimes even psychological coercion; the assumptions, goals, psychology or logic of these techniques; how and why these interrogation techniques, when misapplied to the innocent, can lead to false confessions; that numerous interrogation-induced false confessions have been documented and analyzed; the risk factors for eliciting false confessions from the innocent; or the patterns, characteristics and indicia of unreliability that researchers have found across false confession cases. Instead, most lay people (and criminal justice officials) tend to erroneously assume that false confessions are rare anomalies that only occur if police physically torture suspects.

Because police-induced false confession occurs in surprisingly high numbers, and because there is a thriving body of social science research that explains the little-known psychology of police interrogation techniques and counter-intuitive phenomenon of false confession, attorneys in recent decades have increasingly called on interrogation and confession experts to testify as expert witnesses in criminal and civil cases involving disputed interrogations and confessions. These experts have been primarily academic social psychologists, criminologists, and sociologists. Their testimony has sought to educate the jury generally about the psychology of police interrogation and how and why innocent individuals might be manipulated into giving or agreeing to false confessions, as well as to address specific questions and issues in particular cases, without offering any ultimate

opinions. To my knowledge, the first time an expert witness testified in a disputed interrogation/confession case was in the mid-1970s. By the mid to late 1980s, the use of social science expert testimony in disputed interrogation/confession cases was becoming increasingly common. By the 1990s it had already become widespread.

## V. The Psychology of Police Interrogation and False Confessions

Once patrol officers promote to the rank of detective, they typically receive intensive training in the practice and law of interrogation and thereafter learn to apply, refine and hone their interrogation skills through extensive case experience, supervision, and/or additional training. Police interrogation is a structured process in which detectives draw on an arsenal of psychological techniques to overcome a suspect's anticipated denials and elicit incriminating statements, admissions and/or confessions. This is the sole purpose of custodial interrogation. To achieve this purpose, interrogators use techniques that may rely on influence, persuasion, pressure, stress, manipulation, deception, and/or psychological coercion. The psychological goal of these techniques is to break down a suspect's confidence in his ability to deny the accusations against him, cause him to perceive that all the evidence establishes his guilt beyond any doubt, and to motivate him to believe that he is better off by making or agreeing to an incriminating account. Once interrogators elicit an admission (*i.e.*, the "I did it" statement), the next step is to elicit from the suspect a post-admission narrative (*i.e.*, how and why the suspect committed the crime).

Social scientists have empirically studied and analyzed how and why the process of police interrogation can lead to false confessions from the innocent, as well as the situational and individual factors that elevate the risk of eliciting false confessions from the innocent. In addition, social scientists have identified three different types of false confessions: *voluntary* false confessions (made in response to minimal or no police pressure); *compliant* false confessions (given to terminate the stressful, punishing and/or coercive experience of interrogation by a suspect who privately knows that he is innocent); and *persuaded* false confessions (given by a suspect who comes to doubt the reliability of his memory and comes to believe that he or she

may have committed the offense). Psychological methods of interrogation can and sometimes do cause innocent individuals to falsely confess, especially interrogations that involve methods that are inherently coercive (such as implied or explicit promises and threats) or that become cumulatively coercive. In addition, some types of individuals – particularly the mentally handicapped and/or cognitively impaired, juveniles and the mentally ill – are more vulnerable to the pressures of interrogation and possess personality characteristics and behavioral traits that increase their risk of giving or agreeing to interrogation-induced false confessions.

## VI. Evaluation the Reliability of Incriminating Statements, Admissions and Confessions

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, social science researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases. To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, social science researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates unique non-public details, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt.

This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some

other source with inside knowledge about crime details. If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. One problem with contemporary American police interrogation in practice is that police detectives often describe crime facts to suspects, lead or direct them to infer correct answers, and sometimes even suggest plausible motives for committing the crime.[3] Because they are trained to presume the guilt of those whom they interrogate, American police assume that they are interrogating suspects who already know the correct crime facts. But this is not true when they are mistakenly interrogating an innocent person. When the entirety of an interrogation is not electronically recorded, there may be a dispute about whether the interrogator(s) first suggested a non-public fact to the suspect or whether the suspect independently volunteered it. Without an electronic recording, there is typically no way of objectively resolving this swearing contest.

