**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|                          |   |                        |
|--------------------------|---|------------------------|
| DANIEL GWYNN,            | : |                        |
|                          | : |                        |
|    Petitioner, | : | Civil Number:  08-5061 |
|                          | : |                        |
|    v.     | : |                        |
|                          | : |                        |
| JEFFREY A. BEARD, et al.,| : |                        |
|                          | : |                        |
|    Respondents. | : |                        |
|                          | : |                        |

_____

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HABEAS RELIEF**

Petitioner Daniel Gwynn, by and through his undersigned counsel, respectfully submits this Memorandum of Law in support of habeas relief as to his conviction for first degree murder.

**PROCEDURAL HISTORY**

Daniel Gwynn was convicted of the first-degree murder of Marsha Smith in Philadelphia, Pennsylvania and sentenced to death in 1995.  Over the dissent of two justices, the Supreme Court of Pennsylvania found no error in the trial or sentencing hearing and affirmed Gwynn's conviction and death sentence.  *Commonwealth v. Gwynn*, 723 A.2d 143 (Pa. 1998), *cert. denied Gwynn v. Pennsylvania*, 528 U.S. 969 (1999).

Gwynn filed a petition under Pennsylvania's Post-Conviction Relief Act on May 30, 2001.  That petition was denied by the trial court on February 10, 2003.  The Supreme Court of Pennsylvania affirmed the denial of post-conviction relief on March 20, 2008, with two justices dissenting as to the denial of Petitioner's claim that prior counsel failed to investigate and present

available mitigation evidence in the penalty phase of his capital trial. *Commonwealth v. Gwynn*, 943 A.2d 940 (2008).

On March 7, 2009, Gwynn filed a Petition for Writ of Habeas Corpus (Dkt. No. 5)

Petitioner filed a second petition under the Pennsylvania Post-Conviction Relief Act on April 27, 2009.

Petitioner moved this Court for discovery on September 15, 2009, requesting the complete police and prosecution files in his case and in the related prosecution of Gary Lupton for the murder of Glenn Taylor. (Dkt. No. 16)

On November 16, 2009, the Commonwealth responded to Petitioner's discovery motion, arguing that it was overbroad and premature, and urged the Court to deny it. (Dkt. No. 23)

The Court granted Petitioner's discovery motion on March 19, 2010, ordering the Commonwealth to turn over the police and prosecution files from the Smith and Taylor murder cases in their entirety. (Dkt. No. 28)

Petitioner amended his Petition on April 2, 2010. (Dkt. No. 29)

In response to the Court's order, the Commonwealth filed a petition for writ of mandamus in the Third Circuit. The Third Circuit denied the Commonwealth's mandamus petition. *In re: Beard*, No. 10-9003 (3d Cir. June 3, 2010) (unpublished).

On April 18, 2011, this Court stayed the habeas proceedings in this case pending resolution of state court litigation. (Dkt. No. 37)

On March 27, 2012, the Commonwealth trial court denied Petitioner's second motion for post-conviction relief.

On October 29, 2012, Petitioner filed a second amendment. (Dkt. No. 43)

On June 17, 2013, the Pennsylvania Supreme Court issued a *per curiam* memorandum order affirming the denial of Petitioner's second motion for post-conviction relief. *Commonwealth v. Gwynn*, No. 644 CAP.

Petitioner filed a third amendment to his habeas petition on July 5, 2013. (Dkt. No. 44)

Following withdrawal of attorneys from the Federal Community Defender for the Eastern District of Pennsylvania, undersigned counsel Gretchen M. Engel was appointed to represent Petitioner on May 5, 2014. (Dkt. No. 62)

The Commonwealth declined to provide its complete files to Petitioner, but produced some documents on April 22, 2016. Thereafter, on September 26, 2016, Petitioner filed a motion to compel, seeking discovery of work product & redacted information. (Dkt. No. 86)

On October 6, 2016, Petitioner filed a Fourth Amendment. (Dkt. No. 87)

On March 20, 2018, this Court denied Petitioner's motion to compel, without prejudice. (Dkt. No. 89)

On December 18, 2020, the Commonwealth and Petitioner entered a joint stipulation to sentencing relief, based on Petitioner's claim that his counsel rendered ineffective assistance of counsel in the investigation and presentation of mitigating evidence at the penalty phase of his trial. (Dkt. No. 106)

The Court accepted the joint stipulation by order of January 14, 2021. (Dkt. No. 107)

On February 8, 2021, the Court ordered Petitioner to file a Memorandum of Law containing all claims for relief he intends to pursue in view of the parties' stipulation that Petitioner is entitled to habeas relief as to sentencing. (Dkt. No. 109)

Undersigned counsel Karl Schwartz was appointed to replace Matthew Stiegler on March 10, 2021. (Dkt. No. 111)

The Court extended the time for the filing of this Memorandum to August 3, 2021, in order to permit counsel Schwartz time to review the record, and subsequently extended the time to October 5, 2021, December 3, 2021, and then January 3, 2022, to permit discovery review. (Dkt. Nos. 114, 117, 119, and 121)

Counsel for Petitioner submit briefing as to three claims for guilt-phase relief:

- Prosecutorial Misconduct in Suppressing Material Exculpatory and Impeachment Evidence and Knowingly Making False Representations ("***Brady/Napue* Claim**," raised as Claim XIII in his original habeas petition and subsequently amended, Dkt. Nos. 5, 29, 44, 87)

- Ineffective Assistance of Counsel in Failing to Challenge Petitioner's Unreliable Confession ("**False Confession Claim**," presented as Claim IV in his original petition and subsequently amended, Dkt. Nos. 5, 44)

- Ineffective Assistance of Counsel in Failing to Challenge the Prosecution's Discriminatory Use of Peremptory Challenges ("***Batson* Claim**," originally raised as Claim X in the original habeas petition, Dkt. No. 5)

## CLAIMS FOR RELIEF

I. **PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING ON HIS CLAIM THAT THE PROSECUTION SUPPRESSED MATERIAL EXCULPATORY EVIDENCE, KNOWINGLY MADE FALSE REPRESENTATIONS TO THE COURT, AND THEREBY DEPRIVED THE JURY OF EVIDENCE OF PETITIONER'S INNOCENCE.**

The *Brady* and *Napue* violations at Petitioner's trial were of two varieties. Each violation standing alone was material, and prejudiced Petitioner. In combination, they served to deprive trial counsel of evidence that would have powerfully refuted the Commonwealth's case. The evidence presents a chillingly credible alternative theory of guilt, accompanied by known, and likely, alternative perpetrators. The claim is thus rooted not only in the multiple due process violations that pervaded Petitioner's trial, but his actual innocence as well.

First, there was suppressed evidence demonstrating the likelihood that the arson in this case was the work of Gary Lupton or one of his henchmen. As further set forth below, Lupton had been

charged and later convicted of a brutal murder of Glenn Taylor, and a brutal beating of Donald Minnick, one of the witnesses who testified against Petitioner in his trial. That murder and beating occurred in the identical location as the one for which Petitioner was convicted (4504 Chestnut), and was witnessed by Minnick and John Antrom, another witness who testified against Petitioner. The Taylor murder occurred over a year before the incident in this case. The suppressed evidence took the form of witness intimidation by Lupton and his henchmen that impelled these two witnesses – who were homeless and squatting in an abandoned building – to falsely accuse anyone other than Lupton or his associates, of threatening them with retaliation. At Petitioner's trial, these witnesses falsely accused Petitioner of threatening them on November 19, 1994, the day before the arson fire that led to the death of Marsha Smith.

Second, there was evidence that all of the witnesses present on November 19, 1994 (including those who did not testify at Petitioner's trial) previously identified someone other than Petitioner as having committed the arson in this case, demonstrating Minnick's and Antrom's willingness to accuse *anyone* other than Lupton or his associates.

Both strains of this *Brady* violation were suppressed by the Commonwealth, and in both instances the trial prosecutor made false representations suggesting that no such evidence existed.

### Facts Supporting the Claim

A.    **The Prosecutor's Lies and the Suppressed *Brady* Evidence that the Witnesses *Falsely* Claimed that Petitioner was in a Prior Photo Array They Viewed**

The trial prosecutor argued against the need for a pre-trial hearing challenging witnesses' John Antrom and Donald Minnick's identifications at Petitioner's trial. NT, 10/25/95 at 115-118. He assured the trial court and counsel that the witnesses had seen Petitioner's picture when shown a photo array during the investigation of an earlier, "unrelated" homicide (in which the victim was Glenn Taylor). NT, 10/25/95 at 117. According to the prosecutor, the witnesses stated to detectives

that the police already had Petitioner's photo, and that he was in the photo spread they were previously shown relating to the Taylor homicide. *Id.* That earlier array, according to the prosecutor, was no longer in existence. *Id.*

The prosecutor's representations were false in three (3) critical respects: First, the witnesses never saw Petitioner's picture, an exculpatory fact demonstrating both the unreliability of their later in-court identifications of Petitioner, and that someone *other than Petitioner* who they had identified, was the perpetrator in this case; second, the array from the earlier case did exist, as this Court learned when it was turned over pursuant to this Court's discovery order. Dkt. No. 87-1 Att. A. The array contained no photo of Petitioner, and every detective and prosecutor who laid eyes on the photo array knew, or should have known, that Petitioner was nowhere to be found in that array. *Id.* And, third, as discussed in greater length in the following section, the previous homicide *was* related to this case and the Commonwealth knew it. Thus, the Commonwealth was obliged to provide the relevant *Brady* material from that previous homicide.

Petitioner obtained all of this *Brady* material despite the Commonwealth's objection to disclosure, and despite the state court having denied discovery.

**B.     The Taylor Murder and the Additional Suppressed *Brady* Material**

The Commonwealth's knowledge of the relationship between the two homicides was revealed by its discovery disclosure in response to this Court's Discovery Order.  Dkt. No. 28. Photographs of Lupton and Johnson, and a Taylor-murder police report, supplied pursuant to the Order, were found in the police file of this case (the Smith murder), Dkt. No. 87-1, Att. I. This, despite the prosecutor's representation at Petitioner's trial that the two cases were completely unrelated. A review of each case reveals abundant evidence of their interconnectedness.

### i.    The Perpetrator Known as "Rick."

In August 1993 – approximately fifteen months prior to the November 1994 fire for which Petitioner was convicted and sentenced to death – two men murdered a homeless man named Glenn Taylor. Taylor's murder took place at 4504 Chestnut Street in Philadelphia, the very same building Petitioner was later convicted of burning down. Taylor was beaten to death with a pipe. One person who heard the attack described it as a "continuous beating" – "Shit, it must about been eighty times [that Taylor was hit], it seemed like they was beating dude for about twenty five minutes."  Statement of Anthony Daniels (8/14/93). Dkt. No. 30 Ex. 50. Taylor suffered sixteen broken ribs, his lungs, liver, kidney, and spleen all were torn, and he died by drowning in his own blood. Lupton Trial N.T. 11/29/94 at 127. Dkt. No. 30, Ex. 32. 6

During the incident, the killers invited one of the people squatting in the building up to see the room where some of the beating had occurred – they "told me that they wanted to show me how they painted Lorraine's[1] room," and "there was blood on the floors and the walls." Statement of Carol Smith (8/18/93) at 1, Dkt. No. 30, Ex. 51. The first police officer on the scene described what he found: "There was blood splattered on the walls in the front and rear apts. on the 2nd floor. The blood was smeared on the walls in the hallway between the two apartments. In the rear apartment, there was a pool of blood on the floor, and the bed had blood on it too." Statement of Michael Root (8/8/93, 2:40 p.m.) at 2, Dkt. No. 30 Ex. 52. The apparent motive for the killing was that the victim's girlfriend owed one of the killers $25 for drugs. Lupton N.T. 11/22/94 at 17-18, Dkt. No. 30, Ex. 31.

John Antrom and Donald Minnick, two witnesses who survived the fire and identified Petitioner at his trial, were critical eyewitnesses in the Taylor murder case. Minnick was beaten so

---

[1]  This is a reference to Lorraine Irby.  As will be discussed, the Commonwealth also withheld material, exculpatory evidence concerning threats made against Irby.

severely in the same incident that he was hospitalized for five days with serious head injuries. Lupton Trial N.T. 11/17/94 at 157-160, Dkt. No. 30, Ex. 29. Minnick was beaten "literally to within an inch of his life." *Commonwealth v. Lupton*, No. 0989-1000, at 7 (Pa. C.C.P. Nov. 22, 2000), Dkt. No. 30, Ex. 53.

When John Antrom, spoke to the officers investigating Taylor's death on August 8, 1993, he reported that two men were responsible for the beating. Dkt. No. 30, Ex. 41 at 2-4. One was Maurice Johnson, whom he referred to as Reese. *Id*. The other was a man he knew only as "Rick." *See* Dkt. No. 30, Ex. 41 at 2-4 ("two guys named 'Reese' and 'Rick'"). Additionally, two other witnesses to the Taylor homicide, Larry Hawkins and Terry McCullough, identified one of the killers as "Rick." Dkt. No. 30, Ex. 39 at 3-6 & Ex. 43 at 5.

On August 10, 1993, these witnesses were shown photo arrays, and they stated that the man they called Rick was actually named Gary. Statement of Hawkins (8/10/93, 4:25 p.m.) at 1, Dkt. No. 30, Ex. 40. ("The first time I seen Rick was when all this happened. We found out that his real name is Gary."); Statement of Antrom (8/10/93, 4:00 p.m.) at 1, Dkt. No. 30, Ex. 42; ("His name is Gary. I called him Rick."); Statement of McCullough (8/10/93, 4:45 p.m.) at 1, Dkt. No. 30, Ex. 44.