Contamination by police, however, regularly occurs in interrogation-induced false confession cases. And after police interrogators have contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about. One researcher has called these contaminated details "misleading specialized knowledge."[4] In many false confessions cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators. In a recent study of the first 232 DNA exonerations of innocent prisoners in the American criminal justice system, Brandon Garrett has shown that this pattern was present in more than 90% of the false confession cases in this data set (31 of 34 cases). In other words, in the overwhelming majority of these proven false confession cases, police interrogators fed the suspect unique non-public facts that "only the true

---

[3] Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).
[4] Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).

perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[5]

Absent contamination, the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that is full of gross errors and inconsistent with the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and therefore strongly suggests innocence.

The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement. Properly trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence. For example, in high profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge. If an element of a crime is particularly heinous or novel, police often keep this fact from the press so that it can be used to demonstrate a confessor's guilty knowledge. Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime. In other types of cases,

---

[5]Brandon Garrett (2010). "The Substance of False Confessions." 62 *Stanford Law Review.*

police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work. This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations won't fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because properly trained detectives realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongfully arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides a gold mine of potential evidence to the unbiased, properly trained detective who is seeking to ferret out the truth. For if the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a suspect during the post-admission period and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

## VII. Daniel Gwynn's Statement Contains Indicia of Unreliability

Mr. Gwynn was convicted of first degree murder, arson and aggravated assault in 1995. The primary evidence against him was an incriminating police-written statement that he signed. In this statement, Mr. Gwynn is supposed to have started the fire at 4504-4506 Chestnut Street in Philadelphia, Pennsylvania that killed Marcia Smith, one of six homeless residents there, who refused to jump out of a third floor residence. The other five residents survived. Two of them, John Antrom and Donald Minnick, testified that on the day before the fire they had an altercation with someone known as "Rick," who fought with them for seventy minutes before being forced to flee the residence and threatening revenge. The five homeless residents told police that they believed "Rick" had to have started the fire – even though they did not see who started the fire – and, after being shown

pictures by police, three of the residents identified pictures of Daniel Gwynn as "Rick." The only other evidence alleged against Mr. Gwynn was that he possessed matches and lighters when he was arrested. There was no physical evidence linking Gwynn to the burned building or the victim, and there were no eyewitnesses to the fire.

I have reviewed the extensive above-referenced materials in this case, and it is my professional opinion that the police-written confession statement that Mr. Gwynn signed does not bear indicia of reliability but instead contains multiple indicators of untrustworthiness. First, Mr. Gwynn's statement does not contain any unique, non-public details that were not already known to the police prior to his interrogation. Mr. Gwynn was interrogated primarily by Detective Dominic Mangoni, with detective James Dougherty also present. Detective Mangoni participated in the fire investigation, and four days prior to Mr. Gwynn's interrogation, Detective Mangoni had reviewed the detailed fire investigation from Fire Department Lt. Thomas Lawson. Because Detectives Mangoni and Dougherty failed to electronically record their interrogation of Mr. Gwynn, there is no objective record of what occurred during the interrogation that led to Mr. Gwynn's police-written statement, who said what to whom or what information was or was not provided to Mr. Gwynn. We therefore cannot rule out the possibility that Detective Mangoni suggested all the crime-specific facts contained in the police-written statement.

Second, this possibility is supported by the fact that on those issues Detective Mangoni knew details about (the location at which the gasoline was poured and ignited, for example), Mr. Gwynn's police-written statement is very specific. By contrast, on those issues that Detective Mangoni did not know details about (for example, Mr. Gwynn's actions before and after the fire), Mr. Gwynn's police-written statement is vague. The issues about which Detective Mangoni did not have knowledge, such as Mr. Gwynn's actions before and after the fire, were never corroborated. And there is not a single fact about the fire in Mr. Gwynn's police-written statement that Detective Mangoni did not already know.

Third, Mr. Gwynn's police-written statement contains factual errors that reveal a lack of knowledge about basic crime scene facts as well as a description of events that would have been physically impossible, a classic indicator of a false or unreliable confession. Mr. Gwynn gets basic details of the building wrong in his police-written statement. For example, Mr. Gwynn's police-written statement asserts that he exited the abandoned apartment building by running down the stairs and out the door. However, this would have been physically impossible – because the door was boarded up. The only way Mr. Gwynn could have exited (or entered) the building would have been by crawling through a window. In addition, Mr. Gwynn's police-written statement describes him watching gas spread down the hallway and down the steps from the third to the second floor of the building. While this description is consistent with the fire marshal's report and thus the crime facts known to Detective Mangoni at the time of Mr. Gwynn's interrogation, it is physically impossible and therefore false. The building had no power or electricity, and the fire occurred before the sun came up. Because the hallway was therefore pitch black, it would have been impossible for Mr. Gwynn to have watched gasoline spread down a hallway or from one floor to another.