Lupton was on probation for a prior conviction for possession of a sawed-off shotgun. *Commonwealth v. Lupton*, No. 0989-1000, at 4 (Pa. C.C.P. Oct. 18, 1993), Dkt. No. 30, Ex. 54. He reported having been fired from a job as a fireman. Lupton Court Bail Program form, Dkt. No. 30, Ex. 55. Johnson had a series of prior felony convictions. Extract of Criminal Record, Dkt. No. 30, Ex. 56. He was being prosecuted for rape. Lupton N.T. 11/21/94 at 57, Dkt. No. 30, Ex. 30.

### ii.     Rick's Threats to Antrom and Minnick.

Both Rick (Gary Lupton) and Johnson repeatedly and emphatically declared their intention to kill the squatters or have them killed if they cooperated with police in the Taylor murder investigation. Rick (Gary Lupton) told Antrom after Taylor's murder that "if Reese [Maurice Johnson] gets picked up I am going to carry out the rest of the orders. I am going to have you killed. I'll get someone to 'spray' the building." Dkt. No. 30, Ex. 42 at 2. Both Rick (Gary Lupton) and Johnson told witness McCullough that "If l tell the police anything about beating up Donald they would kill me." McCullough, Ex. 43 at 6. Two days later, Terry McCullough told police, "Reese and Rick were saying that if the police came looking for them then they would know we told on them and that they had back-up that would take care of us." Dkt. No. 30, Ex. 44 at 2. Rick (Gary Lupton) told Minnick "not to tell the cops or he would come back and finish it up." Statement of Minnick (8/10/93, 6:40 p.m.) at 2, Dkt. No. 30, Ex. 38.

At Lupton's trial for Taylor's murder, Antrom testified:

A.     Gary [Lupton] said if you, Terry, call the police or if Maurice get picked up, they will have someone to kill you, and they will have the building sprayed.

Q.     And who said that they would have the building sprayed?
A.     Gary.

Q.     And what did you understand that to mean?
A.     Kill everyone in the building.

Lupton N.T. 11/17/93 at 65, Dkt. No. 30, Ex. 29. Antrom went on to testify that Johnson threatened them by saying, "'If any of y'all tell who did this to him, that we'll kill you.'" *Id*. at 70. "Then Gary said "[i]f Maurice get picked up, I will be the one to carry out the orders to have the building sprayed." *Id.*

Three of these threats – "I'll get someone to spray the building," "they had back- up that would take care of us," and "they will have someone to kill you" – referred specifically to Johnson

and Rick (Gary Lupton) having associates who would carry out the revenge murders for them. Lupton's reference to "carry[ing] out the rest of the orders" also implied the involvement of others; *see also* Affidavit of John Antrom ¶ 4 ("[T]he guys that beat up Glenn Taylor were two of the drug boys."), Dkt. No. 30, Ex. 1. In addition, Lupton offered to pay a fellow inmate to prevent another squatter witness to Taylor's murder from testifying against him, causing that inmate to fear for the squatter's safety. *Commonwealth v. Lupton*, No. 0989-1000, at 3 (Pa. C.C.P. Nov. 22, 2000), Dkt. No. 30, Ex. 53. Johnson's step-father threatened to kill the same witness. Dkt. No. 30, Ex. 47; Statement of Irby (8/8/93, 11:20 p.m.) at 3, Dkt. No. 30, Ex. 33; Statement of Irby (8/9/93, 2:55 a.m.) at 2, Dkt. No. 30, Ex. 34; Affidavit of Stacie Brown at ¶ 8, Dkt. No. 30, Ex. 2.

Antrom testified that these threats left him mortally frightened – "we were kind of scared for our lives." Lupton Trial N.T. 11/17/94 at 70-71, Dkt. No. 30, Ex. 29; *see also* Dkt. No. 30, Ex. 1 at ¶ 9 ("We were worried that the drug boys or their friends would come back and mess with us, or hurt us like they hurt Donald."); *id*. ¶ 14 ("I was always worried after the [Lupton] trial that the drug boys or any of their friends might come back and hurt or kill us. That is what they threatened to do to us if they got caught."). As the prosecutor at Lupton's trial explained, "And was John Antrom scared? You better believe he was scared." Lupton N.T. 11/23/94 at 113, Dkt. No. Ex. 32; *see also id*. at 116 ("Did he stay around to tell the police what he knew or did he run away and try to protect himself because he had a reason to be scared? He knew the defendant, he knew what the defendant had threatened to do, and he didn't know where the defendant was or when he would come back.").

Both the trial judge and the prosecutor in the Taylor murder case, recognized how vulnerable the squatters were to the threats being carried out. At the close of Lupton's preliminary hearing, the presiding judge ruled on a bail motion. She asked Lupton, "is there any question in

your mind that you're not supposed to have any contact with that abandoned building," and "if you see those people you better act like you don't see them. Do you understand that?" She continued:

> I'm going to issue a protective order for all the Commonwealth witnesses. These people who I heard from the last two days are very vulnerable people. You have three brothers living in a situation, I mean they're at the bottom. I don't want you anywhere near them. You hear me?

Lupton Preliminary Hearing N.T. 9/29/93 at 37, Dkt. No. 30, Ex. 28; *see also id.* at 38 ("Don't even look at them if you see them."); ("[Y]ou may see them. You better walk across the street if you do because you're already in trouble.").

When the prosecutor moved to revoke Lupton's bail less than a month later, she concluded the motion thusly: "Gary Lupton is presently on probation for possession of a sawed-off shotgun. He knows all the witnesses in this case, men and women who are homeless and the most vulnerable members of society." Commonwealth's Petition for Revocation of Bail, *Commonwealth v. Lupton*, No. 0989-1000, at 4 (Pa. C.C.P. Oct. 18, 1993), Dkt. No. 30, Ex. 57.

### iii. The Lupton Trial

Antrom and Minnick, the two witnesses who identified Petitioner at his trial, both testified for the prosecution in Gary Lupton's murder trial. They testified against Lupton on November 17, 1994 – three days before the building where they were living was burned down. Antrom testified that Rick was Gary Lupton:

> Q. Okay. And do you remember on that date straightening out the situation issue that Rick was in fact Gary Lupton?
> A. They had showed me some photos.
>
> Q. Okay. And that was straightened out as to Rick and Gary?
> A. Yes, yes.

Lupton Trial N.T. l/ l 7/94 at 119, Dkt. No. 30, Ex. 29. Antrom and the other squatters testified that Johnson and Rick (Gary Lupton) committed the murder and assault. Lupton, who was represented by experienced retained counsel at trial, acknowledged that he and Johnson were in fact present at the scene, and he has never asserted otherwise. Lupton testified in great detail as to their actions and Taylor's death, ultimately asserting that he was in the room but it was Johnson who bludgeoned Taylor. Lupton Trial N.T. 11/22/94 at 134-61, Dkt. No. 30, Ex. 31; *see also Commonwealth v. Lupton*, No. 0989- 1000, at 7 (Pa. C.C.P. Nov. 22, 2000) (noting "the Commonwealth presented overwhelming evidence of the defendant's guilt"), Dkt. No. 30, Ex. 53.

During closing arguments, the prosecutor addressed the question of Lupton's motive for terrorizing the squatters and ultimately beating one to death over $25. She said: "Why was it so important, ladies and gentlemen? I would contend, ladies and gentlemen, that it was so important because by his actions and what you heard testified to in this courtroom, the man was a bully." Lupton N.T. 11/29/94 at 129, Dkt. No. 30, Ex. 32.

### iv.    The Fire in this Case

Less than three days after the squatters testified at Lupton's trial that Rick was Gary Lupton and that Lupton and Johnson murdered Taylor, the fatal fire in this case was set. Antrom and Minnick, the two witnesses who identified Petitioner as having been involved in an altercation the day before and vowing revenge, were still squatters in the building, and were asleep inside when the fire started. Officers investigating the fire that morning asked the squatters who was responsible for the fire. They reported that Rick had been there a day earlier and fought with Antrom and Minnick.

In at least fourteen (14) different statements given after the fire, the squatters identify one suspect: Rick. None distinguish this Rick from the Rick they previously identified as Gary Lupton.

None mention Petitioner. *See* Statements and Interview Notes of Antrom, Minnick, McCullough, Jones and Hawkins, Dkt. No. 30, Exs. 7-23. In response to this Court's Discovery Order (Dkt. No. 28), the Commonwealth provided *Brady* material showing the only "Rick," that Minnick and Antrom described was, in fact, Gary Lupton.

In response to the Discovery Order, the Commonwealth provided Lupton's mugshot. Dkt. No. 87-1, Att. D. It is consistent with the squatters' description of Rick, as having a heavy or medium build and short, close cut hair. Dkt. No. 29, Ex. 13 at 5 (Statement of McCullough 11/20/94, 9:35 a.m.); Dkt. No. 87.1, Att. E; Ex. 1[2] at 5 (Statement of Minnick 11/20/94, 10:45 a.m.). As can be seen, the mugshot of Lupton shows him with a full, round face and double chin, close-cut hair, and lists him as 5 foot 9 and 180 pounds. *Id.* Petitioner's mugshot shows him as gaunt. Other evidence suggests that the squatters' references to "Rick" implied Lupton. Lupton's criminal history shows that in December of 1992, he had been sentenced to six months to a year in prison and that when he was arrested for the Taylor murder, he still was on probation. Dkt. No. 87-1, Att. F. After the fire at 4504 Chestnut, the squatters told police that Rick had gotten out of jail "about a year ago" and was on probation. Dkt. No. 29, Ex. 13 at 6 (Statement of McCullough (11/20/94, 9:35 a.m.); Ex. 2 at 4 (Statement of Antrom 11/20/94, 9:40 a.m.). Petitioner had no prior convictions or probationary periods. Additionally, the Commonwealth disclosed police reports showing that Anthony Daniels, who went by "T," washed cars at 46th and Chestnut and knew Lupton. Dkt. No. 87-1, Att. G; Ex. 3 at 2 (Statement of Raiceon Hawkins 11/20/94, 6:30 p.m.). After the fire at 4504 Chestnut, the squatters told police that Rick had a friend known as "T" who worked at a car wash at 46th and Chestnut. Dkt. No. 29, Ex. 21 at 3 (Statement of Jones

---

[2] All but three of the documents received in discovery and cited in this Memorandum have previously been made part of the record in these proceedings. The three "new" witness statements, numbered Ex.1 through 3, are attached to the Memorandum.

11/20/94, 12:40 p.m.). Daniels's name, his "T" nickname, his mugshot, and his location all were in the Smith murder file, but nothing in the file indicates the Smith murder investigators interviewed him. There is no evidence that Daniels knew Petitioner.

There is also no evidence indicating that the witnesses realized that Lupton was incarcerated during his trial. To the contrary, John Antrom stated, "When I went to court for Glenn Taylor's murder I was not sure if the drug boys were in jail. They could have been out on the street." Dkt. No. 30, Ex. 1 at ¶ 13; *see also id*. ¶ 11 ("We stayed away from the building for several weeks. We knew the drug boys were around but we wanted to stay clear of them."). This confusion is unsurprising. Lupton was not arrested until weeks after Johnson was arrested, and when the squatters were subpoenaed to appear at Johnson's preliminary hearing, Lupton was still free, was subpoenaed to appear along with them, and waited with them in the same witness room. Notice of Appearance, Dkt. No. 30, Ex. 46; PCRA of Gary Lupton, No. 0989- 1000, at 2 (Pa. C.C.P. Nov. 2, 1998), Dkt. No. 30, Ex. 58. When Minnick and Antrom testified at Lupton's jury trial prior to the fire, Lupton was in street clothes. Order, *Commonwealth v. Lupton*, No. CP 9310-0977 (Pa. C.C.P. Nov. 15, 1994), Dkt. No. 30, Ex. 59. There is no evidence that the squatters were aware Lupton was in custody at the time they gave their statements.

### v.      The Lorraine Irby Fire and Other Suspicious Fires

Lorraine Irby also was an occupant of the apartment building at 4504 Chestnut Street at the time of Glenn Taylor's murder. Like the other witnesses, she was interviewed by the police and implicated "Reese" and "Rick," and she also testified for the prosecution at Lupton's trial. Statement of Irby (8/10/93, 4:45 p.m.) at l, Dkt. No. 30, Ex. 35; Lupton Trial N.T. 11/17/93 at 242, Dkt. No. 30, Ex. 29. Like the others, she also reported to police that she had been threatened with death if she cooperated against Lupton. In an August 26, 1993 police report, Irby explained that

Lupton and Johnson's father appeared to be following her over a series of days. Statement of Irby (8/26/93; 1:20 p.m.) at 2-3, Dkt. No. 30, Ex. 36. On one occasion, upon seeing the two men she went into a friend's house and stayed there. *Id.* Late at night, Johnson's stepfather entered the house and Irby told the friend "that he knew I was there + that he was going to kill me for turning his son in." *Id.*; *see also* Complaint or Incident Report (8/25/93) (Irby reporting to police that Johnson's stepfather "entered the premises and stated that 'he was going to kill [Irby] or that his family was going to kill her.'"), Dkt. No. 30, Ex. 47; Statement of Irby (8/8/93, 11:20 p.m.) at 3, Dkt. No. 30, Ex. 33; Statement of Irby (8/9/93, 2:55 a.m.) at 2, Dkt. No. 30, Ex. 34; Affidavit of Stacie Brown at ¶ 8, Dkt. No. 30, Ex. 2.