Fourth, Mr. Gwynn's police-written statement contains statements that contradict or are not supported by existing physical and testimonial evidence, another classic indicator of a false or unreliable confession. I have already mentioned that Mr. Gwynn's account that he ran out the front door of the building is clearly contradicted by trial testimony that the front door was impassable, thus making this statement necessarily false because the only entrance/exit would have been through a back window. Another example is that Mr. Gwynn told police that on the morning of the fire he went to the building, knocked on the door, and tried to apologize to the residents for the alleged quarrel that had occurred the day before, but that they would not accept his apology (he stated that door was slammed in his face). However, all of the surviving squatters denied seeing, hearing or speaking to Mr. Gwynn or the person they identified as the perpetrator (i.e., "Rick") prior to the fire.

Fifth, Mr. Gwynn's police-written statement is internally inconsistent, another classic indicator of a false or unreliable confession. For example, in his police-written statement, Mr. Gwynn gives three accounts of how he started the fire. The first and third accounts of how he lit the fire (that he started the fire on the third floor) are inconsistent with the second account (that he started the fire on the first floor, which is inconsistent with all the evidence (all of which indicates that the fire started on the third floor). It is significant that in the written confession it is clear that the detectives moved Mr. Gwynn from an incorrect account (fire starting on 1st floor) back to an account they knew to be correct (fire starting on 3rd floor).

Finally, it is striking that there is no record of any police investigation of the crime after the taking of Mr. Gwynn's statement. Mr. Gwynn's statement is surprisingly vague on details as confessions go, especially in light of the seriousness of the crime. Nevertheless, the detectives did not appear to confirm any of the details present in Mr. Gwynn's police-written statement. None of the records I reviewed indicate that there was attempt by the detectives, after eliciting Mr. Gwynn's statement, to corroborate his confession or to conduct any further investigation. This kind of post-confession presumption of guilt, often accompanied by both tunnel vision and professional laziness, is also common in cases involving false and unreliable confessions.

Because the detectives failed to electronically record Mr. Gwynn's interrogation, there is, of course, no objective record of the questioning session that may have led to a false confession. Even in the absence of a record of what occurred during the interrogation, however, we can still identify several risk factors for false confession that were present in this case. Mr. Gwynn's interrogation and detention were lengthy. Mr. Gwynn was held for seventeen hours and had been interrogated for at least three hours of that time. Mr. Gwynn was interrogated 14 hours after his arrest, and he spent much of that time handcuffed to a chair in an interrogation room. Because he was a long term cocaine addict, Mr. Gwynn was in the

throes of severe withdrawal, and the associated symptoms, at the time of his interrogation. In addition, Mr. Gwynn suffered from profound mental illness at the time of his interrogation, including hallucinations, depression, borderline personality disorder, and post-traumatic stress disorder. The combination of Mr. Gwynn's drug withdrawal and mental illness, under conditions of accusatory interrogation, likely led Mr. Gwynn to experience distress, anxiety, confusion, fatigue, tension, possible hallucinations, and impaired cognitive and social functioning. All of these factors suggest that Mr. Gwynn, at the time of his interrogation, was in a state that left him overly prone to compliance and confabulation, as noted by Dr. Jackman, and that he was especially vulnerable to pressures and physical and psychological states that are known to elevate the risk for making or agreeing to a false or unreliable confession.

## VIII. Conclusion

In my professional opinion, Mr. Gwynn's police-written statement does not bear indicia of reliability but, instead, contains multiple indicators of untrustworthiness. Mr. Gwynn's police-written statement does not reveal his personal knowledge of any unique or non-public crime facts because the inculpatory statement does not contain a single such fact that was not already known to the police who interrogated him; Mr. Gwynn's assertions about issues known by Detective Mangoni were detailed and specific, whereas Mr. Gwynn's assertions about issues that were not known by Detective Mangoni were vague; and, perhaps most importantly, Mr. Gwynn's police-written statement contains factual errors and physical impossibilities that reveal an ignorance of the crime scene and crime facts, a classic hallmark of an unreliable admission and post-admission narrative. In sum, because of the lack of any indicia of personal knowledge of non-public or unique crime facts, our inability to rule out the possibility – if not the probability – of contamination, and the presence of factual errors and physical impossibilities in Mr. Gwynn's post-admission narrative, I do not believe that Mr. Gwynn's police-written inculpatory statement reasonably supports a judgment of guilt.