Further, at Lupton's trial, Lupton's fellow inmate John Witherspoon testified that Lupton "offered Witherspoon money, if he, Witherspoon, could do something to stop Irby from testifying." *Commonwealth v. Lupton*, No. 0989-1000, at 3 (Pa. C.C.P. Nov. 22, 2000), Dkt. No. 30, Ex. 53. Lupton provided Witherspoon with several addresses where he believed Irby could be found. Witherspoon contacted authorities because he was "concern[ed] for the safety of Irby." *Id.* Additionally, in response to this Court's Discovery Order (Dkt. No. 28), the Commonwealth revealed for the first time a letter from Witherspoon. Dkt. No. 87-1. Att. B. In the letter, written nine (9) months before the fire in this case, Witherspoon states that Lupton offered to pay him to "get rid of" Loraine Irby, and gave him five (5) addresses for where to find her, *including 4504 Chestnut Street*. *Id.* In response to the Discovery Order, the Commonwealth also provided Witherspoon's police interview, an interview taken seven (7) months before the fire in this case. In that interview, Witherspoon reaffirmed that Lupton tried to hire him to kill Irby, and gave him the 4504 Chestnut Street address for where to find her. Dkt. No. 87.1, Att. C at 3.

Irby never returned to 4504 Chestnut and thus was not there at the time of the fire that led to Marsha Smith's death. Brown, Dkt. No. 30, Ex. 2 at ¶ 6. After the Taylor murder and the ensuing threats, she stopped staying at that building, although she remained in the area. *Id*. at ¶ 9.

On March 8, 1995 – while Petitioner was in jail awaiting trial, and less than four months after Irby testified, and the fire at 4504 Chestnut occurred – Irby was at a small apartment building at 4600 Spruce Street in Philadelphia where she regularly stayed. *Id*. at ¶ 10. This four-story building was approximately four blocks away from 4504 Chestnut Street. The building was set on fire. *Id*.; Fire Marshal's Logs at 9, Dkt. No. 30, Ex. 48 at 9. To escape the fire, Irby was forced to jump from an upper floor window, breaking her back in the process. Brown, Ex. 2 at ¶ 10. An elderly woman died in the fire. Office of the Medical Examiner Case Registration Summary at 1-2, Dkt. No. 30, Ex. 49.

The fire was set in the early morning hours, during darkness. *Id.* It was started using gasoline as a liquid accelerant. Dkt. No. 30, Ex. 2 at ¶ 10. The gasoline was poured on the stairways and landings in the hallway outside of the apartments, preventing residents from exiting their rooms. *Id. Each of these signature features also was true of the fire the other witnesses against Johnson and Lupton survived, for which Petitioner was charged and convicted.* No suspect ever was arrested or tried for the Lorraine Irby fire.

### vi.    Other Arson Fires at 4504 Chestnut Street

There was also a pattern of intentionally set fires at 4504 Chestnut Street after Johnson's and Lupton's arrests and leading up to the fire which finally destroyed the building. Fire Marshal's Logs, Dkt. No. 30, Ex. 48 at 3-8.

Carol Mack, who was squatting in the building during that period, recalled that the building was firebombed with a bottle of gasoline. Dkt. No. 30, Ex. 2 at ¶ 13. The Philadelphia Fire

Department files reveal that firefighters fought a one-alarm fire at 4504 Chestnut on May 30, 1994, roughly six months before the fatal fire. The fire marshal concluded that the cause of the fire was "incendiary," Fire Marshal's Logs, Dkt. No. 30, Ex. 48 at 3.

Exactly two months later, on Saturday, July 30, 1994, the fire department responded to another fire at 4504 Chestnut. The fire department was dispatched at 1:47 a.m. The fire investigation determined that the fire began when an open flame was used to ignite common combustibles. The fire marshal determined that this fire also was an arson. Fire Marshal's Log, Dkt. No. 30, Ex. 48 at 5.

Approximately two months later, on September 24, 1994, the fire department responded to a third fire at 4504 Chestnut. Fire Marshal's Logs, Dkt. No. 30, Ex. 48 at 7. September 24 was also on a weekend, and again the fire was set after dark. Once again, the fire marshal determined that the fire was an arson. *Id*. This third arson occurred less than two weeks after the trial date was announced for Lupton and Johnson's murder trial. *Commonwealth v. Johnson,* Quarter Session file 1/24/94, Dkt. No. 30, Ex. 60.

Approximately two months later, on November 20, 1994, the fire which finally destroyed the same building involved in this case, occurred on the weekend. No suspect ever was arrested or tried for the three prior arsons.

### vii.    None of the *Brady* Material Was Disclosed

None of the foregoing facts regarding the Taylor murder were ever disclosed to the defense. The prosecution never disclosed that the same witnesses who identified Petitioner as Rick had, in prior statements and sworn testimony, identified another man as Rick. The prosecution never disclosed that the two identifying witnesses at Petitioner's trial reported numerous death threats from Rick and his co-defendant. And the prosecution never disclosed that Rick's murder trial was

ongoing at the time of the fire and the fire victim witnesses had testified against Rick only days before the fire was set.

In addition, although the Irby fire occurred more than seven months before Petitioner's trial, no information about it – neither its startling similarity to the fire at 4504 Chestnut nor Lupton's attempt while in jail to hire someone to prevent Irby from testifying – was ever disclosed to the defense in Petitioner's case.

Finally, the prosecution never disclosed the pattern of intentionally set fires at 4504 Chestnut Street after Johnson's and Lupton's arrests and leading up to the fire which finally destroyed the building. Fire Marshal's Logs, Dkt. No. 30, Ex. 48 at 3-8.

### viii. The Commonwealth's Knowledge of this *Brady* Material

Three of the detectives who investigated the Taylor murder also investigated the fire in this case. Two of these detectives – Perks and Santiago[3] – heard the witnesses identify Rick as the perpetrator in both cases. In the Taylor murder, Detective Perks interviewed Terry McCullough, who identified one of the perpetrators as Rick. Dkt. No. 30, Ex. 43 at 3-7. Detective Perks again interviewed McCullough regarding the fire in this case, and heard McCullough again identify the perpetrator as Rick. Statement of McCullough (11/20/94, 9:35 a.m.) at 3-6, Dkt. No. 30, Ex. 13. Detective Santiago interviewed Hawkins in the Taylor murder, and heard him identify one of the perpetrators as Rick. Hawkins, Dkt. No. 30, Ex. 39 at 3-12. In Petitioner's case, Detective Santiago interviewed Officer Nikki Jones, who stated that, at the scene of the fire, Minnick identified Rick as the perpetrator. Statement of Jones (I 1/20/94, 9:40 a.m.) at 4-5, Dkt. No. 30, Ex. 24. Detective

---

[3] Indeed, Santiago's involvement in this case raises additional questions about the reliability and honesty of the investigation. He is currently under indictment in Philadelphia County for perjury. Samantha Melamed and Chris Palmer, *Three ex-Philly homicide detectives charged with perjury for their testimony during the retrial of an innocent man*, PHILADELPHIA INQUIRER, August 13, 2021, available at https://www.inquirer.com/news/philadelphia-homicide-detectives-perjury-devlin-santiago-jastrzembski-20210813.html.

Mangoni, who took the statement from Gwynn and interviewed Jones and Hawkins, also interviewed witnesses in the Taylor murder, including Carol Smith, one of the people squatting in the building at the time of Taylor's death. Statement of Smith (8/18/93), Dkt. No. 30, Ex. 45.

As for the Irby arson, and the numerous other arsons at 4504 Chestnut, as soon as those fires were determined to be incendiary, Philadelphia Police Department involvement was a given. Accordingly, the Commonwealth was well aware of the existence of arsons involving, and imperiling, all of the witnesses against Lupton, two of whom testified against Petitioner.

## ARGUMENT

### A. The Trial Prosecutor's False Representations and Suppression of Exculpatory Evidence

The trial prosecutor falsely represented that 1) the Taylor and Smith homicides were unrelated; 2) Petitioner was in the photo array – an array which the witnesses later claimed contained the perpetrator in this case; 3) the array was no longer in existence. Relatedly, the prosecutor suppressed the extant, exculpatory evidence that demonstrated the falsity of those representations.

The prosecutor's conduct violated due process on two separate, yet related bases. It involved deception that is incompatible "with rudimentary demands of justice," *Mooney v. Holohan,* 294 U.S. 103, 112 (1935); and suppression of favorable and material evidence. *Brady v. Maryland,* 373 U.S. 83 (1963).

### B. *Mooney/Napue.*

A prosecution's proper concern in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *United States v. Modica*, 663 F.2d 1173, 1181 (3rd Cir. 1981). While a prosecutor "may strike hard blows, he is

not at liberty to strike foul ones." *Berger*, 295 U.S. at 88. Due process is violated when the state knowingly presents false evidence. *Mooney v. Holohan,* 294 U.S. 103, 112 (1935). Indeed, "[i]t has long been established that the prosecution's 'deliberate deception of a court [] by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" *Banks v. Dretke,* 540 U.S. 668, 694 (2004) (quoting *Giglio v. United States,* 405 U.S. 150, 153 (1972). Thus, "a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois,* 360 U.S. 264, 269 (1959).

It is of no consequence that the false evidence here – that Petitioner was in the earlier array, and it was no longer preserved – was presented to the trial court, and not the jury. It was no less a due process violation, since its impact was to preclude the actual exculpatory evidence from ever seeing the light of day. *See, e.g., United States v. Alzate,* 47 F.3d 1103, 1110 (11th Cir. 1995) (holding that *Napue* and *Giglio* apply to a false representation to the Court, upon which the defense relies – there, a prosecutor's false representation at side-bar – since they no less involve "corruption of the truth-seeking function" than false evidence). Had trial counsel known that the witnesses had not seen Petitioner in the earlier array, but had identified someone who they connected to the arson in that same array (someone they wrongly believed to be Petitioner), reasonably competent counsel would have moved mountains to present that evidence. Indeed, this is prototypical actual innocence evidence, the identification of someone other than Petitioner as the doer, and supports a powerful alternative claim of actual innocence. No competent lawyer would have ignored it. Instead, alerted to the false information that Petitioner was in the array, trial counsel stayed away from the array; indeed, even if he had chosen not to, the Commonwealth had falsely represented that the array no longer existed.

### C.    *Brady*

A prosecutor's failure to disclose *Brady* material requires a new trial when the exculpatory evidence would have been material to the trial. *Kyles*, 514 U.S. at 432 (quoting *Brady*, 373 U.S. at 87); *see also Banks*, 540 U.S. at 675–76. *Brady* evidence is material if it affects the defendant's preparation for trial. *Dennis v. Secretary, Pa. Dep't of Corr.*, 834 F.3d 263, 307-308 (3d Cir. 2016) (*en banc*) (citing *Wood v. Bartholomew,* 516 U.S. 1 (1995)). *See also United States v. Perdomo,* 929 F.2d 967, 971-972 (3d Cir. 1991) (analyzing way in which nondisclosed background information regarding witness could have informed trial counsel's preparation for cross-examination).

It requires little imagination to predict how defense counsel would have cross-examined witnesses Antrom and Minnick, had he learned that Petitioner was not in the previous array. This irrefutable evidence would have undermined the witnesses' in-court identifications of Petitioner, in two critical ways. First, competent counsel would have been able to credibly suggest that it was in fact the perpetrator who was in the earlier array, and who was identified by Antrom and Minnick. Thus, the wrong man was on trial. Additionally, Antrom's and Minnick's mistakenly recalling Petitioner in the array, demonstrated either the unreliability of their in-court identifications or their abject willingness to make false accusations.

### D.    **The Commonwealth is One Entity**

The prosecution's disclosure duty is not limited to information actually known to the trial prosecutor but, instead, includes all information in the possession of the prosecutor's office, police, and others responsible for or acting on behalf of the prosecutor's office. *Id*. 437, 482 ("prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in the case, including the police"; "prosecutor has a duty to learn of any favorable evidence known

to the others acting on the government's behalf"); *Giglio*, 405 U.S. at 154 ("prosecutor's office is an entity"; knowledge of anyone in office attributed to the trial prosecutor). This is an important consideration in this case, since the *Brady* violations implicate the police. As discussed above, police detectives were well-aware of the common witnesses and issues among these cases. Additionally, as soon as the fires involving Kirby and 4504 Chestnut were determined to be incendiary, Philadelphia police were necessarily made aware of these related arson-fires. Further, the police knew the identity of the fillers in the Taylor murder array, none of whom were Petitioner. Any doubt as to whether this imposed upon the Commonwealth a *Brady* obligation is eliminated by *Kyles*, 514 U.S. 419 (1995):

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see *Brady*, 373 U.S. at 87), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Id*. 437–38. *See also Youngblood v. West Virginia,* 547 U.S. 867, 869–70 (2006) ("*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.") *See also Dennis*, 834 F.3d at 348–49 (Jordan, J., concurring and dissenting) (noting the Pennsylvania Supreme Court's distinction between information known to police and prosecutor is contrary to *Kyles*).

### E. Motive and Opportunity Evidence Fits Squarely Within *Brady*

As discussed above, the Commonwealth knew that the only person the squatters had ever previously identified as "Rick" was Gary Lupton; and they knew of Lupton's and others' threats against those witnesses that would motivate them not to cast blame in Lupton's direction. This evidence presented the strongest of incentives on the part of witnesses Antrom and Minnick to identify anyone other than Lupton, or his associates. The additional *Brady* evidence, demonstrating

that Petitioner was not in the array, that the Commonwealth was forced to reveal in 2016 (*see* Dkt. No. 87-1), certainly suggests that these witnesses were ready, willing, and able to fabricate identification evidence. They placed Petitioner in an array that did not include him. That they did so, makes the evidence of their incentive to avert blame away from the murderous Lupton all the more compelling. The Commonwealth knew all of this, yet disclosed none of it.