If you have any questions, or if I can be of any further assistance, please do not hesitate to contact me.

Sincerely yours,

Richard A. Leo, Ph.D., J.D.
Professor of Law
University of San Francisco

# EXHIBIT B

## AFFIDAVIT AND DECLARATION OF JOSEPH THORNTON
### PURSUANT TO 28 U.S.C. § 1746 AND 18 Pa.C.S. § 4904

1.      My name is Joseph Thornton. I am an investigator and I assisted in the preparation of Daniel Gwynn's initial post-conviction proceedings.

2.      I attempted to interview the surviving victims of the fire at 4504-4506 Chestnut Street.

Because all of these individuals were homeless, it was very difficult to locate them. I was unable to find Rosalie Jones or Larry Hawkins.

3.      In or about January of 2001, I was able to locate Donald Minnick, John Antrom and Terry McCullough. I told each of them that I was investigating the case on Mr. Gwynn's behalf. Minnick refused to speak to me, but Antrom and McCullough agreed to talk to me. I interviewed Antrom and McCullough on separate occasions.

4.      Because there were questions as to how Mr. Gwynn became a suspect in the fire, I investigated the circumstances of his identification by the surviving victims, including the photo array out of which they identified Mr. Gwynn as "Rick." I asked Antrom and McCullough open-ended questions about the photo array and "Rick."

5.      Antrom and McCullough did not tell me that the photo of "Rick" appeared as a filler in a photo array from a prior investigation, or that they had told the police that they already knew who "Rick" was because his photo had been a filler in prior array. Both confirmed that they were shown a number of photographs by the police. Neither mentioned anything about a prior investigation of another homicide at that location.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746 and 18 Pa. C.S. § 4904.

WENDY L. JIMMO
NOTARY PUBLIC
State of Maine
My Commission Expires
August 16, 2012

Notarized:

_____
Joseph Thornton
Dated: 8/29/11

Personally appeared before me this 29th day of August 2011 and acknowledged it to be true & accurate.

Wendy Jimmo

# EXHIBIT C

## AFFIDAVIT AND DECLARATION OF STACIE BROWN
## PURSUANT TO 28 U.S.C. § 1746 AND 18 Pa.C.S. § 4904

1.    My name is Stacie Brown. I am employed as an investigator by the Federal Community Defender Office for the Eastern District of Pennsylvania, Capital Habeas Unit.

2.    Prior to March 5, 2009, we had no idea that any of the surviving victims in Mr. Gwynn's case had identified another man, Gary Lupton, as "Rick" or that Lupton had threatened to harm them before the fire. On that date, I interviewed Gary Lupton, who gave me permission to review and copy his case files, which were in the possession of his mother. Later that evening, I received from Lupton's mother his files, which included police reports and partial transcripts from Lupton's trial containing the information that the surviving victims identified Lupton as "Rick" and that Lupton threatened to harm them if they testified against him, which Antrom and Minnick did three days before the fire.

3.    After interviewing Lupton and reviewing the files I received from his mother, I attempted to interview the common witnesses from the Lupton and Gwynn cases, including John Antrom, Donald Minnick, Terry McCullough and Larry Hawkins, as well as witnesses from Lupton's case including Lorraine Irby, Carol (Smith) Mack and Isaiah Mack.

4.    The only witness I have been able to locate is John Antrom, who is in poor health and is homebound. Antrom provided an affidavit on April 23, 2009. Minnick, McCullough and Hawkins appear to be homeless or transient, as they were at the time of Mr. Gwynn's trial.

5.    I have been a capital post-conviction investigator for over eleven years. This has been one of the most difficult investigations I have ever undertaken because so many of the critical witnesses are homeless or transient.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746 and 18 Pa. C.S. § 4904.

Stacie Brown
Dated: 9-8-2011

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
KATHLEEN KAIB, Notary Public
City of Philadelphia, Phila. County
My Commission Expires November 17, 2013

Notarized:

Sworn to and subscribed before me
this 8 day of Sept 20 11.