The United States Supreme Court has made clear that such motive evidence falls squarely within *Brady*'s ambit. In *Kyles,* the state suppressed statements of an informant in which the informant indicated that he was interested in reward money, and feared being prosecuted for the murder on which he was informing. 514 U.S. at 442 n.13. The Court held that under *Brady,* the State was obliged to disclose those statements since they "revealed at least two motives" for the informant to accuse the Petitioner. *Id.*

A fair review of Antrom and Minnick's statements in the Taylor murder case reveals no less a motive to implicate someone other than Lupton or his associates, than the witness in *Kyles* had to implicate someone other than himself. Antrom and Minnick certainly had reason to deflect attention away from Lupton and his associates. Lupton did not merely tell Antrom that he would have him killed, but he told him how he would do it (i.e., getting someone to "spray" the building). Indeed, Antrom testified to this at Lupton's trial. As for Minnick, Lupton told him that he "would come back and finish it up." Minnick's and Antrom's fears were as powerful a motivator as the informant's self-interest in *Kyles*. Added to that motive to lie in this case, were the witnesses' demonstrated willingness to do so.

*Kyles* also stands for the proposition that evidence within the possession of the government that is probative of an alternative suspect with the opportunity to commit the crime, fits within *Brady*'s ambit, and must be disclosed. 514 U.S. at 447. The *Kyles* Court found that the witness's

involvement in prior criminal activity in the same vicinity of the incident on trial, and his status as a suspect in a murder involving a victim of a similar demographic (there, an elderly woman) was *Brady* material the State was obliged to disclose. *Id.*; 442 n. 13. That template fits the Taylor homicide evidence to a "T". Indeed, here, the victims – the squatters – were at the identical location as the previous homicide. Additionally, they did not simply occupy a similar demographic as Lupton's previous victims, they were very same individuals.

Motive and opportunity were implicated in every piece of *Brady* material that was suppressed – the Taylor homicide evidence, the evidence of the other arsons at 4504 Chestnut, the Irby arson, and the witnesses' falsely claiming Petitioner was in a prior photo array.

### F.     Counsel Was Entitled to Rely on the Prosecutor's Representations

The trial prosecutor made representations about the Taylor homicide photo array (that the witnesses saw Petitioner's photo in it, and that it no longer existed), and the Taylor case itself (that it was unrelated to Petitioner's case), that trial counsel was entitled to rely on. Defense counsel is entitled to rely on an understanding that prosecutors will fairly"discharge[] their official duties," *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995), and that the prosecutor shall act as the "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially . . . and whose interest, therefore, ina criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88 (1935). Petitioner's entitlement to relief under *Brady* does not turn on the good or bad faith of the trial prosecutor. The prosecutor is responsible for "any favorable evidence known to the others acting on the government's behalf, including the police." *Kyles*, 514 U.S. at 437-38.

In *Banks v. Dretke,* 540 U.S. 668, 696 (2004), the Court rejected the notion that when the government falsely asserts that evidence does not exist, if defense counsel could have "detected"

the evidence, *Brady* is not violated. *See id.* (rejecting a rule "declaring 'prosecutor may hide, defendant must seek,' [as] not tenable in a system constitutionally bound to accord defendants due process."). In *Banks,* the defense was entitled to rely on a general representation that the state "would disclose all *Brady* material." *Id.* at 693. Thus, Petitioner's reliance here was even more justified, since the trial prosecutor's representations were specific (and false), i.e., that Petitioner was in the former array and the former case was unrelated to his. Under *Banks,* defense counsel are entitled to expect that when the prosecutor denies the existence of *Brady* material, there is no *Brady* material to be discovered. *Dennis v. Sec'y,* 834 F.3d 263, 290 (3d Cir. 2016) (*en banc*). "Once *Brady* is understood to impose an affirmative disclosure obligation on the government, one in which criminal defendants are entitled to place their faith, a defendant's lack of independent investigation does not equate to a lack of due diligence, at least not without facts giving him a reasonable basis to suspect a *Brady* violation." *Bracey v. Sup't,* 986 F.3d 274, 293 (3d Cir. 2021). Here, the dual facts the trial prosecutor presented to trial counsel gave him a reasonable basis to believe that no *Brady* evidence existed.

### G.    The Suppressed *Brady/Napue* Evidence Was Exculpatory and Material

### i.    *Brady* Materiality Standard

Due process requires the prosecution to disclose evidence favorable to the defense. *Banks v. Dretke*, 540 U.S. 668 (2004); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 153–56 (1972); *Brady*, 373 U.S. at 87. There are two components to a *Brady* claim: 1) the government suppressed favorable evidence, either intentionally or inadvertently; and 2) the suppressed evidence was material to the outcome of trial. *Slutzker v. Johnson*, 393 F.3d 373, 386 (3d Cir. 2004). Favorable evidence includes impeachment evidence and exculpatory evidence. *Bagley*, 473 U.S. at 676.

A prosecutor's failure to disclose *Brady* material requires a new trial when the exculpatory evidence would have been material to the trial. *Kyles*, 514 U.S. at 432 (quoting *Brady*, 373 U.S. at 87); *see also Banks*, 540 U.S. at 675–76.

A "showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Instead, the "touchstone of materiality is a '*reasonable probability*' of a different result," which is "shown when the government's evidentiary suppression '*undermines confidence* in the outcome of the trial.'" *Id.; see also Hull v. Kyler*, 190 F. 3d 88, 110 (3d Cir. 1999) (the "undermines confidence" standard "is not a stringent one. It is less demanding than the preponderance standard."). It is "not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial . . . ." *Kyles,* 514 U.S. at 434.

*Brady* evidence is material if it affects the defendant's preparation for trial. *Dennis v. Secretary, Pa. Dep't of Corr.*, 834 F.3d 263, 307-308 (3d Cir. 2016) (*en banc*) (citing *Wood v. Bartholomew,* 516 U.S. 1 (1995)). *See also United States v. Perdomo*, 929 F.2d 967, 971-972 (3d Cir. 1991) (analyzing way in which nondisclosed background information regarding witness could have informed trial counsel's preparation for cross-examination). The suppressed *Brady* material here, would have presented any reasonably competent counsel with a readily apparent and potent defense evidence. This included motive evidence for the witnesses (their fear of Lupton); an alternative suspect(s); opportunity evidence regarding that suspect(s); corroboration that the alternative suspect(s) was involved because of the witnesses' reference to his nickname; and the witnesses' demonstrated willingness to place Petitioner in an array from which he was absent.

### ii.    *Mooney/Napue* **Standard**

Due process is also violated when the state knowingly presents false evidence. *Mooney v. Holohan,* 294 U.S. 103, 112 (1935). Such deliberate deception is incompatible "with rudimentary demands of justice." *Id.* That, however, is not the extent of the State's obligation. The prosecutor also violates due process when, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. The State may not knowingly rely on such evidence even where such evidence goes only to the credibility of a witness, because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors ... that a defendant's life or liberty may depend." *Id.; see also Banks*, 540 U.S. at 694 ("It has long been established that the prosecution's 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'").

This standard is equally applicable where, as here, the prosecutor makes false representations upon which the defense relies. *United States v. Alzate,* 47 F.3d at 1110. The *Alzate* Court explained why: "[T]he reason the lower materiality burden applies where there is knowing use of perjured testimony is that such a situation involves prosecutorial misconduct and a corruption of the truth-seeking function of the trial. *United States v. Bagley,* 473 U.S. 667, 680 (1985)]; *Agurs*, 427 U.S. at 104, 96 S. Ct. at 2397. [Similarly, a prosecutor's false representation] involves prosecutorial misconduct and a corruption of the truth-seeking function as well, albeit through somewhat different means." *Id.* Here, those false representations precluded defense discovery and presentation of compelling exculpatory evidence: Petitioner's absence from an array the witnesses claimed he was in, and a prior murder at the identical location, that provided a motive for those responsible to commit the arson in this case.

Concerning a prosecutor's false representations, an even more defense-friendly materiality standard applies: that of *Bagley*, 473 U.S. at 678–79 & n.9, and *United States v. Agurs*, 427 U.S. 97, 103 (1976), which require the Commonwealth to show that the error is harmless beyond a reasonable doubt. *See United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (when the prosecutor knowingly conveys false information, the falsehood is material "'if there is any reasonable likelihood [it] could have affected the judgment of the jury,'" requiring the State to show harmlessness beyond a reasonable doubt (quoting *Agurs*, 427 U.S. at 103)); in noting the imperative of this stricter standard, the Third Circuit held that it was required "not just because [those claims] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Haskell v. Superintendent Greene, SCI,* 866 F.3d 139, 146–47 (3d Cir. 2017). In *Bagley,* 473 U.S. at 679 n.9, the Court noted that this standard is equivalent to the harmless error standard of *Chapman v. California,* 386 U.S. 18 (1967).

In light of the prosecutor's misrepresentations, upon which trial counsel's reliance precluded presentation of a credible, substantial defense, this less exacting standard of review applies to Petitioner's due process claim. Even if does not, Petitioner establishes *Brady* materiality.

### iii. Evaluation of the Suppressed Evidence under *Brady* and *Napue* Standards

The Lupton/Taylor evidence, coupled with the exposure of witnesses Antrom's and Minnick's erroneous assurances to the prosecutor that Petitioner was in the earlier array, would have cast grave doubt on the theory of guilt the Commonwealth argued to the jury. The evidence was exculpatory. The prosecutor had witnesses who claimed that a man named Rick had fought with them a day before the fire and left threatening them harm, and presented evidence and argument that Petitioner was Rick. The credibility of that evidence and argument was dependent

on the *absence* of evidence that:

- those same witnesses had identified another man, Gary Lupton, as Rick numerous times, including as recently as three days before the fire;

- after Lupton and Johnson had assaulted Minnick and beaten Glenn Taylor to death, they repeatedly threatened to have those same witnesses killed if the witnesses did not stay silent about the Taylor murder;

- those same witnesses testified for the prosecution at Rick's (Gary Lupton's) murder trial just three days before the fire;

- another prosecution witness, John Witherspoon, testified that Lupton offered him money to prevent Lorraine Irby from testifying, and gave him several addresses where Irby might have been staying;

- Lorraine Irby was a victim of a strikingly similar arson shortly afterward;

- several other fires had been intentionally set in the building occupied by the witnesses in the time between the Taylor murder and the fatal fire.

- the two identifying witnesses at trial, Antrom and Minnick were willing to implicate Petitioner as the doer present in an earlier photo array, when in fact he was not in that array.

The undisclosed evidence demonstrates that someone else – Gary Lupton – had a motive to harm the surviving victims, and had threatened to kill them if they testified at Lupton's trial, which they did just days before the fire. There was suppressed evidence that Gary Lupton sought to retaliate against anyone who would testify against him, even while he was incarcerated – Antrom and McCullough told police that Lupton threatened to have his associates kill them if they testified. Antrom said he was afraid of Lupton's associates coming to get him as a result of his testimony. The withheld evidence also suggests that another witness against Lupton was targeted with a similar fire, and testimony presented at Lupton's trial demonstrated that he solicited another inmate to have that witness killed.

The suppressed evidence also calls into question the truth of Minnick's and Antrom's identifications of Petitioner as "Rick," the man they allegedly fought with the day before the fire.

Antrom, Hawkins and McCullough all identified Lupton as "Rick." Indeed, the evidence from the Lupton trial demonstrated that on additional bases, Minnick's identifications were unreliable. After previously stating that he knew Maurice Johnson prior to the Taylor murder, but not GaryLupton, at the preliminary hearing, Minnick botched the in-court identification, standing in front of both defendants and mistaking Lupton for Johnson. *Petition*, ¶ 256 n.30; *First Amendment*, ¶ 57 n.1*; see also* Lupton N.T. 11/17/94 at 198-201. Additionally, both Antrom and Minnick gave accounts in their testimony at the Lupton trial that differed in material respects from the statements they had given police and at the preliminary hearing. Lupton N.T. 11/17/94 at 98- 101, 117-124, 131-33 (Antrom); *id.* at 177-78, 193-201 (Minnick).

Most importantly, both of these trial witnesses exhibited a willingness to falsely place Petitioner in a photo array (albeit retrospectively), when characterizing him as the perpetrator in this case. This Court has seen the array. Petitioner is not in it.

Additionally, the evidence also suggests that the police investigation in this case was less than thorough, as it appears that the Philadelphia Police Department did not even investigate the possibility that Gary Lupton, and/or those operating under his direction, could have been responsible for the fire. This, despite the fact that the Lupton prosecutor was aware of the fire at the time it happened, the prosecutor had previously sought a protective order for the various witnesses in the Lupton trial in order to protect them from retaliation by Lupton, Lupton Preliminary Hearing N.T. 9/29/93 at 37, Dkt. No. 30, Ex. 28, and there was evidence in the police records and at trial that Lupton and his associates had threatened to kill the surviving victims and other witnesses if they testified. This line of attack has special force given the absence of any evidence as to how Petitioner became a suspect in this case. In *Kyles*, the Supreme Court specifically noted in its prejudice analysis the power of attacking "the reliability of the

investigation." 514 U.S. at 446.

The Lupton/Taylor evidence is significant because it suggests that there is a likely alternative suspect, an individual who was already charged with murder (and later convicted), and had threatened to have the surviving victims killed for taking the very action (testifying) they took just days before the fire, and who they identified by name ("Rick") to the police the morning of the fire. *See* discussion of *Kyles* above and at 514 U.S. 441 n.13; 447. This evidence also undermines Minnick's and Antrom's identifications of Petitioner and the veracity of their account of a fight with "Rick" the day before the fire.

The *Brady* evidence in this case constitutes compelling evidence of Petitioner's actual innocence, and was material to the outcome of his trial. The "touchstone of materiality is ... not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial...." *Kyles*, 514 U.S. at 434. Evidence is "material" when "the favorable evidence could reasonably be taken" to put the case "in such a different light as to undermine confidence in the verdict." *Banks*, 540 U.S. at 698; *Kyles*, 514 U.S. at 435; *see also Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (The "undermines confidence" standard "is not a stringent one. It is less demanding than the preponderance standard."). Petitioner must demonstrate only that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Simmons v. Beard*, 581 F.3d 158, 167 (3d Cir. 2009).

When "considered collectively, not item-by-item," *Kyles*, 519 U.S. at 436, the suppressed evidence here clearly puts the case in a significantly different light, and confidence in the verdict is undermined. At trial, defense counsel had little factual basis to contest what the Commonwealth presented as an open-and-shut case. Based upon the evidence he had, trial counsel was forced to

choose between arguing voluntary intoxication based upon the statement of Petitioner, which appeared to be corroborated by the witness's identifications, or to make the uncorroborated argument that the confession was false. Had the jury heard the Lupton/Taylor evidence, and evidence that the two identification witnesses placed Petitioner in an array he was not in, and thus, in all likelihood, identified someone other than Petitioner as the perpetrator, there is at least a reasonable probability that Mr. Gwynn's trial would have ended in a different result.[4]

Had the Commonwealth disclosed the Lupton/Taylor evidence, and the fact that the witnesses fabricated Petitioner's presence in the former array, trial counsel would have had a wealth of material to attack all aspects of the case against Petitioner. This evidence demonstrates that Lupton had an equal or greater motive to harm the witnesses, and that the witnesses were willing to fabricate Petitioner's presence in the array to avoid implicating Lupton, or anyone connected to him. It also gives rise to the possibility that the witnesses actually did see the perpetrator in the array – it would make sense that an associate of Lupton would be in an array with him – and the person they retrospectively identified as the perpetrator was that person.

Notably, Lupton had threatened to harm the witnesses for taking the very action they did – testifying against him – just days before the fire. He had also sought to retaliate against another witness even while imprisoned before trial. In addition, the other witness had been a victim of a similar fire months after the fire in this case, 4504 Chestnut had a rash of suspicious fires during the preceding year, and the witnesses knew and identified Lupton to the police and fire marshal investigating the fire as "Rick." The jury would have had an ample factual basis to believe that

---

[4] In light of an incontrovertible record of affirmative misrepresentations regarding all of this *Brady* evidence, Petitioner contends that the appropriate prejudice standard is that of *Chapman,* as directed by *Haskel* and *Agurs.* The Commonwealth cannot seriously contend that the *Brady/Napue* error here was harmless beyond a reasonable doubt. However, in an abundance of caution, Petitioner engages here in a standard *Brady* materiality analysis, which also compels the grant of relief.

Lupton, or those acting under his direction, were more likely the perpetrators of the fire and had made good on his threats against the witnesses by successfully ordering the fire from prison.

This evidence would have given the jury significant reasons to doubt the veracity of Minnick's and Antrom's identification of Petitioner and their testimony about his alleged motive. Against this evidence, the Commonwealth's evidence of Petitioner's guilt was strikingly weak. The prosecution presented no physical evidence linking Petitioner to the burned building or its occupants. *See e.g.,* NT, 10/31/95 at 30 (prosecutor acknowledging lack of fingerprint evidence). It presented no eyewitness to the arson. There is no evidence, apart from the post-fire assertions of some of the surviving victims, that Petitioner had ever been known as Rick. He was arrested in a different section of the city. *See* NT, 10/31/95 at 161 (testimony of Officer Surina that Petitioner was arrested at Wallace and Ludwick; fire occurred at 4504 Chestnut). Petitioner had no prior history of violence whatsoever.

Without the evidence that the witnesses falsely claimed Petitioner had been in the prior array, and without the Lupton/Taylor evidence, the Commonwealth was able to present the jury with a simple, clear, and persuasive theory of guilt: Rick the bully tries to take advantage of a homeless woman, he is thwarted by her friends, he leaves vowing revenge, the next morning their building is destroyed by arson, and Rick is now Daniel Gwynn. Had the full picture been available to the jury, the prosecution's task of proving guilt beyond a reasonable doubt would have been exponentially more difficult.

Against the witnesses' claim that Rick was Petitioner, the jury would have weighed their repeated prior statements that Rick was Gary Lupton. And, against Petitioner's alleged single purported threat to get the occupants, the jury would have weighed Minnick's and Antrom's willingness to falsely implicate Petitioner, in lieu of getting anywhere near Lupton or his

associates; the repeated specific threats by Lupton and Johnson to have the occupants killed; Lupton's attempt to prevent the testimony of Lorraine Irby; and the strikingly similar arson in the building where Irby resided after the murder of Glenn Taylor.

### iv.    Petitioner's Alleged Confession Does Not Defeat Materiality

In assessing materiality, Mr. Gwynn's confession does not alter the basic weakness of the prosecution's evidence against him. The formerly suppressed *Brady* material would have given the jury a substantial basis to doubt the veracity of the confession. *Wilson v. Beard*, 589 F3d 651 (3rd Cir. 2009) (granting *Brady* relief in habeas, where prosecution suppressed information impeaching prosecution witnesses, notwithstanding fact of confession – there to jailhouse informant); *Floyd v. State,* 902 So. 2d 775 (Fla. 2005) (granting *Brady* relief where prosecution failed to disclose evidence of other suspects and evidence impeaching prosecution witnesses, finding reasonable probability of a different result, despite petitioner's confession to jailhouse informant, presence of crime scene evidence corroborating confession, fact that petitioner was caught cashing checks out of victim's bank account, and blood sock linked to victim was found in his pocket; because suppressed evidence "at least would have given the defendant an avenue through which to challenge [the evidence corroborating the confession]"); *Hoffman v. State,* 800 So. 2d 174 (Fla. 2001) (granting *Brady* relief where prosecution suppressed hair analysis report and third party confession, finding reasonable probability of different result, despite petitioner's *two* confessions to law enforcement). There are multifaceted problems with the confession, which are addressed in Claim II, which Petitioner incorporates by reference as if fully set forth here. The confession does not alter the prejudice analysis.

The Commonwealth disclosed only the evidence that facially supported its case against Petitioner, including the identifications of the witnesses and his alleged confession. Contrary to its

obligations under *Brady*, the Commonwealth suppressed the evidence that revealed the glaring flaws in its case. Had the jury heard that *Brady* evidence, and had trial counsel been able to develop it, there is a reasonable likelihood of a different result.

### H.    Review is *De Novo*

Review of Petitioner's *Brady* claim is *de novo* since the state court did not have before it the *Brady* evidence that this Court has. Petitioner diligently attempted to uncover the *Brady* material that he obtained in this Court, in state court. *See Commonwealth v. Gwynn,* 2012 Phila. Ct. Com. Pl. LEXIS 516 at *11 (Mar. 27, 2012) (court denying discovery). Yet it was not until 2016, in compliance with this Court's Discovery Order (Dkt. No. 28) that Petitioner received the *Brady* material that:    1) revealed that, despite the witnesses' and trial prosecutor's assurances that Petitioner was in the former array, he was not; 2) corroborated Lupton's threats of violence to those who lived at 4504 Chestnut Street; 3) demonstrated that Lupton fit the description of "Rick" and Petitioner did not; 4) demonstrated that Anthony Daniels, whom the arson victims identified as connected to "Rick," was connected to Lupton, and not Petitioner; 5) demonstrated that Lupton's co-defendant, Johnson, knew that Irby had implicated him in the Taylor murder; and, 6) demonstrated that the Taylor and Smith murders were related, by the presence of Taylor documents in the Smith police file. In short, the discovery denied in state court, yet granted in this Court provided incontrovertible evidence of prosecutorial deception at trial, as well as exculpatory evidence of the witnesses' identification of someone other than Petitioner, or at the very least, their willingness to falsely place him in an array; and powerful motive and opportunity evidence regarding other suspects.

Facially, the Common Pleas Court applied a state bar, finding that Petitioner's petition was

time-barred. *Gwynn,* 2012 Phila. Ct. Com. Pl. at *17.[5] Petitioner can establish cause and prejudice to excuse any procedural default for not raising the full factual bases of his *Brady* claim. He tried diligently in state court to obtain *Brady* material to which he was constitutionally entitled, and he was rebuffed. Additionally, in light of the state court's denial of effective process, i.e., its refusal to order the disclosure of critical *Brady* evidence, later disclosed in this Court, exhaustion is excused. *See* 28 U.S.C. § 2254(b)(1)(B)(ii). To the extent that the Philadelphia Court of Common Pleas addressed Petitioner's claim on the merits,[6] its analysis flatly contradicted two of *Kyles'* animating principles, and thus ran afoul of 28 U.S.C. § 2254(d)(1).

Application of *Williams v. Taylor,* 529 U.S. 420 (2009), demonstrates that Petitioner satisfies the cause and prejudice standard for merits review. In *Williams,* the petitioner raised a claim based on facts developed in federal court which formed the basis of a different claim than the one raised in state court. *Id.* at 442-43. In state court the petitioner alleged that "irregularities, improprieties and omissions existed with respect to empaneling of the jury." *Williams,* 529 U.S. at 442. In federal court the petitioner developed new evidence that, during voir dire, the jury foreperson failed to disclose that a state witness was her former husband and that she had formerly been represented by the prosecutor when the prosecutor was a private attorney. *Id.* at 440-42. In *Williams,* as here, Petitioner's *Brady* claim was bereft of the factual information developed in state court, *only* because of the state court's denial of discovery.

The *Williams* Court found that the petitioner demonstrated diligence in state court when he

---

[5] Since the Pennsylvania Supreme Court affirmance involved merely a one-word order – "affirmed" – the AEDPA analysis "looks through" to the application of the state bar as applied in the last reasoned opinion of a state court, here the Court of Common Pleas. *Ylst v. Nunnemaker,* 501 U.S. 797, 806 (1991).

[6] Since the Pennsylvania Supreme Court affirmance involved merely a one-word order – "affirmed" – the AEDPA analysis "looks through" to the reasoning of the Court of Common Pleas. *Wilson v. Sellers,* 138 S. Ct. 1188, 1192 (2018).

sought funds for an investigator to develop his state-court juror claim (and was refused), and therefore he did not "fail" to develop the claim, under 28 U.S.C. § 2254(e)(2)(B). *Id.* at 442-43. The *Williams* Court held that such finding of diligence "should suffice to establish cause for any procedural default petitioner may have committed in not presenting these claims to the [state] courts in the first instance." *Id*. at 444. This is nothing more than a commonsense recognition that when a petitioner is truly diligent in his attempts to comply with a state rule, but unsuccessful, there was something external to the process preventing compliance. *See also Barrientes v. Johnson,* 221 F.3d 741, 771 (5th Cir. 2000) (noting that *Williams* "linked the "failure to develop" inquiry with the cause inquiry for procedural default"). Here the external impediment was the state court's refusal to permit discovery and evidentiary development during Petitioner's state post-conviction proceeding. It was based on a state discovery rule requiring "a showing of exceptional circumstances," *Gwynn,* 2012 Phila. Ct. of Common Pleas at *13, that is wholly at odds with the Commonwealth's *Brady* obligation. "The rule of *Brady v. Maryland* is founded on the constitutional requirement of a fair trial, binding on both state and federal courts. It is not a rule of discovery." *United States v. Kaplan,* 554 F.2d 577, 579 (3d Cir. 1977).

By the same analysis, Petitioner is entitled to an evidentiary hearing on this *Brady* claim pursuant to 28 U.S.C. § 2254(e)(2). As the *Williams* Court held, "comity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2)." 529 U.S. at 437. Petitioner diligently sought what this Court now knows was material *Brady* evidence, and an evidentiary hearing in state court. In denying the *Brady* claim, the Common Pleas Court enforced a rule – rejected by Supreme Court precedent – that if Petitioner could conceivably have found the *Brady* evidence that the Commonwealth affirmatively

represented did not exist,[7] then there could be no *Brady* violation, and he was entitled to neither discovery nor a hearing. *See Gwynn,* 2012 Phila. Ct. Com. Pl. at *8 (erroneously finding that because Petitioner was present in court when the Lupton case was discussed, he should have found the *Brady* evidence on his own). While "[t]he state courts are, of course, the final arbiters of when and how a state prisoner can obtain an evidentiary hearing in their courts[, whether] whether a habeas petitioner has shown 'a lack of diligence' in failing to obtain an evidentiary hearing is a question of federal law decided by the federal habeas courts." *Boyle v. McKune*, 544 F.3d 1132, 1135-36. (10th Cir. 2008). Petitioner was diligent; he should have obtained discovery and a hearing in state court; he obtained discovery in this Court and now merits an evidentiary hearing.

The *Williams* Court found diligence (and cause), even though the Petitioner's state court claim was "vague," and did not provide the state court with the nature of the "irregularities, improprieties and omissions" nor identify the juror(s) involved. 529 U.S. 442-43. By contrast, Petitioner's request was focused, alerted the state court to the *Brady* issues, motive and opportunity of other known suspects, and a questioned photo array. Petitioner thus eclipsed the diligence found in *Williams* to establish cause.

On a separate basis, Petitioner establishes cause, and alternatively can demonstrate, pursuant to 28 U.S.C. § 2254(b)(1)(B)(ii), that circumstances existed rendering the state court process ineffective to protect his rights.

In *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 10 (1992), the Supreme Court reiterated the long-accepted principle of comity that a state court process "must afford the petitioner a full and fair" opportunity to advance his federal claim. Earlier, in *Townsend v. Sain,* 372 U.S. 293, (1963), the

---

[7] The Common Pleas Court knew that the trial prosecutor had assured counsel that the two murders bore no relation. This Court has since learned that when he assured counsel that his client was in the former array, this assurance was false.

Court recognized that where the state process precluded development of "material facts" or "did not afford the habeas applicant a full and fair fact hearing," a petitioner is denied his full and fair opportunity to litigate his claim. *Cf. Vasquez v. Hillery,* 474 U.S. 254, 267 (1986) (where state has not afforded petitioner "full and fair" opportunity to litigate habeas claim, federal merits review is appropriate). Thus, a State impediment – whether actually required, or presumed by the state court to be required – fits squarely within the "cause" paradigm. *See, e.g., Hudson v. Whitley,* 979 F.2d 1058, 1064 (5th Cir. 1992) (state statute that arguably prevented disclosure of *Brady* material regarded as "external impediment[]"preventing full and fair opportunity to litigate claim, constituting "cause"). Petitioner was precluded from a full and fair opportunity to litigate his claim, having been denied discovery by a rigid state court discovery rule at odds with due process. The discovery in question would have uncovered the facts relating to the critical issues in this case.

## I. The State Court's Merit's Analysis was Contrary to, and an Unreasonable Application of, *Brady*

To the extent that the state court actually addressed the *Brady* claim,[8] it failed to properly apply *Brady* to the facts of Petitioner's case. First, it held "there can be no *Brady* violation when the evidence is available to the defense through sources other than the prosecution . . . ." *Gwynn,* 2012 Phila. Ct. Com. Pl. at *9. Thus, the Common Pleas Court reasoned, because trial counsel knew of the earlier Taylor homicide, it was trial counsel's duty to obtain whatever information he deemed important. *Id.* Of course, the Common Pleas Court neglected to mention that when the trial prosecutor brought up the earlier Taylor homicide, he assured trial counsel that it was

---

[8] Although the dismissal order was based on timeliness, *Gwynn,* 2012 Phila. Ct. Com. Pl. at *17, other than positing that Petitioner could have found the suppressed *Brady* material on his own earlier, the Court did not indicate how the *Brady* issues implicated the timeliness concern. Because the Court engaged in a constitutional *Brady* analysis, that seemed to undergird the procedural ruling, that analysis is addressed here. *Cf. Ake v. Oklahoma,* 470 U.S. 68, 75 (1985) ("when resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and [federal] jurisdiction is not precluded.").

unrelated to the Smith homicide, and doubled-down on that falsehood by assuring trial counsel that his client's photo was in the array from that homicide – when in fact it was not. Moreover, he assured trial counsel that his witnesses recognized Petitioner in the array, and was now assuring him that he was the perpetrator in this case. Even in the absence of a prosecutor's misdirection that "there is nothing to see here," a prosecutor's nondisclosure is not excusable under *Brady,* merely because the defense might have, or could have, discovered the *Brady* evidence on its own. Petitioner's discussion of *Mezzantto, Banks, Dennis* and *Bracey,* above, makes this clear, and is incorporated by reference. This Supreme Court and Third Circuit precedent refutes the Common Pleas Court's holding that because Petitioner could have found this evidence on his own (in spite of the trial prosecutor's misdirection), the prosecutor was relieved of his *Brady* obligation. Indeed, even the Pennsylvania Supreme Court has since rejected this notion, correctly interpreting *Brady* to be unconcerned with defense diligence or lack thereof, in the face of a prosecutor's implied or explicit assurance that no *Brady* material exists. *See Commonwealth v. Bagnall,* 235 A.2d 1075, 1092 (Pa. 2020) ("Due diligence does not require Appellant to assume that the prosecution and [its witness] are being untruthful.").

As for its materiality analysis, the Common Pleas Court applied a cramped interpretation of *Brady* flatly at odds with clearly established Supreme Court precedent. Essentially, the Common Pleas Court rejected out-of-hand, the motive and opportunity evidence that *Kyles* held is squarely within *Brady*'s wheelhouse. As discussed above, the *Kyles* Court found *Brady* to be implicated by evidence that 1) a potential suspect had committed a crime at the same location as charged against the defendant (as Lupton did in this case);  2) a witness was incentivized to implicate someone other than the real perpetrator (as were the witnesses who were terrorized by Lupton and his associates in this case); 3) a potential suspect had picked for his victim a member of a similar

demographic as the victim in the defendant's trial (as Lupton had done a year earlier). 514 U.S. at 442 n. 13; 447. Brushing aside the significance of this type of evidence, the Common Pleas Court held that "[t]he fact that the witnesses in his case had identified another individual they knew as 'Rick' during an unrelated criminal prosecution more than a year before petitioner committed his crime is of no import. *Gwynn,* 2012 Phila. Ct. Com. Pl. at \*10.

The Common Pleas analysis of this claim was myopic. That the witnesses all knew the perpetrator as "Rick" and that Lupton was the only person the squatters knew as Rick, was hardly the entirety of the *Brady* material. Rather it was one confirmatory piece. Lupton had committed the prior murder at the identical location. Lupton had the motive to intimidate the witnesses. Lupton clearly had intimidated the witnesses. Arson fires had broken out during this period of intimidation, both at the exact location of Lupton's earlier murder and the residence of one of the eyewitnesses to that murder. Thus, those witnesses had a motive – their safety, if not their lives – to not implicate Lupton or his associates.

## X.  PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING ON HIS CLAIM THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO CHALLENGE THE RELIABILITY OF PETITIONER'S STATEMENT TO POLICE.

Recent studies have identified false confessions as the leading or primary cause of wrongful convictions; more than a quarter – 27% -- of people in the National Registry of Exonerations who were convicted of homicide gave false confessions.[9] In this case, police investigators wrested an incriminating statement from Petitioner more than 17 hours after his arrest. Trial counsel challenged the voluntariness of Petitioner's confession, but failed to present available evidence

---

[9] *See* Steven A. Drizin & Richard A. Leo, "The Problem of False Confessions in the Post-DNA World," 82 N.C. L. Rev. 891, 904 (2004); Erin Blakemore, "Examining why false confessions occur in the U.S. criminal justice system," WASHINGTON POST, June 23, 2019, available at https://www.washingtonpost.com/health/examining-why-false-confessions-occur-in-the-us-criminal-justice-system/2019/06/20/10128bb4-9207-11e9-aadb-74e6b2b46f6a_story.html.

supporting the motion. Trial counsel also failed to challenge the voluntariness and reliability of Petitioner's statement before the jury. Petitioner seeks an evidentiary hearing on trial counsel's ineffectiveness in failing to investigate and present evidence that would have challenged the Commonwealth's contention that Petitioner's confession was both voluntary and reliable.

### Petitioner's Arrest and Interrogation

The record shows Petitioner was arrested at 1:30 a.m. on November 30, 1994. He was frisked and transported to the 16th police district, then to the Pretrial Services building, and finally to the Police Administration building. Petitioner arrived at this final destination shortly after 4:00 a.m., where he was fingerprinted. MTS 68-71, 74, 86. During this time, Petitioner was in continuous custody, handcuffed, and had no access to an attorney. MTS 71. From the time of his arrest until the police ceased interrogating him, Petitioner was able to sleep only 15 minutes. MTS 82-83.

Homicide detectives began to question Petitioner at 3:30 p.m. on December 1, 1994, approximately 14 hours after his arrest. MTS 44. Petitioner was questioned for approximately three hours and his statement was completed at 6:40 p.m., over 17 hours after his arrest. MTS 53, 66.

Trial counsel moved to suppress Petitioner's statement on the ground it was involuntary. MTS 42-43. In support of the motion, counsel relied entirely on the testimony of Petitioner, focusing primarily on his drug use. Petitioner testified that he told police he had smoked five nickel bags of crack about an hour before he was arrested. Then, when he was detained by the police, he managed to smoke three more nickel bags of crack cocaine while seated in the squad car. MTS 77-78, 83-84. Trial counsel also elicited testimony that, at the time of his interrogation,

Petitioner was tired, confused, and under the influence of crack cocaine. MTS 79, 82. He was feeling frightened and paranoid, and he felt threatened by the police. MTS 80-81.

At the conclusion of the suppression hearing evidence, trial court observed, "The only issue is, I guess, whether or not the defendant was so high at the time." MTS 99. Defense counsel could only respond that it was up to the trial judge "whether you believe [] the testimony offered by the defendant as to when he had consumed the drugs and the effect that they had on him was such as to negate the voluntariness of the statement." *Id*. The trial court denied the motion. MTS 101. Trial counsel thereafter abandoned any effort to challenge the reliability or voluntariness of Petitioner's statement.

## Argument

It is well established that a criminal defendant may offer evidence to the jury on whether an admissible confession is "unworthy of belief." *Crane v. Kentucky*, 476 U.S. 683 (1986). As the Court explained in *Crane*:

> But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be "insufficiently corroborated or otherwise . . . unworthy of belief." Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt? Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.

476 U.S. at 689 (internal citation omitted).

There is no question that Petitioner's statement was damaging evidence for the defense, and trial counsel's failure to present readily available evidence and argument to the jury regarding

the unreliability of Petitioner's statement was unreasonable.  Reasonably competent counsel would have conducted a proper investigation and consulted with appropriate experts, and thereafter presented evidence strongly suggesting that Petitioner's statement was unworthy of belief.

Richard A. Leo, Ph.D, is a highly regarded national expert in police interrogation and false confessions.  Dr. Leo has examined Petitioner's statement to interrogators and concluded that it "does not contain indicia of reliability," nor does it "reliably establish[] or corroborate[] his guilt." Leo Report at 4-5.[10]

Dr. Leo's conclusions are based on the multiple indicators of untrustworthiness in Petitioner's statement.  These include the following:

- The statement contains no unique, non-public details of the crime that were not already know to police interrogators;

- When it comes to details in the statement about the fire, there is not a single fact about the fire that the interrogating officer did not already know;

- On topics the interrogating officers already knew details, the statement is very specific, and on issues the police lacked information, the statement is vague;

- The statement contains factual errors that reveal a lack of knowledge about basic crime scene facts and includes a description of events that is physically impossible;

- The statement includes purported facts that contradict or are not supported by existing physical evidence and witness testimony;

- The statement is internally inconsistent; and

- There is no record of any post-statement investigation wherein the police attempted to confirm any of the statement's details.

Leo Report at 11-15.

Among the factual errors identified by Dr. Leo is that Petitioner's statement says he left the burning building by running down the steps and out the front door.  This is impossible because

---

[10]  Dr. Leo's report was submitted as Exhibit A to Petitioner's 3rd Amendment to his Petition for Writ of Habeas Corpus.  (Dkt No. 44)

the front door was boarded shut.  *See* Leo Report at 13; 10-31-1995 Tp. 116 (testimony of John Antrom, describing entering the building by climbing through a window, jumping into the cellar, and coming upstairs from the cellar).  The statement also claims that Petitioner watched gasoline spread down the hallway and steps from the third to the second floor.  However, the building had no power or electricity and the fire occurred before the sun came up.  Consequently, it would have been impossible for Petitioner to have seen – in the pitch dark – gas spreading down a hallway or steps.  *See* 10-31-1995 Tp. 116 (Antrom testimony affirming there was no electricity in the building at the time of the fire), Leo Report at 13.

Other inconsistencies include Petitioner's statement that he went to the apartment building Sunday morning and tried to speak to the people who were squatting in the third floor apartment, but they closed the door in his face.  Rosalie Jones, Donald Minnick, and John Antrom, all denied seeing the perpetrator the morning of the fire.  11-1-1995 Tp. 21-22, 26; Leo Report at 13.

Finally, Petitioner's statement set out three different accounts of how the fire started: the first and third – that the fire was set on the third floor – were inconsistent with the second – which the fire started on the first floor.[11]  Moving from an account at odds with the physical evidence, to one the interrogating officers knew to be physically plausible, is "another classic indicator of a false or unreliable confession."  Leo Report at 14.

Significantly, Petitioner's history of drug use made him particularly susceptible to giving a false confession.  Petitioner was forthright about his history of cocaine addiction, and consequently, trial counsel knew Petitioner got high "a lot," smoked crack and marijuana "a lot," and that he got high "every day."  11-1-1995 Tp. 20.  Counsel also knew Petitioner spent "most"

---

[11] The second account is also inconsistent with the physical evidence.  *See* 11-1-1995 Tpp. 62, 69-70, 72 (testimony of fire department officer describing fire's origin on the third floor).

of his time on the streets trying "to make money to get high." 11-1-1995 Tpp. 22-23. Despite these red flags pointing to the need for further investigation, trial counsel did not engage an expert psychologist to examine Petitioner. Had he done so, counsel would have found additional evidence supporting a challenge to the reliability of Petitioner's statement to the police. Most importantly, counsel would have learned that the issue involved more than simply whether – as the trial court stated – Petitioner "so high at the time" the statement was taken. As discussed below, that single criterion does not include the impact of Petitioner's withdrawal and his having been severely addicted to drugs for a period of years predating his interaction with detectives.

Jay M. Jackman, M.D. is a forensic psychiatrist. Dr. Jackman conducted an examination of Petitioner and reviewed materials pertaining to his background. Dr. Jackman found that Petitioner had a long history of drug abuse dating back to when he was in the sixth grade. Jackman Affidavit at ¶ 9.[12] As a junior high school student, Petitioner became so intoxicated on a mixture of wine and beer that he occasionally passed out. *Id.* By the age of 16, he was using crack cocaine on a daily basis, and he continued to consume alcohol, primarily rum and corn liquor. *Id.* at ¶ 10. As a young man, Petitioner's crack cocaine use took over his life and his existence revolved around getting high. *Id.* at ¶ 11-12. Petitioner's addiction was severe and long-lasting, spanning many years, and meeting the diagnostic criteria for Cocaine Dependence. *Id.* at ¶ 3. As a result of his chronic abuse of crack cocaine, Petitioner suffered from impaired perception and judgement, emotional lability, rambling speech, paranoid ideation, and a host of other deficits. *Id.* at ¶ 13.

Dr. Leo considered Dr. Jackman's findings and affirmed that, during his interrogation, Petitioner "was in a state that left him overly prone to compliance and confabulation" and that he

---

[12] Dr. Jackman's affidavit dated May 31, 2001, was submitted as Exhibit J to the Petition for Writ of Habeas Corpus. (Dkt. No. 5)

"was especially vulnerable to pressures and physical and psychological states that are known to elevate the risk for making or agreeing to a false or unreliable confession." Leo Report at 15.

Petitioner has presented sufficient facts concerning the unreliability of his statement which, if true, entitle him to relief. Accordingly, he is entitled to an evidentiary hearing.

**XI.    PETITIONER IS ENTITLED TO VACATUR OF HIS CONVICTION BECAUSE HIS TRIAL ATTORNEY PROVIDED INEFFECTIVE ASSISTANCE COUNSEL BY FAILING TO OBJECT TO THE PROSECUTION'S DISCRIMINATORY USE OF PEREMPTORY CHALLENGES TO EXCLUDE BLACK CITIZENS FROM THE JURY.**

### Background Facts

Petitioner is a Black man who was convicted by a District Attorney's Office that schooled its prosecutors in evading constitutional principles of equal justice under the law. In a now infamous training seminar filmed in 1986, Philadelphia assistant district attorney Jack McMahon instructed his colleagues to exclude the following citizens from juries:

- Young Black women –they are "very bad" and "downtrodden" and "difficult"

- Older Black women – especially "when you have like a black defendant who's a young boy and they can identify as his, you know-motherly type thing"

- Black people who come from poor neighborhoods – "blacks from the low-income areas are less likely to convict" because "there's a resentment for law enforcement, there's a resentment for authority"

- Educated Blacks[13]

McMahon encouraged his colleagues not only to discriminate, but also advised them on how to get away with discriminating. After noting the recent decision by the U.S. Supreme Court

---

[13] In *Wilson v. Beard*, 426 F.3d 653 (3rd Cir. 2005), the Third Circuit found "compelling evidence" that the prosecutor, an assistant in the Philadelphia District Attorney's Office, had "regularly acted with discriminatory animus toward African-American jurors" and affirmed the district court's grant of habeas relief. The Court recounted the McMahon videotape in significant detail, and the characterizations set out here appear at 426 F.3d at 656-58.

in *Batson v. Kentucky*, 476 U.S. 79 (1986), McMahon instructed his audience to make sure they had pretextual reasons for exclusion they could cite at a later time:

> But in the future, we're going to have to be aware of this case, and the best way to avoid any problems with it is to protect yourself. And my advice would be in that situation is when you do have a black jur[or], you question them at length. And on this little sheet that you have, mark something down that you can articulate [at a] later time if something happens.

426 F.3d at 658.

McMahon went on to explain that the best way to camouflage pretext was to ask Black potential jurors more questions, since this "gives you more ammunition to make an articulable reason as to why you are striking them, not for race. So that's how to pick a jury." *Id.*

Evidence that prosecutors were trained in methods to exclude minority citizens from jury service is unquestionably relevant to the *Batson* inquiry. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 264 (2005). In *Miller-El II*, the training materials at issue were prepared nearly two decades before the defendant's trial. *Id.* Nonetheless, the Supreme Court found these materials were "available" to at least one of the trial prosecutors and probative of whether prosecutors "took their cues" from these reprehensible materials. *Id.* at 266. Here, there is little question of McMahon's influence. McMahon was a six-year veteran in the homicide unit in 1988, when Paul Riley, the assistant district attorney who tried this case, joined the Philadelphia District Attorney's Office, and the two worked together in the homicide unit for two years.[14] Riley started working in the office just two years after *Batson* was decided and only a year after McMahon gave his notorious presentation.

---

[14] See https://www.brookmanrosenberg.com/attorneys/riley/ (Riley started at the District Attorney's Office in 1988); http://www.jackmcmahonlaw.net/about-us.html (McMahon worked in the District Attorney's Office from 1978-1990). In 2016, a federal district court found the training practices at the Philadelphia District Attorney's Office, including McMahon's training video and lectures given by the director of training, Bruce Sagel, raised an issue of fact "as to whether the DAO had a custom of racial discrimination in jury selection." *See Wilson v. City of Philadelphia*, No. 2:05-CV-05396-GJP, Memorandum of Pappert, J., Dkt. No. 245, April 8, 2016, at 33.

At Petitioner's trial, African Americans made up only a quarter of the qualified venire, but accounted for more than half of the prosecution's strikes. Significantly, the prosecution rejected only 5/20 or 25% of non-Black potential jurors but struck 5/8 or 62.5% of Black potential jurors.[15] This means the prosecution excluded Black citizens at two and a half times the rate it struck other citizens. Put another way, the prosecution accepted 75% of non-Black prospective jurors, exactly double the Commonwealth's acceptance race for Black potential jurors, 37.5%.

In addition, the prosecution clearly engaged in disparate treatment. The prosecution began its examination of Black potential juror Brenda Pone by asking about her work in the mental health field. 10-27-95 JST 59. Pone was also asked whether she or anyone close to her had been the victim of a crime and she replied that her cousin's house was broken into. Asked if she harbored any resentment about the fact that no one had been arrested, Pone said no. 10-27-95 JST 60. The son of one of Pone's neighbors was arrested for some sort of drug or alcohol offense; Pone did not know the details of the charge and she did not attend the trial. She was also close to a bank security guard. 10-27-95 JST 61. Pone stated she could follow the law with regard to the death penalty. 10-27-95 JST 61-62. At this point, the prosecutor returned to Pone's job as a mental health worker and asked if any of her clients or their parents were involved in drugs. Pone said the parents were. Defense counsel asked no questions and the prosecutor then struck Pone. 10-27-95 JST 63.

Meanwhile, the prosecution accepted Leslie McCullough, a white potential juror. McCullough's oldest son was charged with assault and battery and she attended the trial. The prosecutor immediately noticed it was difficult for McCullough to talk about this incident and he apologized for asking about it. Asked if the experience of seeing her son prosecuted would cause

---

[15] The prosecution struck the following African American potential jurors: James Payne, Emmanuel Adens, Brenda Pone, Cheryl Seaborough, and Beatrice Cooper.

her not to be fair, McCullough said no. 10-27-95 JST 96-97. McCullough's answers on the death penalty were similar to Pone's. 10-27-95 JST 98. The prosecutor asked McCullough no questions about her work or her experience with people who used drugs.

The prosecution also accepted white potential juror Agnes McDowell. McDowell had been the victim of a mugging about 15 years before. No one was arrested. The prosecutor asked, "That wouldn't affect you at all in deciding the case, would it?" McDowell said it would not. 10-27-95 JST 144-45.

McDowell's 20-year-old son had been arrested for robbery as a juvenile. He went to trial and McDowell both attended the trial and testified as a character witness. Asked if she might harbor any resentment about her son's prosecution and conviction, McDowell said no. 10-27-95 JST 145-46, 148, 152. McDowell's answers on the death penalty were similar to Pone's, 10-27-95 JST 147, and the prosecution asked McDowell no questions about her work or her contact with people who used drugs.

Faced with these numbers, evidence of differential questioning and disparate treatment of Black and white citizens, while representing a Black man on trial for his life, defense counsel sat mute. He made no objection to the Commonwealth's clear pattern of strikes, even after the trial judge put on the record that the prosecution had used its strikes to exclude only 1/9 whites while striking 2/3 Blacks and, of the jurors chosen at that point, 5/6 or more than 80% were white, this in a city that was approximately 40% African American.[16] 10-26-95 JST 176-77.

---

[16] For a racial breakdown of the population of Philadelphia between 1990 and 2010, see https://www.pewtrusts.org/~/media/legacy/uploadedfiles/wwwpewtrustsorg/reports/philadelphia_research_initiative/philadelphiapopulationethnicchangespdf.pdf.

Petitioner sought relief under the Post-Conviction Relief Act and alleged that, under the circumstances, counsel's failure to raise the issue of discrimination and object under *Batson* was unreasonable and constituted deficient and prejudicial performance.

In response, the Commonwealth argued that Petitioner had failed to establish a prima facie violation of *Batson* because he did not identify "the race of the entire venire, the race of the jurors selected, the race of those struck by the Commonwealth, as well as the race of those struck by the defense." Based on this argument, the Pennsylvania Supreme Court summarily denied relief on the merits. *Commonwealth v. Gwynn*, 943 A.2d 940, 949-50 (Pa. 2008).

In federal court, Petitioner reviewed copies of the prosecution's jury selection notes. Any doubt about the strength of Petitioner's *Batson* claim were erased by these notes. Had counsel lodged a *Batson* objection at trial, there is little question he would prevail on this claim now. Notes from the prosecution file reveal precisely the kinds of biases exhorted in the McMahon tape. For example, the prosecutor noted with regard to African American potential juror Emmanuel Adens, "hates cops." Similarly, the prosecution observed of Black potential juror Beatrice Cooper, "hates cops – you can tell."

These conclusory comments are consistent with McMahon's assertion that, when it comes to Black potential jurors, "there's a resentment for law enforcement, there's a resentment for authority."[17]

The voir dire of Black potential juror Brenda Pone must also be viewed through the lens of the prosecutor's notes. On Pone's questionnaire, the words "Parent w/drugs" is circled.



This is an apparent reference to the answer Pone gave to the prosecutor's last question, and demonstrates the prosecutor took McMahon's advice to heart: "question them at length . . . mark something down . . . to make an articulable reason as to why you are striking them, not for race." Notably, it was not Pone's parent who abused drugs – arguably a reason to exclude her from jury service. Rather, it was her mental health clients' parents. This was hardly surprising, and hardly a reason to warrant a peremptory strike.

Finally, there is the mystery of the yellow sticky notes on certain juror questionnaires. Only three potential jurors received these: Brenda Pone, Cheryl Seaborough, and James Payne.

---

[17] The effect of using peremptory strikes to exclude citizens who hold negative views of law enforcement is hardly race neutral. Overall, Black and white Americans differ in their views of the criminal punishment system and African Americans are more likely to view the system as racially discriminatory and unjust. These attitudes are rooted in our country's long history of racial oppression and the differential treatment faced by African Americans, including by members of law enforcement. *See, e.g.*, Nazgol Chandnoosh, Sentencing Project, *Race and Punishment: Racial Perceptions of Crime and Support for Punitive Policies* 3 (2014), https://www.sentencingproject.org/wp-content/uploads/2015/11/Race-and-Punishment.pdf; John Gramlich, *From Police to Parole, Black and White Americans Differ Widely in Their Views of Criminal Justice System*, Pew Res. Ctr. (May 21, 2019), https://www.pewresearch.org/fact-tank/2019/05/21/from-police-to-parole-black-and-white-americans-differ-widely-in-their-views-of-criminal-justice-system/.







All three of these potential jurors were Black and all three were stuck by the State.

## Argument

Petitioner's trial attorney rendered ineffective assistance of counsel by failing to object to the prosecution's use of peremptory challenges against Black citizens. In order to prevail on this claim, Petitioner must show his trial counsel's performance was deficient and that counsel's errors and omissions prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient counsel's representation falls "below an objective standard of reasonableness . . . under prevailing professional norms." *Id*. Prejudice is shown when "but for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

**Deficient Performance**

This case involved a Black defendant and the prosecutor clearly used a disproportionate number of strikes to exclude Black people. *Batson* had been decided nine years before Petitioner's trial and a competent attorney, particularly a lawyer engaged in capital defense, would surely be familiar with that case. *See Wilson*, 426 F.3d at 658 (Jack McMahon describing *Batson* as "the new case . . . I'm sure you've all become aware of."). Moreover, other attorneys in Pennsylvania were routinely raising *Batson* objections. *See, e.g.*, *Commonwealth v. Spence*, 627 A.2d 1176 (Pa. 1993) (Philadelphia death penalty case); *Commonwealth v. Jackson*, 562 A.2d 338 (Pa. 1989) (Philadelphia robbery case). Indeed, just two years before Petitioner's trial, the Third Circuit had granted *Batson* relief in a Philadelphia robbery and conspiracy case that was tried in 1989. *Jones v. Ryan*, 987 F.2d 960 (3ʳᵈ Cir. 1993). Likewise, the Supreme Court of Pennsylvania had also granted relief on *Batson* grounds just a few years before Petitioner's trial. *See Commonwealth v. Dinwiddie*, 601 A.2d 1216 (Pa. 1992) (Philadelphia robbery and conspiracy case).[18] Thus, under prevailing professional norms, trial counsel's failure to lodge a *Batson* objection in this case was patently unreasonable.

**Prejudice**

Moreover, trial counsel's omission prejudiced Petitioner. *Batson* challenges require a three-step inquiry: (1) the defendant must establish a *prima facie* case of discrimination; (2) the

---

[18] *See also Brinson v. Vaughn*, 398 F.3d 225 (3ʳᵈ Cir. 2005) (finding *Batson* violation in 1986 Philadelphia murder trial); *Holloway v. Horn*, 355 F.3d 707 (3ʳᵈ Cir. 2004) (granting *Batson* relief in a capital murder case tried in Philadelphia in 1985). Defense counsel raised a *Batson* objection in *Brinson*, 398 F.3d at 234, and, even in *Holloway*, a pre-*Batson* case, trial counsel objected to the prosecution's use of peremptory strikes saying, "I think the District Attorney has now developed a pattern of striking only black prospective jurors." 355 F.3d at 721.

prosecutor must provide a race-neutral explanation for the strike; and (3) the court must determine in light of all relevant circumstances whether there was purposeful discrimination. *Batson*, 476 U.S. at 98. The defendant need not prove race was the sole factor behind the challenged strike. Rather, the question is whether the prosecutor was "motivated in substantial part by discriminatory intent." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Id.* at 478.

"[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162,170 (2005); *see Batson*, 476 U.S. at 93–94 (stating that a defendant makes a prima facie case of discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose" (citation omitted)).

A criminal defendant may rely on "a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019). This evidence includes, but is not limited to:

- statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;

- evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;

- side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

- relevant history of the State's peremptory strikes in past cases; or

- other relevant circumstances that bear upon the issue of racial discrimination.

*Id*. (citations omitted).

The Supreme Court has identified an additional category of evidence pertinent here. Evidence showing that prosecutors were trained on "the reasoning for excluding minorities from

jury service" is unquestionably relevant to the *Batson* analysis. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 264 (2005), *see also id.* at 266 ("If anything more is needed for an undeniable explanation of what was going on, history supplies it. The prosecutors took their cues from a 20-year-old manual of tips on jury selection.").

The record here amply establishes a prima facie case of intentional discrimination against Black citizens called for jury duty. The statistical evidence of discrimination is irrefutable: the prosecution excluded Black citizens at more than double the rate at which it excluded whites.

There is evidence of disparate treatment and disparate questioning meant to provide, in Jack McMahon's words, "more ammunition" for the State's strike of Black potential juror Brenda Pone. As the Supreme Court recently explained in *Flowers*:

> In other words, by asking a lot of questions of the black prospective jurors or conducting additional inquiry into their backgrounds, a prosecutor can try to find some pretextual reason – any reason – that the prosecutor can later articulate to justify what is in reality a racially motivated strike. And by not doing the same for white prospective jurors, by not asking white prospective jurors those same questions, the prosecutor can try to distort the record so as to thereby avoid being accused of treating black and white jurors differently. Disparity in questioning and investigation can produce a record that says little about white prospective jurors and is therefore resistant to characteristic-by-characteristic comparisons of struck black prospective jurors and seated white jurors. Prosecutors can decline to seek what they do not want to find about white prospective jurors.

139 S.Ct. at 2248. As set out above, Black prospective juror Pone was treated quite differently by the prosecution compared to white prospective jurors McCullough and McDowell. The two white women both had sons who were involved in significant criminal activity – robbery and assault. Pone's connection to the criminal punishment system – the arrest of her neighbor's son on a drug or alcohol charge of unknown severity – was much more tenuous. All three women stated clearly that their experience with police and prosecutors would not affect their ability to be fair and all affirmed their ability to follow the law on capital punishment. Tellingly, only Pone was asked

about drugs. The prosecutor did not ask the white mothers whether drugs had anything to do with their son's crimes. By asking Pone questions not put to other jurors – a tactic straight from McMahon's playbook – the prosecutor finally hit on what he apparently considered a sufficient explanation for striking her, namely the fact that the parents of some of the children she worked with used drugs.

Notes in the prosecutor's files included two entries accusing Black prospective jurors of hating police. These notes reflect stereotypes about African Americans as anti-authority. Moreover, the voir dire transcript does not support these race-based biases.

Prospective juror Adens answered yes to a question about having someone close to him who had been a victim of a crime. The prosecutor asked about this and Adens explained he had a friend who worked for UPS and Adens felt this man had been victimized by being wrongly arrested and charged with signing for a package under someone else's name. Adens did not attend any hearing or the trial in the case. Significantly, the prosecutor never asked Adens whether that experience would have any bearing on his ability to be fair in this case. In fact, the prosecutor abruptly concluded his questioning, and asked Adens nothing about his death penalty views or any other topic. Adens' entire voir dire amounts to approximately two full pages of transcript. 10-26-95 JST 165-67. Had the prosecutor genuinely believed Adens hated police, one might expect a cause challenge. There was none, presumably because Adens actual answers to not establish animosity towards the police disqualifying him from jury service.

As for prospective juror Beatrice Cooper, she had witnessed her son being beaten by the police. Following her son's beating, and prior to the trial in this case, Cooper had been summoned for jury duty in a police brutality case and she had not felt she could be fair in that case. In her juror questionnaire in this case, she alerted the parties to this issue. 10-30-95 JST 17-18.

The trial judge asked Cooper if she would have difficulty being a fair juror generally. Cooper responded, "Only in that type of case." The trial court explained to Cooper there would be police officers testifying as witnesses and then asked, "Would you tend to be more likely not to believe them or could you treat them fairly?" Cooper answered, "I could treat people fairly." 10-30-95 JST 18.

At this point, the trial judge said,

This is not – I don't know what you mean by a police brutality case. All cases involve police, they arrest somebody and sometimes somebody says that the police didn't act properly. I don't know what the trial is going to be about. Police officers testify as witnesses.

10-30-95 JST 18-19. The court then asked, "Do you think because of your experience you couldn't be fair, or do you think you could put that aside and treat a police officer the same way as anyone else?" Cooper responded, "Yes, I could." Cooper also stated, "See, it was just a situation at that time." 10-30-95 JST 19. The trial judge said he was "only interested now whether you could be fair in this case," and he assured Cooper that if she "cannot be fair, that's okay." Cooper again assured the court, "No, I could be fair." *Id*.

The prosecutor asked Cooper just two questions before exercising a peremptory strike. He asked when the incident with her son occurred. After Cooper said it was in 1989, the prosecutor then commented, "I take it made quite an impact on you because you thought to put it down this morning." Cooper answered, "Yes. Because the trial that I was at that particular time being called for involved police officers beating someone beyond recognition." 10-30-95 JST 19-20. The prosecutor suspended his voir dire of Cooper at that point. As with Adens, the prosecution lodged no cause challenge.

In sum, neither of these jurors conveyed hatred of police officers. Cooper consistently stated she could serve impartially and fairly consider the testimony of police officers. Adens was

not even given the chance to say whether he could fairly consider testimony from police. Viewing the totality of the circumstances, particularly the speed with which the prosecutor dismissed these citizens from jury service, the prosecutor's notes reflect race-based stereotyping.

And, finally, there is the sordid history of the Philadelphia District Attorney's Office's record of using peremptory challenges to keep Black people off juries and the perhaps even more insidious history of efforts to evade judicial review of *Batson* objections.

## State Court Adjudication

The state court's rejection of Petitioner's claim was unreasonable and contrary to binding Supreme Court precedent.[19] First, the state court relied upon its earlier decision in *Commonwealth v. Holloway,* 739 A.2d 1039, 1045-46 (Pa. 1999), to require that for any *Batson* challenge, the petitioner must set "forth the race of the entire venire, the race of the jurors selected, the race of those struck by the Commonwealth, as well as the race of those struck by the defense." *Commonwealth v. Gwynn,* 943 A.2d 940, 950 (Pa. 2008). However, when the Third Circuit later addressed those factors during Holloway's habeas proceedings, *Holloway v. Horn,* 355 F.3d 707, 729-30 (3d Cir. 2004), and thereafter, in *Coombs v. DiGuglielmo,* 616 F.3d 25, 261 n.4 (3d Cir. 2010), the Court held that requiring these additional factors for a "*Batson prima facie* case is both contrary to and an unreasonable application of *Batson.*"

In addition to the state court's improper application of what it deemed to be mandatory prerequisites, the state court also failed to consider the strong statistical pattern of excluding Black people from the jury. The transcript of the second day of jury selection plainly showed the prosecution had used its strikes to exclude two-thirds of the qualified African Americans while

---

[19] *Miller-El I* and *II*, *Foster*, and *Flowers* were all decided after Petitioner's conviction became final. However, these cases broke no new ground nor established any new constitutional rule. Notably, *Miller-El* came to the Supreme Court on habeas review and *Foster* was also a post-conviction case. These cases simply applied *Batson* to the facts presented, as must this Court.

striking only about 10% of whites. 10-26-95 JST 176-77. Finally, the state court completely ignored evidence that the prosecutor's office trained its staff in how to violate the constitution and get away with it. The state court's failure to consider this evidence was clearly contrary to established law. *See Miller-El II*, 545 U.S. at 240 (discussing the "remarkable" numbers describing the prosecutor's use of peremptories); *id*. at 264-66 (describing prosecution training manual that gave instructions on "excluding minorities from jury service").

Rather than consider evidence that was clearly pertinent under *Batson*, the state court focused its attention on irrelevant considerations, including the race of the jurors selected and the race of those struck by the defense, an approach condemned in *Coombs* and *Holloway. Batson* "did not accept the argument that race-based peremptories are permissible because both the prosecution and defense could employ them in any individual case and in essence balance things out." *Flowers*, 139 S.Ct. at 2242. The Court explained:

> Under the Equal Protection Clause, the Court stressed, even a single instance of race discrimination against a prospective juror is impermissible. Moreover, in criminal cases involving black defendants, the both-sides-can-do-it argument overlooks the percentage of the United States population that is black (about 12 percent) and the cold reality of jury selection in most jurisdictions. Because blacks are a minority in most jurisdictions, prosecutors often have more peremptory strikes than there are black prospective jurors on a particular panel. In the pre-*Batson* era, therefore, allowing each side in a case involving a black defendant to strike prospective jurors on the basis of race meant that a prosecutor could eliminate all of the black jurors, but a black defendant could not eliminate all of the white jurors. So in the real world of criminal trials against black defendants, both history and math tell us that a system of race-based peremptories does not treat black defendants and black prospective jurors equally with prosecutors and white prospective jurors.

*Id*.[20]

---

[20] The Pennsylvania Superior Court has explained another reason why looking at the final composition of the jury can undermine the principles underlying *Batson*. *See Commonwealth v. Jackson*, 562 A.2d 338, 346 (Pa. Super. 1989) ("There are several reasons why a prosecutor may permit one or two blacks to sit on a jury, but may use her peremptory challenges to discriminate against the remaining blacks in the venire pool. First, the prosecutor may try to deflect criticism of a discriminatory jury selection strategy by allowing token minority representation on the jury."). Indeed,

Had defense counsel objected, and the trial or appellate court considered all relevant circumstances as required by *Batson*, there can be little question that this record establishes a *prima facie* case. Moreover, there is a reasonable likelihood that Petitioner would have prevailed at the second and third steps of the *Batson* analysis, and his conviction would have been reversed. A *Batson* violation affects the entire framework of the trial, is structural error, and requires automatic reversal. *See Batson*, 476 U.S. at 100 ("if the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed"); *Whitus v. Georgia*, 385 U.S. 545, 549-50 (1967) ("a conviction cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race"); *Hernandez v. Texas*, 347 U.S. 475, 482 (1954) (where "[t]he result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner," the "judgment of conviction must be reversed"); *Smith v. Texas*, 311 U.S. 128, 132 (1940) ("If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand.").

At a minimum, this Court should order an evidentiary hearing on defense counsel's failure to object under *Batson* and on the Commonwealth's reasons for striking a disproportionate number of Black potential jurors.

Respectfully submitted, this the 3rd of January 2022.

/s/Gretchen M. Engel
Gretchen M. Engel
NC State Bar # 19558
Center for Death Penalty Litigation
123 W. Main Street, Suite 700

---

Jack McMahon's advice was not to seat an all-white jury, but to permit some Black representation. *See Wilson*, 426 F.3d at 657 ("I've always felt that a jury of like eight whites and four blacks is a great jury, or nine and three . . . ."). Petitioner's jury included nine whites, two Blacks, and one person of unknown race.

Durham, NC  27701
(919) 956-9545
Gretchen@cdpl.org


/s/Karl Schwartz_____
Wiseman & Schwartz, LLP
PA Commonwealth Bar # 38994
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
(215) 360-3988
Schwartz@wisemanschwartz.com


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the forgoing PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HABEAS RELIEF to be filed via the Court's CM/ECF system, which will send notice of such filing to David J. Napiorski at David.Napiorski@Phila.gov.

This the 3rd day of January 2022.


/s/Gretchen M. Engel_____
Gretchen M. Engel

## EXHIBITS TO MEMORANDUM

1. Statement of Donald Minnick at 10:45 a.m. on 11/20/94

2. Statement of John Antrom at 9:40 a.m. on 11/20/94

3. Statement of Raiceon Hawkins at 6:30 p.m. on 11/20/94